Charles M. Lizza
William C. Baton
Sarah A. Sullivan
SAUL EWING LLP
One Riverfront Plaza, Suite 1520
Newark, NJ 07102-5426
(973) 286-6700
clizza@saul.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim Pharmaceuticals, Inc.*
*and Boehringer Ingelheim International GmbH*

*Of Counsel*:

Christopher N. Sipes
R. Jason Fowler
Justin W. Burnam
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC  20001-4956
(202) 662-6000

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. and BOEHRINGER INGELHEIM INTERNATIONAL GMBH,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**ANOBRI PHARMACEUTICALS US, LLC, NANCHANG ANOVENT PHARMACEUTICAL CO., LTD., and SHANGHAI ANOVENT PHARMACEUTICAL CO., LTD.,**<br><br>**Defendants.** | **Civil Action No. _____**<br><br>**(Filed Electronically)** |

## COMPLAINT FOR PATENT INFRINGEMENT

Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International

GmbH (collectively, "Plaintiffs"), by their undersigned attorneys, bring this action against

Anobri Pharmaceuticals US, LLC (formerly known as Anovent Pharmaceutical (U.S.), LLC),

NanChang Anovent Pharmaceutical Co., Ltd., and Shanghai Anovent Pharmaceutical Co., Ltd.

(collectively, "Defendants"), and hereby allege as follows:

**NATURE OF THE ACTION**

1.    This action for patent infringement, brought pursuant to the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, and in particular under 35 U.S.C §§ 271 (a–c and e), arises from Defendants' submission of Abbreviated New Drug Application (ANDA) No. 216581 to the United States Food and Drug Administration (FDA). Through this ANDA, Defendants seek approval to market a generic version of the pharmaceutical product SPIRIVA® Respimat® prior to the expiration of United States Patent Nos. 7,284,474 ("the '474 patent"), 7,896,264 ("the '264 patent"), 7,396,341 ("the '6,341 patent"), 9,027,967 ("the '967 patent"), 7,837,235 ("the '235 patent"), and 8,733,341 ("the '3,341 patent") (collectively, "the patents-in-suit"). Plaintiffs seek injunctive relief against infringement, attorneys' fees, and any other relief the Court deems just and proper.

2.    This is also an action under 28 U.S.C. §§ 2201–02 for a declaratory judgment of patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, and in particular under 35 U.S.C. § 271.

**THE PARTIES**

3.    Boehringer Ingelheim Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877.

4.    Boehringer Ingelheim International GmbH is a private limited liability company organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

5.    On information and belief, Shanghai Anovent Pharmaceutical Co., Ltd. is a corporation organized and existing under the laws of China, having a place of business at

Room 1019, Yi Building, No. 555, Dongchuan Road, Minhang District, Shanghai, Shanghai 20000-0, China.

6.      On information and belief, NanChang Anovent Pharmaceutical Co., Ltd. is a corporation organized and existing under the laws of China, having a place of business at Building B1, Lianbo Science and Technology Park, No. 888, Jingka NanChang 330052.

7.      On information and belief, NanChang Anovent Pharmaceutical Co., Ltd. is a subsidiary of Shanghai Anovent Pharmaceutical Co., Ltd.

8.      On information and belief, Anobri Pharmaceuticals US, LLC is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at One Gateway Center, Suite 2600, Newark, New Jersey 07102. On information and belief, Anobri Pharmaceuticals US, LLC (formerly known as Anovent Pharmaceutical (U.S.), LLC) amended its certificate of formation on July 23, 2021, to identify this address as the location of its principal office, and Anobri Pharmaceuticals US, LLC has since used this address in patent assignments recorded at the U.S. Patent and Trademark Office (USPTO), including as recently as June 13, 2023. Anobri Pharmaceuticals US, LLC also represented to the USPTO that it was incorporated in New Jersey, at this address, during the time that Defendants were developing the ANDA Product.

9.      On information and belief, Anobri Pharmaceuticals US, LLC is a wholly owned subsidiary of NanChang Anovent Pharmaceutical Co., Ltd.

10.     On information and belief, Anobri Pharmaceuticals US, LLC amended its certificate of formation in Delaware on May 22, 2023, changing its name from Anovent Pharmaceutical (U.S.), LLC.

11. On information and belief, Anobri Pharmaceuticals US, LLC, in collaboration with NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd., prepared and submitted ANDA No. 216581 ("Defendants' ANDA"), and they continue to collaborate in seeking FDA approval of Defendants' ANDA.

12. On information and belief, Defendants intend to commercially manufacture, market, offer for sale, and sell the product described in Defendants' ANDA (the "ANDA Product") throughout the United States, including in the State of New Jersey, in the event FDA approves Defendants' ANDA.

**JURISDICTION AND VENUE**

13. This civil action for patent infringement arises under the patent laws of the United States, including 35 U.S.C. § 271, and alleges infringement of the patents-in-suit. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338, and 2201–02.

14. On information and belief, this Court has personal jurisdiction over Anobri Pharmaceuticals US, LLC because it is a limited liability company with a principal place of business in New Jersey and is the agent of NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd. On information and belief, Anobri Pharmaceuticals US, LLC is acting as the agent of NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd. with respect to Defendants' ANDA.

15. On information and belief, this Court has personal jurisdiction over NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd. because the requirements of Federal Rule of Civil Procedure 4(k)(2) are met: (a) Plaintiffs' claims arise under federal law; (b) NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd. are foreign defendants not subject to general personal jurisdiction in the

courts of any state; and (c) NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd. have sufficient contacts with the United States as a whole, including, but not limited to, preparing and submitting ANDAs to FDA and/or manufacturing, importing, offering to sell, and/or selling pharmaceutical products to be distributed throughout the United States, such that this Court's exercise of jurisdiction over NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd. satisfies due process.

16. On information and belief, this Court also has jurisdiction over Defendants because, *inter alia*, this action arises from actions of Defendants directed toward New Jersey and because Defendants have purposefully availed themselves of the rights and benefits of New Jersey law by engaging in systematic and continuous contacts with New Jersey. On information and belief, Anobri Pharmaceuticals US, LLC has a principal place of business at One Gateway Center, Suite 2600, Newark, New Jersey 07102. On information and belief, Anobri Pharmaceuticals US, LLC amended its certificate of formation on July 23, 2021, to identify this address as the location of its principal office, and Anobri Pharmaceuticals US, LLC has since used this address in patent assignments recorded at the USPTO, including as recently as June 13, 2023. Anobri Pharmaceuticals US, LLC also represented to the USPTO that it was incorporated in New Jersey, at this address, during the time that Defendants were developing the ANDA Product.

17. On information and belief, Defendants have committed, aided, abetted, contributed to, and/or participated in the commission of acts of patent infringement that will lead to foreseeable harm and injury to Plaintiffs, which manufacture SPIRIVA® Respimat® for sale and use throughout the United States, including this Judicial District. On information and belief, Anobri Pharmaceuticals US, LLC has submitted, caused to be submitted, or aided and abetted in the preparation or submission of Defendants' ANDA, including activities undertaken from One

Gateway Center, Suite 2600, Newark, New Jersey 07102. On information and belief, in the event that FDA approves Defendants' ANDA, Anobri Pharmaceuticals US, LLC, with the participation of NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd., intends to commercially manufacture, import, market, offer for sale, and sell the ANDA Product throughout the United States and in this Judicial District.

18. At least because, on information and belief, Anobri Pharmaceuticals US, LLC has a regular and established place of business in New Jersey, committed act(s) of infringement in New Jersey, and is acting as the agent of NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd., venue is proper in this Judicial District as to Anobri Pharmaceuticals US, LLC pursuant to 28 U.S.C. § 1400(b).

19. At least because, on information and belief, NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd. are foreign corporations, venue is proper in this Judicial District as to NanChang Anovent Pharmaceutical Co., Ltd. and Shanghai Anovent Pharmaceutical Co., Ltd. pursuant to 28 U.S.C. §§ 1391(c)(3) and 1400(b).

## PLAINTIFFS' APPROVED SPIRIVA® RESPIMAT® DRUG PRODUCT AND PATENTS-IN-SUIT

20. Plaintiffs make and sell SPIRIVA® Respimat®, a product that is used as an anticholinergic agent indicated for the long-term, once-daily, maintenance treatment of bronchospasm associated with chronic obstructive pulmonary disease (COPD), and for reducing COPD exacerbations. A true and correct copy of the prescribing label for SPIRIVA® Respimat® is attached hereto as Exhibit A.

21. Boehringer Ingelheim Pharmaceuticals, Inc. is the holder of New Drug Application (NDA) No. 021936 for SPIRIVA® Respimat® and a licensee of the patents-in-suit. FDA first approved NDA No. 021936 for SPIRIVA® Respimat® in September 2014.

22. Boehringer Ingelheim International GmbH owns the '474 patent, which is listed in the Approved Drug Products With Therapeutic Equivalence Evaluations (an FDA publication commonly known as the "Orange Book") for SPIRIVA® Respimat®.

23. The '474 patent is entitled "Piston-Pumping System having O-ring Seal Properties" and was duly and lawfully issued by the USPTO on October 23, 2007. The '474 patent is attached hereto as Exhibit B.

24. Boehringer Ingelheim International GmbH owns the '264 patent, which is listed in the Orange Book for SPIRIVA® Respimat®.

25. The '264 patent is entitled "Microstructured High Pressure Nozzle with Built-in Filter Function" and was duly and lawfully issued by the USPTO on March 1, 2011. The '264 patent is attached hereto as Exhibit C.

26. Boehringer Ingelheim International GmbH owns the '6,341 patent, which is listed in the Orange Book for SPIRIVA® Respimat®.

27. The '6,341 patent is entitled "Blocking Device for a Locking Stressing Mechanism having a Spring-Actuated Output Drive Device" and was duly and lawfully issued by the USPTO on July 8, 2008. The '6,341 patent is attached hereto as Exhibit D.

28. Boehringer Ingelheim International GmbH owns the '967 patent, which is listed in the Orange Book for SPIRIVA® Respimat®.

29. The '967 patent is entitled "Device for Clamping a Fluidic Component" and was duly and lawfully issued by the USPTO on May 12, 2015. The '967 patent is attached hereto as Exhibit E.

30. Boehringer Ingelheim International GmbH owns the '235 patent, which is listed in the Orange Book for SPIRIVA® Respimat®.

7

31.    The '235 patent is entitled "Device for Clamping a Fluidic Component" and was duly and lawfully issued by the USPTO on November 23, 2010. The '235 patent is attached hereto as Exhibit F.

32.    Boehringer Ingelheim International GmbH owns the '3,341 patent, which is listed in the Orange Book for SPIRIVA® Respimat®.

33.    The '3,341 patent is entitled "Atomizer and Method of Atomizing Fluid with a Nozzle Rinsing Mechanism" and was duly and lawfully issued by the USPTO on May 27, 2014. The '3,341 patent is attached hereto as Exhibit G.

**DEFENDANTS' ANDA**

34.    On information and belief, Defendants have submitted or caused to be submitted Defendants' ANDA to FDA under 21 U.S.C. § 355(j), in order to obtain approval to engage in the commercial manufacture, use, or sale of tiotropium bromide inhalation spray as a purported generic version of SPIRIVA® Respimat® prior to the expiration of the patents-in-suit.

35.    On information and belief, on or about May 18, 2023, Defendants mailed Plaintiffs a letter regarding "notice and information required by 21 U.S.C. §§ 355(j)(2)(B)(i) and (ii)" ("Notice Letter"). The Notice Letter represented that Defendants had submitted to FDA Defendants' ANDA and a purported Paragraph IV certification to obtain approval to engage in the commercial manufacture, use, or sale of the product described in Defendants' ANDA before the expiration of the patents-in-suit, which are listed in the Orange Book for SPIRIVA® Respimat®. Hence, Defendants' purpose in submitting Defendants' ANDA is to manufacture and market the ANDA Product before the expiration of the patents-in-suit.

36.    The only dosage form referenced in Defendants' Notice Letter is tiotropium bromide inhalation spray, 2.5 mcg/actuation.

8

37. Defendants' Notice Letter contained a purported detailed statement of the factual and legal bases for Defendants' Paragraph IV certification ("Detailed Statement").

38. The Detailed Statement conclusorily alleges that the '474 patent will not be infringed by the commercial manufacture, use, or sale of the ANDA Product.

39. The Detailed Statement conclusorily alleges that the '264 patent will not be infringed by the commercial manufacture, use, or sale of the ANDA Product.

40. The Detailed Statement conclusorily alleges that the '6,341 patent will not be infringed by the commercial manufacture, use, or sale of the ANDA Product.

41. The Detailed Statement alleges that the '967 patent is invalid.

42. The Detailed Statement alleges that the '235 patent is invalid.

43. The Detailed Statement conclusorily alleges that the '3,341 patent will not be infringed by the commercial manufacture, use, or sale of the ANDA Product.

44. Defendants' Notice Letter contained a purported offer of confidential access ("Defendants' Offer"). Defendants' Offer did not permit any of Plaintiffs' in-house attorneys to access Defendants' ANDA. Defendants' Offer also did not permit scientific consultants to access Defendants' ANDA. In addition, Defendants' Offer contained provisions that unreasonably restricted counsel receiving access to Defendants' ANDA. The restrictions that Defendants' Offer placed on access to Defendants' ANDA contravene 21 U.S.C. § 355(j)(5)(C)(i)(III), which states that an offer of confidential access "shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information." Outside counsel for Plaintiffs negotiated in good faith with counsel for Defendants and were ultimately able to reach agreement on the terms of confidential access to Defendants'

9

ANDA. Following that agreement, however, Defendants produced only limited information about the proposed inhaler from Defendants' ANDA and unreasonably refused to produce other portions of Defendants' ANDA. Defendants also unreasonably refused to provide samples of the proposed inhaler. Defendants further unreasonably objected to a scientific consultant identified by Plaintiffs. Defendants thus have not provided reasonable access to Defendants' ANDA, and Defendants' actions have impeded Plaintiffs' ability to evaluate Defendants' contentions that the proposed inhaler does not infringe certain of the patents-in-suit.

45. On information and belief, Defendants have participated in the preparation and submission of Defendants' ANDA, have provided material support to the preparation and submission of Defendants' ANDA, and intend to support the further prosecution of Defendants' ANDA.

46. On information and belief, if FDA approves Defendants' ANDA, Defendants will manufacture, offer for sale, or sell the ANDA Product within the United States, including within New Jersey, or will import the ANDA Product into the United States, including New Jersey.

47. Alternatively, on information and belief, if FDA approves Defendants' ANDA, Defendants will actively induce or contribute to the manufacture, use, offer for sale, or sale of the ANDA Product within the United States, including within New Jersey, or will import the ANDA Product into the United States, including New Jersey. On information and belief, Defendants' ANDA Product is especially adapted for a use that infringes one or more claims of the patents-in-suit and there is no substantial noninfringing use for Defendants' ANDA Product.

48. This action is being filed within forty-five days of Plaintiffs' receipt of the Notice Letter, pursuant to 21 U.S.C. § 355(j)(5)(B)(iii).

10

## COUNT I
## INFRINGEMENT OF THE '474 PATENT

49.     Plaintiffs incorporate by reference paragraphs 1–48 as if fully set forth herein.

50.     On information and belief, Defendants have submitted or caused the submission of Defendants' ANDA to FDA and continue to seek FDA approval of Defendants' ANDA.

51.     Defendants have infringed the '474 patent under 35 U.S.C. § 271(e)(2)(A) by submitting Defendants' ANDA with a Paragraph IV certification and seeking FDA approval of Defendants' ANDA prior to the expiration of the '474 patent.

52.     On information and belief, if Defendants' ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, import, or otherwise distribute the ANDA Product in the United States, including in the State of New Jersey, directly infringing one or more claims of the '474 patent.

53.     Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Product would actively induce and/or contribute to the infringement of the '474 patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 216581, Defendants will make, use, offer to sell, or sell the ANDA Product within the United States, or will import the ANDA Product into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '474 patent.

54.     Defendants had actual knowledge of the '474 patent prior to submitting Defendants' ANDA and were aware that the submission of Defendants' ANDA with the request for FDA approval prior to the expiration of the '474 patent would constitute an act of infringement of the '474 patent. Defendants had no reasonable basis for asserting that the commercial

11

manufacture, use, offer for sale, or sale of the ANDA Product will not directly infringe, contribute to the infringement of, and/or induce the infringement of the '474 patent.

55.    In addition, Defendants submitted Defendants' ANDA without adequate justification for asserting the '474 patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Product. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '474 patent thus renders this case "exceptional" under 35 U.S.C. § 285.

56.    Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '474 patent. Plaintiffs do not have an adequate remedy at law and, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**COUNT II**
**INFRINGEMENT OF THE '264 PATENT**

57.    Plaintiffs incorporate by reference paragraphs 1–56 as if fully set forth herein.

58.    On information and belief, Defendants have submitted or caused the submission of Defendants' ANDA to FDA and continue to seek FDA approval of Defendants' ANDA.

59.    Defendants have infringed the '264 patent under 35 U.S.C. § 271(e)(2)(A) by submitting Defendants' ANDA with a Paragraph IV certification and seeking FDA approval of Defendants' ANDA prior to the expiration of the '264 patent.

60.    On information and belief, if Defendants' ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, import, or otherwise distribute the ANDA Product in the United States, including in the State of New Jersey, directly infringing one or more claims of the '264 patent.

12

61.  Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Product would actively induce and/or contribute to the infringement of the '264 patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 216581, Defendants will make, use, offer to sell, or sell the ANDA Product within the United States, or will import the ANDA Product into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '264 patent.

62.  Defendants had actual knowledge of the '264 patent prior to submitting Defendants' ANDA and were aware that the submission of Defendants' ANDA with the request for FDA approval prior to the expiration of the '264 patent would constitute an act of infringement of the '264 patent. Defendants had no reasonable basis for asserting that the commercial manufacture, use, offer for sale, or sale of the ANDA Product will not directly infringe, contribute to the infringement of, and/or induce the infringement of the '264 patent.

63.  In addition, Defendants submitted Defendants' ANDA without adequate justification for asserting the '264 patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Product. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '264 patent thus renders this case "exceptional" under 35 U.S.C. § 285.

64.  Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '264 patent. Plaintiffs do not have an adequate remedy at law and, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

13

**COUNT III**
**INFRINGEMENT OF THE '6,341 PATENT**

65. Plaintiffs incorporate by reference paragraphs 1–64 as if fully set forth herein.

66. On information and belief, Defendants have submitted or caused the submission of Defendants' ANDA to FDA and continue to seek FDA approval of Defendants' ANDA.

67. Defendants have infringed the '6,341 patent under 35 U.S.C. § 271(e)(2)(A) by submitting Defendants' ANDA with a Paragraph IV certification and seeking FDA approval of Defendants' ANDA prior to the expiration of the '6,341 patent.

68. On information and belief, if Defendants' ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, import, or otherwise distribute the ANDA Product in the United States, including in the State of New Jersey, directly infringing one or more claims of the '6,341 patent.

69. Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Product would actively induce and/or contribute to the infringement of the '6,341 patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 216581, Defendants will make, use, offer to sell, or sell the ANDA Product within the United States, or will import the ANDA Product into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '6,341 patent.

70. Defendants had actual knowledge of the '6,341 patent prior to submitting Defendants' ANDA and were aware that the submission of Defendants' ANDA with the request for FDA approval prior to the expiration of the '6,341 patent would constitute an act of infringement of the '6,341 patent. Defendants had no reasonable basis for asserting that the

14

commercial manufacture, use, offer for sale, or sale of the ANDA Product will not directly infringe, contribute to the infringement of, and/or induce the infringement of the '6,341 patent.

71.    In addition, Defendants submitted Defendants' ANDA without adequate justification for asserting the '6,341 patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Product. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '6,341 patent thus renders this case "exceptional" under 35 U.S.C. § 285.

72.    Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '6,341 patent. Plaintiffs do not have an adequate remedy at law and, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

## COUNT IV
## INFRINGEMENT OF THE '967 PATENT

73.    Plaintiffs incorporate by reference paragraphs 1–72 as if fully set forth herein.

74.    On information and belief, Defendants have submitted or caused the submission of Defendants' ANDA to FDA and continue to seek FDA approval of Defendants' ANDA.

75.    Defendants have infringed the '967 patent under 35 U.S.C. § 271(e)(2)(A) by submitting Defendants' ANDA with a Paragraph IV certification and seeking FDA approval of Defendants' ANDA prior to the expiration of the '967 patent.

76.    On information and belief, if Defendants' ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, import, or otherwise distribute the ANDA Product in the United States, including in the State of New Jersey, directly infringing one or more claims of the '967 patent.

15

77. Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Product would actively induce and/or contribute to the infringement of the '967 patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 216581, Defendants will make, use, offer to sell, or sell the ANDA Product within the United States, or will import the ANDA Product into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '967 patent.

78. Defendants had actual knowledge of the '967 patent prior to submitting Defendants' ANDA and were aware that the submission of Defendants' ANDA with the request for FDA approval prior to the expiration of the '967 patent would constitute an act of infringement of the '967 patent. Defendants had no reasonable basis for asserting that the commercial manufacture, use, offer for sale, or sale of the ANDA Product will not directly infringe, contribute to the infringement of, and/or induce the infringement of the '967 patent.

79. In addition, Defendants submitted Defendants' ANDA without adequate justification for asserting the '967 patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Product. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '967 patent thus renders this case "exceptional" under 35 U.S.C. § 285.

80. Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '967 patent. Plaintiffs do not have an adequate remedy at law and, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

16

**COUNT V**
**INFRINGEMENT OF THE '235 PATENT**

81. Plaintiffs incorporate by reference paragraphs 1–80 as if fully set forth herein.

82. On information and belief, Defendants have submitted or caused the submission of Defendants' ANDA to FDA and continue to seek FDA approval of Defendants' ANDA.

83. Defendants have infringed the '235 patent under 35 U.S.C. § 271(e)(2)(A) by submitting Defendants' ANDA with a Paragraph IV certification and seeking FDA approval of Defendants' ANDA prior to the expiration of the '235 patent.

84. On information and belief, if Defendants' ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, import, or otherwise distribute the ANDA Product in the United States, including in the State of New Jersey, directly infringing one or more claims of the '235 patent.

85. Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Product would actively induce and/or contribute to the infringement of the '235 patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 216581, Defendants will make, use, offer to sell, or sell the ANDA Product within the United States, or will import the ANDA Product into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '235 patent.

86. Defendants had actual knowledge of the '235 patent prior to submitting Defendants' ANDA and was aware that the submission of Defendants' ANDA with the request for FDA approval prior to the expiration of the '235 patent would constitute an act of infringement of the '235 patent. Defendants had no reasonable basis for asserting that the commercial

17

manufacture, use, offer for sale, or sale of the ANDA Product will not directly infringe, contribute to the infringement of, and/or induce the infringement of the '235 patent.

87.    In addition, Defendants submitted Defendants' ANDA without adequate justification for asserting the '235 patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Product. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '235 patent thus renders this case "exceptional" under 35 U.S.C. § 285.

88.    Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '235 patent. Plaintiffs do not have an adequate remedy at law and, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**COUNT VI**
**INFRINGEMENT OF THE '3,341 PATENT**

89.    Plaintiffs incorporate by reference paragraphs 1–88 as if fully set forth herein.

90.    On information and belief, Defendants have submitted or caused the submission of Defendants' ANDA to FDA and continue to seek FDA approval of Defendants' ANDA.

91.    Defendants have infringed the '3,341 patent under 35 U.S.C. § 271(e)(2)(A) by submitting Defendants' ANDA with a Paragraph IV certification and seeking FDA approval of Defendants' ANDA prior to the expiration of the '3,341 patent.

92.    On information and belief, if Defendants' ANDA is approved, Defendants and their affiliates will make, offer for sale, sell, import, or otherwise distribute the ANDA Product in the United States, including in the State of New Jersey, directly infringing one or more claims of the '3,341 patent.

93. Defendants' commercial manufacture, use, offer for sale, sale, or importation into the United States of the ANDA Product would actively induce and/or contribute to the infringement of the '3,341 patent. Accordingly, unless enjoined by this Court, upon FDA approval of ANDA No. 216581, Defendants will make, use, offer to sell, or sell the ANDA Product within the United States, or will import the ANDA Product into the United States, and will thereby contribute to the infringement of and/or induce the infringement of one or more claims of the '3,341 patent.

94. Defendants had actual knowledge of the '3,341 patent prior to submitting Defendants' ANDA and were aware that the submission of Defendants' ANDA with the request for FDA approval prior to the expiration of the '3,341 patent would constitute an act of infringement of the '3,341 patent. Defendants had no reasonable basis for asserting that the commercial manufacture, use, offer for sale, or sale of the ANDA Product will not directly infringe, contribute to the infringement of, and/or induce the infringement of the '3,341 patent.

95. In addition, Defendants submitted Defendants' ANDA without adequate justification for asserting the '3,341 patent to be invalid, unenforceable, and/or not infringed by the commercial manufacture, use, offer for sale, or sale of the ANDA Product. Defendants' conduct in certifying invalidity, unenforceability, and/or non-infringement with respect to the '3,341 patent thus renders this case "exceptional" under 35 U.S.C. § 285.

96. Plaintiffs will be irreparably harmed if Defendants are not enjoined from infringing and from actively inducing or contributing to the infringement of the '3,341 patent. Plaintiffs do not have an adequate remedy at law and, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

**COUNT VII**
**DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '474 PATENT**

97.    Plaintiffs incorporate by reference paragraphs 1–96 as if fully set forth herein.

98.    Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

99.    On information and belief, if Defendants' ANDA is approved, the ANDA Product will be made, offered for sale, sold, or otherwise distributed in the United States, including in the State of New Jersey, by or through Defendants and their affiliates.

100.    On information and belief, Defendants know that healthcare professionals or patients will use the ANDA Product in accordance with the labeling sought by Defendants' ANDA, and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '474 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

101.    On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Product complained of herein will begin immediately after FDA approves Defendants' ANDA. Any such conduct before the '474 patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '474 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

102.    As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '474 patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

103. Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

104. This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

**COUNT VIII**
**DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '264 PATENT**

105. Plaintiffs incorporate by reference paragraphs 1–104 as if fully set forth herein.

106. Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

107. On information and belief, if Defendants' ANDA is approved, the ANDA Product will be made, offered for sale, sold, or otherwise distributed in the United States, including in the State of New Jersey, by or through Defendants and their affiliates.

108. On information and belief, Defendants know that healthcare professionals or patients will use the ANDA Product in accordance with the labeling sought by Defendants' ANDA, and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '264 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

109. On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Product complained of herein will begin immediately after FDA approves Defendants' ANDA. Any such conduct before the '264 patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '264 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

110.    As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '264 patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

111.    Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

112.    This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

## COUNT IX
## DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '6,341 PATENT

113.    Plaintiffs incorporate by reference paragraphs 1–112 as if fully set forth herein.

114.    Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

115.    On information and belief, if Defendants' ANDA is approved, the ANDA Product will be made, offered for sale, sold, or otherwise distributed in the United States, including in the State of New Jersey, by or through Defendants and their affiliates.

116.    On information and belief, Defendants know that healthcare professionals or patients will use the ANDA Product in accordance with the labeling sought by Defendants' ANDA, and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '6,341 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

117.    On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Product complained

22

of herein will begin immediately after FDA approves Defendants' ANDA. Any such conduct before the '6,341 patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '6,341 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

118.   As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '6,341 patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

119.   Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

120.   This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

## COUNT X
## DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '967 PATENT

121.   Plaintiffs incorporate by reference paragraphs 1–120 as if fully set forth herein.

122.   Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

123.   On information and belief, if Defendants' ANDA is approved, the ANDA Product will be made, offered for sale, sold, or otherwise distributed in the United States, including in the State of New Jersey, by or through Defendants and their affiliates.

124.   On information and belief, Defendants know that healthcare professionals or patients will use the ANDA Product in accordance with the labeling sought by Defendants' ANDA, and Defendants will therefore contribute to the infringement of and/or induce the

infringement of one or more claims of the '967 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

125.    On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Product complained of herein will begin immediately after FDA approves Defendants' ANDA. Any such conduct before the '967 patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '967 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

126.    As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '967 patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

127.    Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

128.    This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

## COUNT XI
## DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '235 PATENT

129.    Plaintiffs incorporate by reference paragraphs 1–128 as if fully set forth herein.

130.    Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

131.    On information and belief, if Defendants' ANDA is approved, the ANDA Product will be made, offered for sale, sold, or otherwise distributed in the United States, including in the State of New Jersey, by or through Defendants and their affiliates.

132. On information and belief, Defendants know that healthcare professionals or patients will use the ANDA Product in accordance with the labeling sought by Defendants' ANDA, and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '235 patent under one or more of 35 U.S.C. §§ 271(a), (b), and (c).

133. On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Product complained of herein will begin immediately after FDA approves Defendants' ANDA. Any such conduct before the '235 patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '235 patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f), and (g).

134. As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '235 patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

135. Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

136. This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

## COUNT XII
## DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '3,341 PATENT

137. Plaintiffs incorporate by reference paragraphs 1–136 as if fully set forth herein.

138.    Plaintiffs' claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

139.    On information and belief, if Defendants' ANDA is approved, the ANDA Product will be made, offered for sale, sold, or otherwise distributed in the United States, including in the State of New Jersey, by or through Defendants and their affiliates.

140.    On information and belief, Defendants know that healthcare professionals or patients will use the ANDA Product in accordance with the labeling sought by Defendants' ANDA, and Defendants will therefore contribute to the infringement of and/or induce the infringement of one or more claims of the '3,341 patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f), and (g).

141.    On information and belief, Defendants' infringing activity, including the commercial manufacture, use, offer to sell, sale, or importation of the ANDA Product complained of herein will begin immediately after FDA approves Defendants' ANDA. Any such conduct before the '3,341 patent expires will contribute to the infringement of and/or induce the infringement of one or more claims of the '3,341 patent under one or more of 35 U.S.C. §§ 271(a), (b), (c), (f), and (g).

142.    As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between Plaintiffs and Defendants concerning liability for the infringement of the '3,341 patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

143.    Plaintiffs will be substantially and irreparably harmed by Defendants' infringing activities unless those activities are enjoined by this Court. Plaintiffs have no adequate remedy at law.

144. This case is exceptional, and Plaintiffs are entitled to an award of attorneys' fees under 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request the following relief:

A. A judgment that Defendants have infringed one or more claims of the '474, '264, '6,341, '967, '235 and '3,341 patents under 35 U.S.C. § 271(e)(2)(A);

B. A declaratory judgment that, under one or more of 35 U.S.C. §§ 271(a), (b), and (c), Defendants' commercial manufacture, use, offer for sale, or sale in, or importation into, the United States of the ANDA Product, or inducing or contributing to such conduct, would constitute infringement of one or more claims of the '474, '264, '6,341, '967, '235 and '3,341 patents;

C. A permanent injunction, pursuant to 35 U.S.C. § 271(e)(4)(B), restraining and enjoining Defendants, their affiliates and subsidiaries, and all persons and entities acting in concert with Defendants, from commercially manufacturing, using, offering for sale, or selling or importing any product that infringes the '474, '264, '6,341, '967, '235, and '3,341 patents, including the ANDA Product described in ANDA No. 216581;

D. The entry of an order, pursuant to 35 U.S.C. § 271(e)(4)(A), that the effective date of any FDA approval of ANDA No. 216581 shall be no earlier than the expiration date of the '474, '264, '6,341, '967, '235, and '3,341 patents, or any later expiration of exclusivity for the '474, '264, '6,341, '967, '235, and '3,341 patents, including any extensions or regulatory exclusivities;

E. A declaration under 28 U.S.C. § 2201 that if Defendants, their officers, agents, servants, employees, licensees, representatives, and attorneys, and any other persons acting or attempting to act in active concert or participation with them or acting on their behalf, engage in the commercial manufacture, use, offer for sale, sale and/or importation of the product described

in ANDA No. 216581, it will constitute an act of direct and/or indirect infringement of the '474, '264, '6,341, '967, '235, and '3,341 patents;

F.    An award of damages or other relief, pursuant to 35 U.S.C. § 271(e)(4)(C), if Defendants engage in the commercial manufacture, use, offer for sale, sale, and/or importation of the ANDA Product, or any product that infringes the '474, '264, '6,341, '967, '235, and '3,341 patents, or induces or contributes to such conduct, prior to the expiration of the '474, '264, '6,341, '967, '235, and '3,341 patents, or any later expiration of exclusivity for the '474, '264, '6,341, '967, '235, and '3,341 patents, including any extensions or regulatory exclusivities;

G.    The entry of a judgment declaring that Defendants' acts render this case an exceptional case and awarding Plaintiffs their attorneys' fees pursuant to 35 U.S.C. §§ 271(e)(4) and 285;

H.    An award to Plaintiffs of their costs and expenses in this action; and

I.    Such other and further relief as the Court may deem just and proper.

Dated:  June 29, 2023

*Of Counsel*:

Christopher N. Sipes
R. Jason Fowler
Justin W. Burnam
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC  20001-4956
(202) 662-6000

s/ Charles M. Lizza
Charles M. Lizza
William C. Baton
Sarah A. Sullivan
SAUL EWING LLP
One Riverfront Plaza, Suite 1520
Newark, NJ 07102-5426
(973) 286-6700
clizza@saul.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International GmbH*

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 40.1</u>

I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any action pending in any court or of any pending arbitration or administrative proceeding.

Dated:  June 29, 2023

*Of Counsel*:

Christopher N. Sipes
R. Jason Fowler
Justin W. Burnam
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC  20001-4956
(202) 662-6000

s/ Charles M. Lizza
Charles M. Lizza
William C. Baton
Sarah A. Sullivan
SAUL EWING LLP
One Riverfront Plaza, Suite 1520
Newark, NJ 07102-5426
(973) 286-6700
clizza@saul.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International GmbH*

29

# EXHIBIT A

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use SPIRIVA RESPIMAT safely and effectively.  See full prescribing information for SPIRIVA RESPIMAT.**

**SPIRIVA® RESPIMAT® (tiotropium bromide inhalation spray), for oral inhalation use**
**Initial U.S. Approval: 2004**

---------------------------INDICATIONS AND USAGE--------------------------
SPIRIVA RESPIMAT is an anticholinergic indicated for:
- The long-term, once-daily, maintenance treatment of bronchospasm associated with chronic obstructive pulmonary disease (COPD), and for reducing COPD exacerbations (1.1)
- The long-term, once-daily, maintenance treatment of asthma in patients 6 years of age and older (1.2)

Limitation of Use:
- Not indicated for relief of acute bronchospasm (1.1, 1.2, 5.1)

----------------------DOSAGE AND ADMINISTRATION----------------------
For oral inhalation only
To receive the full dose of medication, SPIRIVA RESPIMAT must be administered as two inhalations once-daily.
- Treatment of COPD: 2 inhalations of SPIRIVA RESPIMAT 2.5 mcg once-daily (2)
- Treatment of asthma patients 6 years and older: 2 inhalations of SPIRIVA RESPIMAT 1.25 mcg once-daily (2)

---------------------DOSAGE FORMS AND STRENGTHS---------------------
- Inhalation spray: 1.25 mcg or 2.5 mcg tiotropium per actuation with the SPIRIVA RESPIMAT inhaler. Two actuations equal one dose (2.5 mcg or 5 mcg). (3)

-------------------------------CONTRAINDICATIONS-----------------------------
Hypersensitivity to tiotropium, ipratropium, or any component of this product (4)

----------------------WARNINGS AND PRECAUTIONS----------------------
- Not for acute use, i.e., not a rescue medication (5.1)
- Immediate hypersensitivity reactions: Discontinue SPIRIVA RESPIMAT at once and consider alternatives if immediate hypersensitivity reactions, including angioedema, urticaria, rash, bronchospasm, or anaphylaxis, occur. (5.2)
- Paradoxical bronchospasm: Discontinue SPIRIVA RESPIMAT and consider other treatments if paradoxical bronchospasm occurs. (5.3)
- Worsening of narrow-angle glaucoma may occur. Use with caution in patients with narrow-angle glaucoma and instruct patients to consult a physician immediately if this occurs. (5.4)
- Worsening of urinary retention may occur. Use with caution in patients with prostatic hyperplasia or bladder-neck obstruction and instruct patient to consult a physician immediately if this occurs. (5.5)

------------------------------ADVERSE REACTIONS------------------------------
The most common adverse reactions in:
- COPD: (>3% incidence in the placebo-controlled trials with treatment durations of between 4 and 48 weeks) were pharyngitis, cough, dry mouth, and sinusitis (6.1).
- Asthma: (>2% incidence in the placebo-controlled trials with treatment durations of between 12 and 52 weeks) were pharyngitis, headache, bronchitis, and sinusitis in adults (6.2).

**To report SUSPECTED ADVERSE REACTIONS, contact Boehringer Ingelheim Pharmaceuticals, Inc. at (800) 542-6257 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

-------------------------------DRUG INTERACTIONS-----------------------------
Anticholinergics: May interact additively with concomitantly used anticholinergic medications. Avoid administration of SPIRIVA RESPIMAT with other anticholinergic-containing drugs. (7.2)

----------------------USE IN SPECIFIC POPULATIONS----------------------
Patients with moderate to severe renal impairment should be monitored closely for potential anticholinergic side effects. (2, 8.6)

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

**Revised: 11/2021**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**1  INDICATIONS AND USAGE**
    1.1  Maintenance Treatment of Chronic Obstructive Pulmonary Disease
    1.2  Maintenance Treatment of Asthma
**2  DOSAGE AND ADMINISTRATION**
    2.1  Chronic Obstructive Pulmonary Disease
    2.2  Asthma
    2.3  Special Populations
**3  DOSAGE FORMS AND STRENGTHS**
**4  CONTRAINDICATIONS**
**5  WARNINGS AND PRECAUTIONS**
    5.1  Not for Acute Use
    5.2  Immediate Hypersensitivity Reactions
    5.3  Paradoxical Bronchospasm
    5.4  Worsening of Narrow-Angle Glaucoma
    5.5  Worsening of Urinary Retention
    5.6  Renal Impairment
**6  ADVERSE REACTIONS**
    6.1  Clinical Trials Experience in Chronic Obstructive Pulmonary Disease
    6.2  Clinical Trials Experience in Asthma
    6.3  Postmarketing Experience
**7  DRUG INTERACTIONS**
    7.1  Concomitant Respiratory Medications
    7.2  Anticholinergics
**8  USE IN SPECIFIC POPULATIONS**
    8.1  Pregnancy
    8.2  Lactation
    8.4  Pediatric Use
    8.5  Geriatric Use
    8.6  Renal Impairment
    8.7  Hepatic Impairment
**10  OVERDOSAGE**
**11  DESCRIPTION**
**12  CLINICAL PHARMACOLOGY**
    12.1  Mechanism of Action
    12.2  Pharmacodynamics
    12.3  Pharmacokinetics
**13  NONCLINICAL TOXICOLOGY**
    13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility
**14  CLINICAL STUDIES**
    14.1  Chronic Obstructive Pulmonary Disease
    14.2  Asthma
**16  HOW SUPPLIED/STORAGE AND HANDLING**
**17  PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

**1    INDICATIONS AND USAGE**

**1.1    Maintenance Treatment of Chronic Obstructive Pulmonary Disease**

SPIRIVA RESPIMAT (tiotropium bromide) is indicated for the long-term, once-daily, maintenance treatment of bronchospasm associated with chronic obstructive pulmonary disease (COPD), including chronic bronchitis and emphysema.  SPIRIVA RESPIMAT is indicated to reduce exacerbations in COPD patients.

Important Limitation of Use:
SPIRIVA RESPIMAT is NOT indicated for the relief of acute bronchospasm.

**1.2    Maintenance Treatment of Asthma**

SPIRIVA RESPIMAT is a bronchodilator indicated for the long-term, once-daily, maintenance treatment of asthma in patients 6 years of age and older**.**

Important Limitation of Use:
SPIRIVA RESPIMAT is NOT indicated for the relief of acute bronchospasm.

**2    DOSAGE AND ADMINISTRATION**

To receive the full dose of medication, SPIRIVA RESPIMAT must be administered as two inhalations once-daily. Do not take more than one dose (2 inhalations) in 24 hours.

Prior to first use, the SPIRIVA RESPIMAT cartridge is inserted into the SPIRIVA RESPIMAT inhaler and the unit is primed.  When using the unit for the first time, patients are to actuate the inhaler toward the ground until an aerosol cloud is visible and then repeat the process three more times.  The unit is then considered primed and ready for use.  If not used for more than 3 days, patients are to actuate the inhaler once to prepare the inhaler for use.  If not used for more than 21 days, patients are to actuate the inhaler until an aerosol cloud is visible and then repeat the process three more times to prepare the inhaler for use *[see Patient Counseling Information (17)]*.

**2.1    Chronic Obstructive Pulmonary Disease**

The recommended dosage for patients with COPD is 2 inhalations of SPIRIVA RESPIMAT 2.5 mcg per actuation once-daily; total dose equals 5 mcg of SPIRIVA RESPIMAT.

**2.2    Asthma**

The recommended dosage for patients with asthma is 2 inhalations of SPIRIVA RESPIMAT 1.25 mcg per actuation once-daily; total dose equals 2.5 mcg of SPIRIVA RESPIMAT. In the treatment of asthma, the maximum benefits in lung function may take up to 4 to 8 weeks of dosing *[see Patient Counseling Information (17)]*.

**2.3    Special Populations**

No dosage adjustment is required for geriatric, hepatically-impaired, or renally-impaired patients. However, patients with moderate to severe renal impairment given SPIRIVA RESPIMAT should be monitored closely for anticholinergic effects *[see Warnings and Precautions (5.6), Use in Specific Populations (8.5, 8.6, 8.7), and Clinical Pharmacology (12.3)]*.

**3    DOSAGE FORMS AND STRENGTHS**

SPIRIVA RESPIMAT consists of a SPIRIVA RESPIMAT inhaler and an aluminum cylinder (SPIRIVA RESPIMAT cartridge) containing tiotropium bromide (as the monohydrate).  The SPIRIVA RESPIMAT cartridge is only intended for use with the SPIRIVA RESPIMAT inhaler.

SPIRIVA RESPIMAT is available in two dosage strengths. Each actuation from the SPIRIVA RESPIMAT inhaler delivers 1.25 mcg or 2.5 mcg of tiotropium (equivalent to 1.562 mcg or 3.124 mcg, respectively, of tiotropium bromide monohydrate) from the mouthpiece.  Two actuations equal one dose (2.5 mcg or 5 mcg).

**4    CONTRAINDICATIONS**

SPIRIVA RESPIMAT is contraindicated in patients with a hypersensitivity to tiotropium, ipratropium, or any component of this product *[see Warnings and Precautions (5.2)]*.  In clinical trials with SPIRIVA RESPIMAT, immediate hypersensitivity reactions, including angioedema (including swelling of the lips, tongue, or throat), itching, or rash have been reported *[see Warnings and Precautions (5.2)]*.

**5    WARNINGS AND PRECAUTIONS**

**5.1    Not for Acute Use**

SPIRIVA RESPIMAT is intended as a once-daily maintenance treatment for COPD and asthma and should not be used for the relief of acute symptoms, i.e., as rescue therapy for the treatment of acute episodes of bronchospasm. In the event of an acute attack, a rapid-acting beta$_2$-agonist should be used.

**5.2    Immediate Hypersensitivity Reactions**

Immediate hypersensitivity reactions, including urticaria, angioedema (including swelling of the lips, tongue or throat), rash, bronchospasm, anaphylaxis, or itching may occur after administration of SPIRIVA RESPIMAT.  If such a reaction occurs, therapy with SPIRIVA RESPIMAT should be stopped at once and alternative treatments should be considered.  Given the similar structural formula of atropine to tiotropium, patients with a history of hypersensitivity reactions to atropine or its derivatives should be closely monitored for similar hypersensitivity reactions to SPIRIVA RESPIMAT.

**5.3    Paradoxical Bronchospasm**

Inhaled medicines, including SPIRIVA RESPIMAT, may cause paradoxical bronchospasm. If this occurs, it should be treated immediately with an inhaled short-acting beta$_2$-agonist such as albuterol. Treatment with SPIRIVA RESPIMAT should be stopped and other treatments considered.

**5.4    Worsening of Narrow-Angle Glaucoma**

SPIRIVA RESPIMAT should be used with caution in patients with narrow-angle glaucoma.  Prescribers and patients should be alert for signs and symptoms of acute narrow-angle glaucoma (e.g., eye pain or discomfort, blurred vision, visual halos or colored images in association with red eyes from conjunctival congestion and corneal edema).  Instruct patients to consult a physician immediately should any of these signs or symptoms develop.

**5.5    Worsening of Urinary Retention**

SPIRIVA RESPIMAT should be used with caution in patients with urinary retention.  Prescribers and patients should be alert for signs and symptoms of urinary retention (e.g., difficulty passing urine, painful urination), especially in patients with prostatic hyperplasia or bladder-neck obstruction.  Instruct patients to consult a physician immediately should any of these signs or symptoms develop.

**5.6    Renal Impairment**

As a predominantly renally excreted drug, patients with moderate to severe renal impairment (creatinine clearance of <60 mL/min) treated with SPIRIVA RESPIMAT should be monitored closely for anticholinergic side effects *[see Clinical Pharmacology (12.3)]*.

**6       ADVERSE REACTIONS**

The following adverse reactions are described, or described in greater detail, in other sections:
- Immediate hypersensitivity reactions *[see Warnings and Precautions (5.2)]*
- Paradoxical bronchospasm *[see Warnings and Precautions (5.3)]*
- Worsening of narrow-angle glaucoma *[see Warnings and Precautions (5.4)]*
- Worsening of urinary retention *[see Warnings and Precautions (5.5)]*

Because clinical trials are conducted under widely varying conditions, the incidence of adverse reactions observed in the clinical trials of a drug cannot be directly compared to the incidences in the clinical trials of another drug and may not reflect the incidences observed in practice.

Since the same active ingredient (tiotropium bromide) is administered to COPD and asthma patients, prescribers and patients should take into account that the observed adverse reactions could be relevant for both patient populations independent of dosage strength.

**6.1    Clinical Trials Experience in Chronic Obstructive Pulmonary Disease**

The SPIRIVA RESPIMAT clinical development program included ten placebo controlled clinical trials in COPD. Two trials were four-week cross-over trials and eight were parallel group trials. The parallel group trials included a three week dose-ranging trial, two 12-week trials, three 48-week trials, and two trials of 4-week and 24-week duration conducted for a different program that contained tiotropium bromide 5 mcg treatment arms. The primary safety database consists of pooled data from the 7 randomized, parallel-group, double-blind, placebo-controlled studies of 4-48 weeks in treatment duration. These trials included 6565 adult COPD patients (75% males and 25% females) 40 years of age and older. Of these patients, 3282 patients were treated with SPIRIVA RESPIMAT 5 mcg and 3283 received placebo. The SPIRIVA RESPIMAT 5 mcg group was composed mostly of Caucasians (78%) with a mean age of 65 years and a mean baseline percent predicted post-bronchodilator $FEV_1$ of 46%.

In these 7 clinical trials, 68.3% of patients exposed to SPIRIVA RESPIMAT 5 mcg reported an adverse event compared to 68.7% of patients in the placebo group. There were 68 deaths in the SPIRIVA RESPIMAT 5 mcg treatment group (2.1%) and 52 deaths (1.6%) in patients who received placebo *[see Clinical Studies (14) Long-term Active-Controlled Mortality Trial: Survival]*. The percentage of SPIRIVA RESPIMAT patients who discontinued due to an adverse event were 7.3% compared to 10% with placebo patients. The percentage of SPIRIVA RESPIMAT 5 mcg patients who experienced a serious adverse event were 15.0% compared to 15.1% with placebo patients. In both groups, the adverse event most commonly leading to discontinuation was COPD exacerbation (SPIRIVA RESPIMAT 2.0%, placebo 4.0%) which was also the most frequent serious adverse event. The most commonly reported adverse reactions were pharyngitis, cough, dry mouth, and sinusitis (Table 1). Other adverse reactions reported in individual patients and consistent with possible anticholinergic effects included constipation, dysuria, and urinary retention.

Table 1 shows all adverse reactions that occurred with an incidence of >3% in the SPIRIVA RESPIMAT 5 mcg treatment group, and a higher incidence rate on SPIRIVA RESPIMAT 5 mcg than on placebo.

**Table 1      Number (Percentage) of COPD Patients Exposed to SPIRIVA RESPIMAT 5 mcg with Adverse Reactions >3% (and Higher than Placebo): Pooled Data from 7 Clinical Trials with Treatment Periods Ranging between 4 and 48 Weeks in COPD Patients**

| Body System (Reaction)* | SPIRIVA RESPIMAT 5 mcg [n=3282] | Placebo [n=3283] |
|---|---|---|
| **Gastrointestinal Disorders** | | |
| Dry mouth | 134 (4.1) | 52 (1.6) |
| **Infections and Infestations** | | |
| Pharyngitis | 378 (11.5) | 333 (10.1) |
| **Respiratory, Thoracic, and Mediastinal Disorders** | | |
| Cough | 190 (5.8) | 182 (5.5) |
| Sinusitis | 103 (3.1) | 88 (2.7) |

*Adverse reactions include a grouping of similar terms

Other reactions that occurred in the SPIRIVA RESPIMAT 5 mcg group at an incidence of 1% to 3% and at a higher incidence rate on SPIRIVA RESPIMAT 5 mcg than on placebo included: *Cardiac disorders:* palpitations; *Gastrointestinal disorders:* constipation, gastroesophageal reflux disease, oropharyngeal candidiasis; *Nervous system disorders:* dizziness; *Respiratory, thoracic, and mediastinal disorders:* dysphonia; *Skin and subcutaneous tissue disorders:* pruritus, rash; *Renal and urinary disorders:* urinary tract infection.

*Less Common Adverse Reactions*

Among the adverse reactions observed in the clinical trials with an incidence of <1% and at a higher incidence rate on SPIRIVA RESPIMAT 5 mcg than on placebo were: dysphagia, gingivitis, intestinal obstruction including ileus paralytic, joint swelling, dysuria, urinary retention, epistaxis, laryngitis, angioedema, dry skin, skin infection, and skin ulcer.

**6.2    Clinical Trials Experience in Asthma**

*Adult Patients*

SPIRIVA RESPIMAT 2.5 mcg has been compared to placebo in four placebo-controlled parallel-group trials ranging from 12 to 52 weeks of treatment duration in adult patients (aged 18 to 75 years) with asthma. The safety data described below are based on one 1-year, two 6-month and one 12-week randomized, double-blind, placebo-controlled trials in a total of 2849 asthma patients on background treatment of at least ICS or ICS and long-acting beta agonist (ICS/LABA).  Of these patients, 787

were treated with SPIRIVA RESPIMAT at the recommended dose of 2.5 mcg once-daily; 59.7% were female and 47.5% were Caucasian with a mean age of 43.7 years and a mean post-bronchodilator percent predicted forced expiratory volume in 1 second ($FEV_1$) of 90.0% at baseline.

Table 2 shows all adverse reactions that occurred with an incidence of >2% in the SPIRIVA RESPIMAT 2.5 mcg treatment group, and a higher incidence rate on SPIRIVA RESPIMAT 2.5 mcg than on placebo.

**Table 2    Number (Percentage) of Asthma Patients Exposed to SPIRIVA RESPIMAT 2.5 mcg with Adverse Reactions >2% (and Higher than Placebo): Pooled Data from 4 Adult Clinical Trials with Treatment Periods Ranging between 12 and 52 Weeks in Asthma Patients**

| Body System (Reaction)* | SPIRIVA RESPIMAT 2.5 mcg [n=787] | Placebo [n=735] |
|---|---|---|
| **Respiratory, Thoracic, and Mediastinal Disorders** | | |
|     Pharyngitis | 125 (15.9) | 91 (12.4) |
|     Sinusitis | 21 (2.7) | 10 (1.4) |
|     Bronchitis | 26 (3.3) | 10 (1.4) |
| **Nervous System Disorders** | | |
|     Headache | 30 (3.8) | 20 (2.7) |

*Adverse reactions include a grouping of similar terms

Other reactions that occurred in the SPIRIVA RESPIMAT 2.5 mcg group at an incidence of 1% to 2% and at a higher incidence rate on SPIRIVA RESPIMAT 2.5 mcg than on placebo included: *Nervous system disorders*: dizziness; *Gastrointestinal disorders*: oropharyngeal candidiasis, diarrhea; *Respiratory, thoracic, and mediastinal disorders*: cough, rhinitis allergic; *Renal and urinary disorders:* urinary tract infection; *General disorders and administration site conditions:* pyrexia; and *Vascular disorders:* hypertension.

*Less Common Adverse Reactions*
Among the adverse reactions observed in the clinical trials with an incidence of 0.5% to <1% and at a higher incidence rate on SPIRIVA RESPIMAT 2.5 mcg than on placebo were: palpitations, dysphonia, acute tonsillitis, tonsillitis, rhinitis, herpes zoster, gastroesophageal reflux disease, oropharyngeal discomfort, abdominal pain upper, insomnia, hypersensitivity (including immediate reactions), angioedema, dehydration, arthralgia, muscle spasms, pain in extremity, chest pain, hepatic function abnormal, liver function test abnormal.

*Adolescent Patients Aged 12 to 17 years*
SPIRIVA RESPIMAT 2.5 mcg has been compared to placebo in two placebo-controlled parallel-group trials ranging from 12 to 48 weeks of treatment duration in adolescent patients with asthma. The safety data described below are based on one 48-week and one 12-week double-blind, placebo-controlled trials in a total of 789 adolescent asthma patients on background treatment of at least ICS or ICS plus one or more controller. Of these patients, 252 were treated with SPIRIVA RESPIMAT at the recommended dose of 2.5 mcg once-daily; 63.9% were male and 95.6% were Caucasian with a mean age of 14.3 years and a mean post-bronchodilator percent predicted $FEV_1$ of 98.3% at baseline. The adverse reaction profile for adolescent patients with asthma was comparable to that observed in adult patients with asthma.

*Pediatric Patients Aged 6 to 11 years*
SPIRIVA RESPIMAT 2.5 mcg has been compared to placebo in two placebo-controlled parallel-group trials ranging from 12 to 48 weeks of treatment duration in pediatric patients aged 6 to 11 years with asthma. The safety data are based on one 48-week and one 12-week double-blind, placebo-controlled trials in a total of 801 pediatric asthma patients aged 6 to 11 years on background treatment of at least ICS or ICS plus one or more controller. Of these patients, 271 were treated with SPIRIVA RESPIMAT at the recommended dose of 2.5 mcg once-daily; 71.2% were male and 86.7% were Caucasian with a mean age of 8.9 years and a mean post-bronchodilator percent predicted $FEV_1$ of 97.9% at baseline. The adverse reaction profile for pediatric patients aged 6 to 11 years with asthma was comparable to that observed in adult patients with asthma.

SPIRIVA RESPIMAT 5 mcg also has been compared to placebo in seven placebo-controlled parallel-group trials ranging from 12 to 52 weeks of treatment duration in 4149 adult patients (aged 18 to 75 years) with asthma and in two placebo-controlled parallel-group trials ranging from 12 to 48 weeks of treatment duration in 789 adolescent patients (1370 adults and 264 adolescents receiving SPIRIVA RESPIMAT 5 mcg once-daily). The adverse reaction profile for SPIRIVA RESPIMAT 5 mcg in patients with asthma was comparable to that observed with SPIRIVA RESPIMAT 2.5 mcg in patients with asthma.

**6.3    Postmarketing Experience**
In addition to the adverse reactions observed during the SPIRIVA RESPIMAT clinical trials in COPD, the following adverse reactions have been observed during post-approval use of SPIRIVA RESPIMAT 5 mcg and another tiotropium formulation, SPIRIVA® HandiHaler® (tiotropium bromide inhalation powder). Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.
- Glaucoma, intraocular pressure increased, vision blurred,
- Atrial fibrillation, tachycardia, supraventricular tachycardia,
- Bronchospasm,
- Glossitis, stomatitis,
- Dehydration,
- Insomnia,
- Hypersensitivity (including immediate reactions), and urticaria.

**7    DRUG INTERACTIONS**
**7.1    Concomitant Respiratory Medications**
SPIRIVA RESPIMAT has been used concomitantly with short-acting and long-acting sympathomimetic (beta-agonists) bronchodilators, methylxanthines, oral and inhaled steroids, antihistamines, mucolytics, leukotriene modifiers, cromones, and anti-IgE treatment without increases in adverse reactions.

**7.2    Anticholinergics**

There is potential for an additive interaction with concomitantly used anticholinergic medications.  Therefore, avoid coadministration of SPIRIVA RESPIMAT with other anticholinergic-containing drugs as this may lead to an increase in anticholinergic adverse effects *[see Warnings and Precautions (5.4, 5.5) and Adverse Reactions (6)].*

**8        USE IN SPECIFIC POPULATIONS**

**8.1    Pregnancy**

Risk Summary

The limited human data with SPIRIVA RESPIMAT use during pregnancy are insufficient to inform a drug-associated risk of adverse pregnancy-related outcomes. There are risks to the mother and the fetus associated with poorly controlled asthma in pregnancy *[see Clinical Considerations].* Based on animal reproduction studies, no structural abnormalities were observed when tiotropium was administered by inhalation to pregnant rats and rabbits during the period of organogenesis at doses 790 and 8 times, respectively, the maximum recommended human daily inhalation dose (MRHDID). Increased post-implantation loss was observed in rats and rabbits administered tiotropium at maternally toxic doses 430 times and 40 times the MRHDID, respectively *[see Data].*

The estimated background risk of major birth defects and miscarriage for the indicated population is unknown. All pregnancies have a background risk of birth defect, loss or other adverse outcomes. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2% to 4% and 15% to 20%, respectively.

Clinical Considerations

*Disease-Associated Maternal and/or Embryo-Fetal Risk*

Poorly or moderately controlled asthma in pregnancy increases the maternal risk of preeclampsia and infant prematurity, low birth weight, and small for gestational age. The level of asthma control should be closely monitored in pregnant women and treatment adjusted as necessary to maintain optimal control.

Data

*Animal Data*

In 2 separate embryo-fetal development studies, pregnant rats and rabbits received tiotropium during the period of organogenesis at doses up to approximately 790 and 8 times the maximum recommended human daily inhalation dose (MRHDID), respectively (on a mcg/m$^2$ basis at inhalation doses of 1471 and 7 mcg/kg/day in rats and rabbits, respectively).  No evidence of structural abnormalities was observed in rats or rabbits.  However, in rats, tiotropium caused fetal resorption, litter loss, decreases in the number of live pups at birth and the mean pup weights, and a delay in pup sexual maturation at tiotropium doses of approximately 40 times the MRHDID (on a mcg/m$^2$ basis at a maternal inhalation dose of 78 mcg/kg/day).  In rabbits, tiotropium caused an increase in post-implantation loss at a tiotropium dose of approximately 430 times the MRHDID (on a mcg/m$^2$ basis at a maternal inhalation dose of 400 mcg/kg/day).  Such effects were not observed at approximately 5 and 95 times the MRHDID, respectively (on a mcg/m$^2$ basis at inhalation doses of 9 and 88 mcg/kg/day in rats and rabbits, respectively).

**8.2    Lactation**

Risk Summary

There are no data on the presence of tiotropium in human milk, the effects on the breastfed infant, or the effects on milk production. Tiotropium is present in milk of lactating rats; however, due to species-specific differences in lactation physiology, the clinical relevance of these data are not clear *[see Data].* The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for SPIRIVA RESPIMAT and any potential adverse effects on the breastfed child from SPIRIVA RESPIMAT or from the underlying maternal condition.

Data

The distribution of tiotropium bromide into milk was investigated after a single intravenous administration of 10 mg/kg to lactating rats. Tiotropium and/or its metabolites are present in the milk of lactating rats at concentrations above those in plasma.

**8.4    Pediatric Use**

The safety and efficacy of SPIRIVA RESPIMAT 2.5 mcg have been established in pediatric patients aged 6 to 17 years with asthma in 6 clinical trials up to 1 year in duration. In three clinical trials, 327 patients aged 12 to 17 years with asthma were treated with SPIRIVA RESPIMAT 2.5 mcg; in three additional clinical trials, 345 patients aged 6 to 11 years with asthma were treated with SPIRIVA RESPIMAT 2.5 mcg. Patients in these age groups demonstrated efficacy results similar to those observed in patients aged 18 years and older with asthma *[see Clinical Studies (14.2)].*

The safety and efficacy of SPIRIVA RESPIMAT have not been established in pediatric patients less than 6 years of age.  The safety of SPIRIVA RESPIMAT 2.5 mcg has been studied in pediatric patients with asthma aged 1 to 5 years who were on background treatment of at least ICS in one placebo-controlled clinical trial of 12 weeks duration (36 treated with SPIRIVA RESPIMAT 2.5 mcg and 34 with placebo RESPIMAT).  In this study, SPIRIVA RESPIMAT or placebo RESPIMAT was delivered with the AeroChamber Plus Flow-Vu® valved holding chamber with facemask once daily.  The majority of the patients in the trial were male (60.4%) and Caucasian (76.2%) with a mean age of 3.1 years.  The adverse reaction profile was similar to that observed in adults and older pediatric patients *[see Adverse Reactions (6.2)].*

*In Vitro Characterization Studies with Valved Holding Chamber*

Dose delivery and fine particle fraction of SPIRIVA RESPIMAT when administered via a valved holding chamber (AeroChamber Plus Flow-Vu® with or without face mask) was assessed by *in vitro* studies.

Inspiratory flow rates of 4.9, 8.0, and 12.0 L/min in combination with holding times of 0, 2, 5, and 10 seconds were tested. The flow rates were selected to be representative of inspiratory flow rates of children aged 6 to 12 months, 2 to 5 years, and over 5 years, respectively.

Table 3 summarizes the results for delivered dose under the respective test conditions and configurations.

**Table 3**    In Vitro Medication Delivery through AeroChamber Plus Flow-Vu® Valved Holding Chamber with Face Mask at Different Flow Rates and Holding Times Using the Dose 2.5 mcg (as two actuations)

| Flow Rate (L/min) and corresponding age | Mask | Holding Time (seconds) | Mean Medication Delivery through AeroChamber Plus Flow-Vu® per Dose (mcg) | Body Weight 50th Percentile (kg)[a] | Medication Delivered per Dose (ng/kg)[b] |
|---|---|---|---|---|---|
| 4.9<br><br>(6 to 12 Months) | small | 0<br>2<br>5<br>10 | 0.85<br>0.86<br>0.55<br>0.62 | 7.5-9.9 | 86-113<br>87-115<br>56-73<br>63-83 |
| 8.0<br><br>(2 to 5 Years) | medium | 0<br>2<br>5<br>10 | 0.74<br>0.93<br>0.72<br>0.57 | 12.3-18.0 | 41-60<br>52-76<br>40-59<br>32-46 |
| 12.0<br><br>(> 5 Years) | medium | 0<br>2<br>5<br>10 | 1.16<br>0.96<br>0.78<br>0.61 | 18.0 | 64<br>53<br>43<br>34 |

[a] Centers for Disease Control growth charts, developed by the National Center for Health Statistics in collaboration with the National Center for Chronic Disease Prevention and Health Promotion (2009).
Body weight values correspond to the average of the 50 percentile weight for boys and girls at the ages indicated.
[b] Inhalation of SPIRIVA RESPIMAT 2.5 mcg dose (as two actuations) in a 70-kg adult without use of a valved holding chamber and mask delivers approximately 2.5 mcg, or 36 ng/kg.

The *in vitro* study data show a reduction of the absolute delivered dose through the valved holding chamber. However, in terms of dose per kilogram of body weight the data suggest that under all tested conditions the dose of SPIRIVA RESPIMAT delivered by the AeroChamber Plus Flow-Vu® valved holding chamber with mask will at least lead to a dosing comparable to that of adults without use of a holding chamber and mask (Table 3). The fine particle fraction (< 5 μm) across the flow rates used in these studies was 69-89% of the delivered dose through the valved holding chamber, consistent with the removal of the coarser fraction by the holding chamber. In contrast, the fine particle fraction for SPIRIVA RESPIMAT delivered without a holding chamber typically represents approximately 60% of the delivered dose.

**8.5    Geriatric Use**
Based on available data, no adjustment of SPIRIVA RESPIMAT dosage in geriatric patients is warranted *[see Clinical Pharmacology (12.3)]*.

Thirty nine percent of SPIRIVA RESPIMAT clinical trial patients with COPD were between 65 and 75 years of age and 14% were greater than or equal to 75 years of age.  Approximately seven percent of SPIRIVA RESPIMAT clinical trial patients with asthma were greater than or equal to 65 years of age. The adverse drug reaction profiles were similar in the older population compared to the patient population overall.

**8.6    Renal Impairment**
Patients with moderate to severe renal impairment (creatinine clearance of <60 mL/min) treated with SPIRIVA RESPIMAT should be monitored closely for anticholinergic side effects *[see Dosage and Administration (2), Warnings and Precautions (5.6), and Clinical Pharmacology (12.3)]*.

**8.7    Hepatic Impairment**
The effects of hepatic impairment on the pharmacokinetics of tiotropium were not studied.

**10    OVERDOSAGE**
High doses of tiotropium may lead to anticholinergic signs and symptoms.  However, there were no systemic anticholinergic adverse effects following a single inhaled dose of up to 282 mcg tiotropium dry powder in 6 healthy volunteers. Dry mouth/throat and dry nasal mucosa occurred in a dose-dependent [10-40 mcg daily] manner, following 14-day dosing of up to 40 mcg tiotropium bromide inhalation solution in healthy subjects.

Treatment of overdosage consists of discontinuation of SPIRIVA RESPIMAT together with institution of appropriate symptomatic and/or supportive therapy.

**11    DESCRIPTION**
The active component of SPIRIVA RESPIMAT is tiotropium.  The drug substance, tiotropium bromide monohydrate, is an anticholinergic with specificity for muscarinic receptors. It is chemically described as (1α, 2ß, 4ß, 5α, 7ß)-7-[(Hydroxydi-2-thienylacetyl)oxy]-9,9-dimethyl-3-oxa-9-azoniatricyclo[3.3.1.0^{2,4}] nonane bromide monohydrate.  It is a synthetic, non-chiral, quaternary ammonium compound.  Tiotropium bromide is a white or yellowish white powder.  It is sparingly soluble in water and soluble in methanol.

The structural formula is:

Tiotropium bromide (monohydrate) has a molecular mass of 490.4 and a molecular formula of $C_{19}H_{22}NO_4S_2Br \cdot H_2O$.

The drug product, SPIRIVA RESPIMAT, is composed of a sterile, aqueous solution of tiotropium bromide filled into a 4.5 mL plastic container crimped into an aluminum cylinder (SPIRIVA RESPIMAT cartridge) for use with the SPIRIVA RESPIMAT inhaler. Excipients include water for injection, edetate disodium, benzalkonium chloride and hydrochloric acid. The SPIRIVA RESPIMAT cartridge is only intended for use with the SPIRIVA RESPIMAT inhaler. The RESPIMAT inhaler is a hand held, pocket sized oral inhalation device that uses mechanical energy to generate a slow moving aerosol cloud of medication from a metered volume of the drug solution.

When used with the SPIRIVA RESPIMAT inhaler, each cartridge containing 4 grams of sterile aqueous solution delivers the labeled number of metered actuations after preparation for use. Each dose (one dose equals two actuations) from the SPIRIVA RESPIMAT inhaler delivers 2.5 mcg or 5 mcg of tiotropium in 22.1 mcL from the mouthpiece. As with all inhaled drugs, the actual amount of drug delivered to the lung may depend on patient factors, such as the coordination between the actuation of the inhaler and inspiration through the delivery system. The duration of inspiration should be at least as long as the spray duration (1.5 seconds).

Prior to first use, the SPIRIVA RESPIMAT cartridge is inserted into the SPIRIVA RESPIMAT inhaler and the unit is primed. When using the unit for the first time, patients are to actuate the inhaler toward the ground until an aerosol cloud is visible and then repeat the process three more times. The unit is then considered primed and ready for use. If not used for more than 3 days, patients are to actuate the inhaler once to prepare the inhaler for use. If not used for more than 21 days, patients are to actuate the inhaler until an aerosol cloud is visible and then repeat the process three more times to prepare the inhaler for use *[see Patient Counseling Information (17)]*.

## 12    CLINICAL PHARMACOLOGY

### 12.1  Mechanism of Action

Tiotropium is a long-acting, antimuscarinic agent, which is often referred to as an anticholinergic. It has similar affinity to the subtypes of muscarinic receptors, $M_1$ to $M_5$. In the airways, it exhibits pharmacological effects through inhibition of $M_3$-receptors at the smooth muscle leading to bronchodilation. The competitive and reversible nature of antagonism was shown with human and animal origin receptors and isolated organ preparations. In preclinical *in vitro* as well as *in vivo* studies, prevention of methacholine-induced bronchoconstriction effects was dose-dependent and lasted longer than 24 hours. The bronchodilation following inhalation of tiotropium is predominantly a site-specific effect.

### 12.2  Pharmacodynamics

Cardiac Electrophysiology

In a multicenter, randomized, double-blind trial using tiotropium dry powder for inhalation that enrolled 198 patients with COPD, the number of subjects with changes from baseline-corrected QT interval of 30 to 60 msec was higher in the SPIRIVA group as compared with placebo. This difference was apparent using both the Bazett (QTcB) [20 (20%) patients vs. 12 (12%) patients] and Fredericia (QTcF) [16 (16%) patients vs. 1 (1%) patient] corrections of QT for heart rate. No patients in either group had either QTcB or QTcF of >500 msec. Other clinical trials with SPIRIVA did not detect an effect of the drug on QTc intervals.

The effect of tiotropium dry powder for inhalation on QT interval was also evaluated in a randomized, placebo- and positive-controlled crossover study in 53 healthy volunteers. Subjects received tiotropium inhalation powder 18 mcg, 54 mcg (3 times the recommended dose), or placebo for 12 days. ECG assessments were performed at baseline and throughout the dosing interval following the first and last dose of study medication. Relative to placebo, the maximum mean change from baseline in study-specific QTc interval was 3.2 msec and 0.8 msec for tiotropium inhalation powder 18 mcg and 54 mcg, respectively. No subject showed a new onset of QTc >500 msec or QTc changes from baseline of ≥60 msec.

### 12.3  Pharmacokinetics

Tiotropium is administered as an inhalation spray. Some of the pharmacokinetic data described below were obtained with higher doses than recommended for therapy. A dedicated pharmacokinetic study in patients with COPD evaluating once-daily tiotropium delivered from the RESPIMAT inhaler (5 mcg) and as inhalation powder (18 mcg) from the HandiHaler resulted in a similar systemic exposure between the two products.

Absorption

Following inhalation of the solution by young healthy volunteers, urinary excretion data suggests that approximately 33% of the inhaled dose reaches the systemic circulation. Oral solutions of tiotropium have an absolute bioavailability of 2% to 3%. Food is not expected to influence the absorption of tiotropium for the same reason. Following 4-week SPIRIVA RESPIMAT once daily dosing, maximum tiotropium plasma concentrations were observed 5-7 minutes after inhalation in COPD and asthma patients.

Distribution

The drug has a plasma protein binding of 72% and shows a volume of distribution of 32 L/kg after an intravenous dose to young healthy volunteers. Local concentrations in the lung are not known, but the mode of administration suggests substantially higher concentrations in the lung. Studies in rats have shown that tiotropium does not penetrate the blood-brain barrier.

Elimination

*Metabolism*

The extent of metabolism is small. This is evident from a urinary excretion of 74% of unchanged substance after an intravenous dose to young healthy volunteers. Tiotropium, an ester, is nonenzymatically cleaved to the alcohol N-methylscopine and dithienylglycolic acid, neither of which binds to muscarinic receptors.

*In vitro* experiments with human liver microsomes and human hepatocytes suggest that a fraction of the administered dose (74% of an intravenous dose is excreted unchanged in the urine, leaving 25% for metabolism) is metabolized by cytochrome P450-dependent oxidation and subsequent glutathione conjugation to a variety of Phase II metabolites. This enzymatic pathway can be inhibited by CYP450 2D6 and 3A4 inhibitors, such as quinidine, ketoconazole, and gestodene. Thus, CYP450 2D6 and 3A4 are involved in the metabolic pathway that is responsible for the elimination of a small part of the administered dose. *In vitro* studies using human liver microsomes showed that tiotropium in supra-therapeutic concentrations does not inhibit CYP450 1A1, 1A2, 2B6, 2C9, 2C19, 2D6, 2E1, or 3A4.

*Excretion*

The terminal half-life of tiotropium in COPD and asthma patients following once daily inhalation is 25 and 44 hours, respectively. Total clearance was 880 mL/min after an intravenous dose in young healthy volunteers. Intravenously administered tiotropium bromide is mainly excreted unchanged in urine (74%). Following 21-day once daily inhalation of 5 mcg of the solution by patients with COPD, 24-hour urinary excretion is 18.6% (0.93 mcg) of the dose. The renal clearance of tiotropium exceeds the creatinine clearance, indicating secretion into the urine. In comparison, 12.8% (0.32 mcg) of the dose was excreted unchanged in the urine over 24 hours at steady state after inhalation of 2.5 mcg in patients with asthma. After chronic once-daily inhalation by COPD and asthma patients, pharmacokinetic steady-state was reached by day 7 with no accumulation thereafter.

Specific Populations
*Geriatric Patients*
As expected for all predominantly renally excreted drugs, advancing age was associated with a decrease of tiotropium renal clearance (347 mL/min in COPD patients <65 years to 275 mL/min in COPD patients ≥65 years). This did not result in a corresponding increase in $AUC_{0-6,ss}$ and $C_{max,ss}$ values following inhalation of the solution. Exposure to tiotropium was not found to differ with age in patients with asthma.

*Pediatric Patients*
The peak and total exposure to tiotropium was not found to differ between pediatric patients (aged 6 to 17 years) and adults with asthma.

*Renal Impairment*
Following 4-week SPIRIVA RESPIMAT 5 mcg once daily dosing in patients with COPD, mild renal impairment (creatinine clearance 60 - <90 mL/min) resulted in 23% higher $AUC_{0-6,ss}$ and 17% higher $C_{max,ss}$ values; moderate renal impairment (creatinine clearance 30 - <60 mL/min) resulted in 57% higher $AUC_{0-6,ss}$ and 31% higher $C_{max,ss}$ values compared to COPD patients with normal renal function (creatinine clearance ≥90 mL/min). The influence of mild or moderate renal impairment on the systemic exposure to SPIRIVA RESPIMAT 2.5 mcg in patients with asthma was similar to what has been described for COPD above. There lacks sufficient data of tiotropium exposure in patients with severe renal impairment (creatinine clearance <30 mL/min) following inhalation of SPIRIVA RESPIMAT. However $AUC_{0-4}$ and $C_{max}$ were 94% and 52% higher, respectively, in patients with severe renal impairment following intravenous infusion of tiotropium bromide.

*Hepatic Impairment*
The effects of hepatic impairment on the pharmacokinetics of tiotropium were not studied.

Drug Interactions
An interaction study with tiotropium (14.4 mcg intravenous infusion over 15 minutes) and cimetidine 400 mg three times daily or ranitidine 300 mg once-daily was conducted. Concomitant administration of cimetidine with tiotropium resulted in a 20% increase in the $AUC_{0-4h}$, a 28% decrease in the renal clearance of tiotropium and no significant change in the $C_{max}$ and amount excreted in urine over 96 hours. Co-administration of tiotropium with ranitidine did not affect the pharmacokinetics of tiotropium.

Common concomitant medications (LABA, ICS) used by patients with COPD were not found to alter the exposure to tiotropium. Similarly, common concomitant medications (LABA, ICS+LABA combinations, oral corticosteroids and leukotriene modifiers) used by patients with asthma were not found to alter the exposure to tiotropium.

## 13    NONCLINICAL TOXICOLOGY
### 13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility
No evidence of tumorigenicity was observed in a 104-week inhalation study in rats at tiotropium doses up to 59 mcg/kg/day, in an 83-week inhalation study in female mice at doses up to 145 mcg/kg/day, and in a 101-week inhalation study in male mice at doses up to 2 mcg/kg/day. These doses correspond to approximately 30, 40, and 0.5, times the maximum recommended human daily inhalation dose (MRHDID) on a $mcg/m^2$ basis, respectively.

Tiotropium bromide demonstrated no evidence of mutagenicity or clastogenicity in the following assays: the bacterial gene mutation assay, the V79 Chinese hamster cell mutagenesis assay, the chromosomal aberration assays in human lymphocytes *in vitro* and mouse micronucleus formation *in vivo*, and the unscheduled DNA synthesis in primary rat hepatocytes *in vitro* assay.

In rats, decreases in the number of corpora lutea and the percentage of implants were noted at inhalation tiotropium doses of 78 mcg/kg/day or greater (approximately 40 times the MRHDID on a $mcg/m^2$ basis). No such effects were observed at 9 mcg/kg/day (approximately 5 times the MRHDID on a $mcg/m^2$ basis). The fertility index, however, was not affected at inhalation doses up to 1689 mcg/kg/day (approximately 910 times the MRHDID on a $mcg/m^2$ basis).

## 14    CLINICAL STUDIES
### 14.1  Chronic Obstructive Pulmonary Disease
The efficacy of SPIRIVA RESPIMAT compared to placebo was evaluated in 6 clinical trials: one dose-ranging trial and 5 confirmatory trials (Trials 1-5). In addition, SPIRIVA RESPIMAT was compared to SPIRIVA HandiHaler in a long-term active-controlled trial in COPD (Trial 6).

Dose-Ranging Trial
Dose selection for the Phase III clinical program was supported by a 3-week randomized, double-blind, placebo and active-controlled, parallel group trial in 202 COPD patients. A total of five doses of tiotropium RESPIMAT (1.25 to 20 mcg) were evaluated compared to placebo. Results demonstrated numerical improvements in $FEV_1$ at all doses compared to placebo. The difference in trough $FEV_1$ from placebo for the 1.25, 2.5, 5, 10 and 20 mcg once daily doses were 0.08 L (95% CI -0.03, 0.20), 0.03 L (-0.08, 0.15), 0.13 L (0.02, 0.25), 0.11 L (-0.004, 0.224), and 0.13 L (0.01, 0.24), respectively. Based on these results, the 5 and 10 mcg doses were further evaluated in the confirmatory COPD trials.

Confirmatory Trials
A total of 6614 COPD patients (2801 receiving SPIRIVA RESPIMAT 5 mcg and 2798 receiving placebo) were studied in the five confirmatory trials of SPIRIVA RESPIMAT. Trials 1 and 2 were 12-week, randomized, double-blind, placebo- and active- (ipratropium) controlled trials that evaluated bronchodilation. Trials 3-5 were 48-week, randomized, double-blind, placebo-controlled, trials that evaluated bronchodilation and effects on COPD exacerbations. Trials 1-4 included both the tiotropium RESPIMAT 5 mcg and 10 mcg doses, whereas Trial 5 included only the 5 mcg dose. These trials enrolled patients who had a clinical diagnosis of COPD, were 40 years of age or older, had a history of smoking greater than 10 pack-years, had an $FEV_1$ less than or equal to 60% of predicted and a ratio of $FEV_1/FVC$ of less than or equal to 0.7. All treatments were administered once-daily in the morning. Change from baseline in trough $FEV_1$ was a primary endpoint in all trials. Trials 3-5 included COPD exacerbations as primary endpoints.

Baseline patient characteristics were similar across the five individual confirmatory trials, except for race in Trial 5 in which there were more Asian patients (30%) compared to other trials (<1%). The mean age ranged from 62 to 66 years. Most patients were male (64-78%), ex-smokers (57-65%) and Caucasian (69-99%). Mean pre-bronchodilator $FEV_1$ was between 1.03 and 1.26 L with a mean $FEV_1/FVC$ ratio of 42-50%. Except for LABAs and other inhaled anticholinergic agents, other pulmonary medications were allowed as concomitant therapy in Trials 1-4. LABA use was permitted in Trial 5.

*Effect on Lung Function*
SPIRIVA RESPIMAT 5 mcg demonstrated significant improvement in trough $FEV_1$ compared to placebo in all 5 confirmatory trials (Table 4). The change from baseline in trough $FEV_1$ over time from Trial 4 is depicted in Figure 1 and is representative of the other two 48-week trials. In Trials 3 and 4 patients treated with SPIRIVA RESPIMAT 5 mcg also used less rescue medication compared to patients on placebo.

**Table 4    Mean Change from Baseline in Trough FEV₁ (L) at End of Treatment**

| Trial | SPIRIVA RESPIMAT 5 mcg N | Placebo N | Trough FEV₁ (L) at End of Treatment Difference from placebo (95% CI) |
|---|---|---|---|
| Trial 1† | 85 | 87 | 0.11 (0.04, 0.18) |
| Trial 2† | 90 | 84 | 0.13 (0.07, 0.18) |
| Trial 3‡ | 326 | 296 | 0.14 (0.10, 0.18) |
| Trial 4‡ | 324 | 307 | 0.11 (0.08, 0.15) |
| Trial 5‡ | 1889 | 1870 | 0.10 (0.09, 0.12) |

† at week 12
‡ at week 48

**Figure 1    Trough FEV₁ Change from Baseline over 48 weeks (Trial 4), SPIRIVA RESPIMAT 5 mcg**



The means are adjusted for center, smoking status at entry and baseline value.

*Exacerbations*

Trials 3, 4, and 5 also evaluated the effect of SPIRIVA RESPIMAT 5 mcg on COPD exacerbations. For Trials 3 and 4, a pooled analysis of exacerbation rate per patient year was pre-specified as a primary endpoint, while the primary endpoint for Trial 5 was time to first exacerbation. Trial 5 also included exacerbation rate per patient year as a secondary endpoint. Exacerbations were defined as a complex of respiratory events/symptoms with a duration of ≥3 days with ≥2 of the following (increase of symptoms or new onset): shortness of breath/dyspnea/shallow, rapid breathing; sputum production (volume); occurrence of purulent sputum; cough; wheezing; chest tightness.

In the pooled analysis of Trials 3 and 4, SPIRIVA RESPIMAT 5 mcg significantly reduced the number of COPD exacerbations compared to placebo with 0.78 exacerbations/patient year versus 1.0 exacerbations/patient year, respectively, with a rate ratio of 0.78 (95% CI 0.67, 0.92). Time to first exacerbation was also delayed in SPIRIVA RESPIMAT 5 mcg patients. For Trial 5, in addition to the definition above, an exacerbation also had to result in a change in or requirement of treatment. In Trial 5, treatment with SPIRIVA RESPIMAT 5 mcg delayed the time to first COPD exacerbation compared to treatment with placebo [hazard ratio of 0.69 (95% CI 0.63, 0.77)]. Consistent with the pooled analysis of Trials 3 and 4, for Trial 5, exacerbation rate was also lower in SPIRIVA RESPIMAT 5 mcg compared to placebo. In Trial 5, SPIRIVA RESPIMAT 5 mcg also reduced the risk of COPD exacerbation-related hospitalization (HR = 0.73; 95% CI = 0.59, 0.90) compared to placebo.

Long-term Active-Controlled Mortality Trial
*Survival*
In a pooled analysis of SPIRIVA RESPIMAT placebo-controlled clinical trials with complete vital status (mortality) follow-up, including the three 48-week trials (Trial 3, 4, and 5) and one 24-week placebo-controlled trial, 68 deaths (Incidence Rate 2.64 deaths per 100 patient years) were observed in the SPIRIVA RESPIMAT 5 mcg treatment group compared to 51 deaths (Incidence Rate 1.98 deaths per 100 patient years) in those treated with placebo. In a 4-year, randomized, double-blind, placebo-controlled, multicenter clinical trial of tiotropium bromide inhalation powder (SPIRIVA HandiHaler) in 5992 COPD patients a similar incidence rate of death had been observed between SPIRIVA HandiHaler and placebo treated groups.

For clarification of the observed difference in fatal events, a long-term, randomized, double-blind, double dummy, active-controlled trial with an observation period up to 3 years was conducted to evaluate the risk of all-cause mortality associated with the use of SPIRIVA RESPIMAT compared to SPIRIVA HandiHaler (Trial 6). The objective of this trial was to rule out a relative excess mortality risk of 25% for SPIRIVA RESPIMAT versus SPIRIVA HandiHaler. The primary endpoints were all-cause mortality and time to first COPD exacerbation. Trial 6 also included a lung function sub-study which measured trough FEV₁ measured every 24 weeks for 120 weeks (461 patients receiving SPIRIVA RESPIMAT 5 mcg, 445 patients receiving SPIRIVA HandiHaler).

In Trial 6, 5711 patients received SPIRIVA RESPIMAT 5 mcg and 5694 patients received SPIRIVA HandiHaler. All patients were followed for vital status (mortality) at the end of the trial. At baseline, patient characteristics were balanced between the two treatment arms. The mean age was 65 years and approximately 70% of subjects were male. Approximately, 82% of patients were Caucasian, 14% were Asian, and 2% were Black. Mean post-bronchodilator FEV₁ was 1.34 L with a mean FEV₁/FVC ratio of 50%. The majority of patients were GOLD II or III (48% and 40%, respectively).

The vital status was confirmed in 99.7% of patients. The median exposure to treatment was 835 days for both treatment groups. All-cause mortality was similar between SPIRIVA RESPIMAT 5 mcg and SPIRIVA HandiHaler with an estimated hazard ratio of 0.96 [(95% CI of (0.84 to 1.09), Table 5].

**Table 5    All-cause Mortality of SPIRIVA RESPIMAT vs SPIRIVA HandiHaler (Trial 6)**

|  | SPIRIVA RESPIMAT 5 mcg (N = 5711) | SPIRIVA HandiHaler (N = 5694) |
|---|---|---|
| Number (%) of Deaths | 423 (7.4) | 439 (7.7) |
| Incidence Rate per 100 patient years | 3.22 | 3.36 |
| HR (95% CI)[a] | 0.96 (0.84, 1.09) ||

[a] Hazard ratios were estimated from a Cox proportional hazard model.

Cause of death was adjudicated by a blinded, independent committee. Cardiovascular deaths included cardiac death, sudden cardiac death, and sudden death; as well as fatal events caused by a cardiac disorder, vascular disorder, or stroke. There were 113 patients (2%) treated with SPIRIVA RESPIMAT 5 mcg who had cardiovascular deaths compared to 101 (2%) patients treated with SPIRIVA HandiHaler. Of the cardiovascular deaths, 11 (0.2%) and 3 (0.1%) deaths were due to myocardial infarction in SPIRIVA RESPIMAT 5 mcg patients and SPIRIVA HandiHaler patients, respectively. For cardiac deaths, sudden cardiac death, and sudden death, there were a total of 69 (1.2%) and 68 (1.2%) deaths in SPIRIVA RESPIMAT 5 mcg patients and SPIRIVA HandiHaler patients, respectively.

Effect on Lung Function and Exacerbations
In the lung function sub-study the effect of SPIRIVA RESPIMAT 5 mcg on trough $FEV_1$ over 120 weeks was similar to SPIRIVA HandiHaler with a mean difference of -0.010 L (95% CI -0.038 to 0.018 L).

Trial 6 also included time to first exacerbation as a co-primary endpoint (exacerbations defined as in Trials 3-5). SPIRIVA RESPIMAT 5 mcg failed to demonstrate superiority to SPIRIVA HandiHaler with a similar time to first COPD exacerbation between treatment groups [hazard ratio of 0.98 (95% CI 0.93 to 1.03)].

**14.2  Asthma**
The SPIRIVA RESPIMAT clinical development program included six 4-week to 8-week cross-over design trials and ten 12-week to 48-week parallel-arm design trials in adult, adolescent (aged 12 to 17 years) and pediatric (aged 1 to 11 years) patients with asthma symptomatic on at least ICS. In all trials, SPIRIVA RESPIMAT was administered on a background of ICS therapy.

Dose Selection
Dose selection for the confirmatory trials was based on three randomized, double-blind, placebo-controlled, 4-week to 8-week, cross-over trials in 256 adult patients, 105 adolescent (age 12 to 17 years) patients, and 101 pediatric (age 6 to 11 years) patients that assessed doses ranging from 1.25 mcg to 10 mcg once daily. Results demonstrated numerical improvements in $FEV_1$ at all doses compared to placebo; however, across the trials, the response was not dose-ordered. For adult patients, in the 4-week trial the difference in peak $FEV_1$ within 3 h post-dosing (peak $FEV_{1, 0-3hr}$) from placebo for the tiotropium RESPIMAT 1.25, 2.5, and 5 mcg doses were 0.138 L (95% CI 0.090, 0.186), 0.128 L (0.080, 0.176), and 0.188 L (0.140, 0.236), respectively. For adolescent patients, the difference in peak $FEV_{1, 0-3hr}$ from placebo for the tiotropium RESPIMAT 1.25, 2.5, and 5 mcg doses were 0.067 L (95% CI −0.005, 0.138), 0.057 L (−0.021, 0.135), and 0.113 L (0.036, 0.190), respectively. For pediatric patients, the difference in peak $FEV_{1, 0-3h}$ from placebo for the tiotropium RESPIMAT 1.25, 2.5, and 5 mcg doses were 0.075 L (95% CI, 0.030, 0.120), 0.104 L (0.059, 0.149), and 0.087 L (0.042, 0.132), respectively. The 10 mcg dose offered no substantial benefit over lower doses and resulted in more systemic anticholinergic side effects (e.g., dry mouth).

The two dose regimen trials in adults with asthma were randomized, double-blind, 4-week, cross-over trials comparing tiotropium RESPIMAT 2.5 mcg twice-daily with 5 mcg once-daily. 24-hour $FEV_1$ results demonstrated comparable treatment effects for twice-daily and once-daily dosing.

12-week to 48-week Parallel-Arm Design Trials in Adults
The program for persistent asthma in adult patients included one 12-week (Trial 1), two replicate 24-week (Trials 2 and 3), and two replicate 48-week (Trials 4 and 5) randomized, double-blind, placebo-controlled trials in a total of 3476 asthma patients (673 receiving SPIRIVA RESPIMAT 2.5 mcg once-daily, 1128 receiving SPIRIVA RESPIMAT 5 mcg once-daily, 541 receiving salmeterol 50 mcg twice daily, and 1134 receiving placebo) on background treatment of at least ICS. Trial 1 evaluated three treatments: SPIRIVA RESPIMAT 2.5 mcg once-daily, SPIRIVA RESPIMAT 5 mcg once-daily, and placebo. Trials 2 and 3 evaluated four treatments: SPIRIVA RESPIMAT 2.5 mcg once-daily, SPIRIVA RESPIMAT 5 mcg once-daily, salmeterol 50 mcg twice daily, and placebo. Trials 4 and 5 evaluated two treatments: SPIRIVA RESPIMAT 5 mcg once-daily and placebo. All trials enrolled patients who had a diagnosis of asthma, were 18 to 75 years of age, and were not current smokers. Patients enrolled in Trials 4 and 5 were required to have airway obstruction that was not fully reversible (post-bronchodilator $FEV_1$/FVC, 0.70). The majority of the 3476 patients in the adult asthma trials were female (60%), Caucasian (61%) or Asian (31%), and had never smoked (81%) with a mean age of 46 years. The patient characteristics for the 12 week to 48 week trials in adult patients with asthma are summarized in Table 6.

**Table 6    Summary of Baseline Patient Characteristics, Adult Confirmatory Studies**

| | Adults, 18 yrs and older | | | | |
| | Trial 1 | Trial 2 | Trial 3 | Trial 4 | Trial 5 |
|---|---|---|---|---|---|
| **Demographics** | | | | | |
| Mean age in years (range) | 42.9 (18 – 74) | 43.3 (18 – 75) | 42.9 (18 – 75) | 53.4 (18-75) | 52.5 (19-75) |
| Mean duration of asthma (years) | 16.2 | 21.7 | 21.8 | 31.5 | 29.1 |
| Smoking status, ex-smoker (%) | 18 | 14 | 19 | 22 | 26 |
| **Laboratory (median)** | | | | | |
| Absolute eosinophils ($10^9$/L) | 0.33 | 0.36 | 0.35 | 0.35 | 0.38 |
| Total IgE (microgram/L) | 536 | 638 | 641 | 601 | 449 |
| **Pulmonary function test (mean)** | | | | | |
| Pre-bronchodilator $FEV_1$ (L) | 2.30 | 2.18 | 2.21 | 1.55 | 1.59 |
| Reversibility (%) | 24.8 | 22.8 | 22.0 | 15.4 | 15.0 |
| Absolute reversibility (mL) | 556 | 488 | 477 | 215 | 218 |
| Post-bronchodilator $FEV_1$/FVC (%) | 74 | 72 | 72 | 60 | 59 |

The primary efficacy endpoint in Trial 1 was change from pre-treatment baseline in peak $FEV_{1, 0\text{-}3hr}$ at week 12. The co-primary efficacy endpoints in Trials 2 and 3 were change from pre-treatment baseline in peak $FEV_{1, 0\text{-}3hr}$ and change from pre-treatment baseline in trough $FEV_1$ at week 24. Additional efficacy measures included asthma exacerbation, Asthma Control Questionnaire (ACQ), and Asthma Quality of Life Questionnaire (AQLQ).

For Trials 1, 2, and 3, SPIRIVA RESPIMAT 2.5 mcg showed statistically significant improvements in lung function over placebo when used in addition to background treatment of ICS (Table 7).

**Table 7    Differences from Placebo in Peak $FEV_{1, 0\text{-}3 hr}$ and Trough $FEV_1$, Adult Confirmatory Studies at Primary Endpoint Time Evaluation**

| Treatment (Duration) *ICS Background Treatment* [b,c] | Treatment in mcg/day | n | Peak $FEV_{1, 0\text{-}3hr}$, in L [a] | | | Trough $FEV_1$, in L [a] | | |
|---|---|---|---|---|---|---|---|---|
| | | | Δ from baseline | Difference from placebo | | Δ from baseline | Difference from placebo | |
| | | | | Mean | 95% CI | | Mean | 95% CI |
| **Adult patients, age 18 years and older** | | | | | | | | |
| **Trial 1 (12 weeks)** *Low dose ICS* | SPIRIVA RESPIMAT 2.5 mcg | 154 | 0.29 | 0.16 | 0.09, 0.23 | 0.13 | 0.11 | 0.04, 0.18 |
| | Placebo | 155 | 0.13 | | | 0.02 | | |
| **Trial 2 (24 weeks)** *Medium dose ICS* | SPIRIVA RESPIMAT 2.5 mcg | 259 | 0.29 | 0.24 | 0.18, 0.29 | 0.15 | 0.19 | 0.13, 0.24 |
| | Salmeterol 100 mcg | 271 | 0.27 | 0.21 | 0.16, 0.27 | 0.09 | 0.12 | 0.06, 0.18 |
| | Placebo | 265 | 0.05 | | | −0.03 | | |
| **Trial 3 (24 weeks)** *Medium dose ICS* | SPIRIVA RESPIMAT 2.5 mcg | 256 | 0.29 | 0.21 | 0.16, 0.26 | 0.16 | 0.18 | 0.12, 0.23 |
| | Salmeterol 100 mcg | 264 | 0.25 | 0.18 | 0.12, 0.23 | 0.09 | 0.11 | 0.05, 0.16 |
| | Placebo | 253 | 0.08 | | | −0.01 | | |

[a] Means adjusted for treatment, center/country, visit, visit*treatment, baseline, baseline*visit.
[b] Additional asthma medications allowed in stable doses prior to and throughout the trials.
[c] Low dose ICS = 200–400 mcg budesonide-equivalent. Medium dose ICS = 400–800 mcg budesonide-equivalent.

Trials 1, 2, and 3 also included a SPIRIVA RESPIMAT 5 mcg once daily treatment arm. In these asthma trials, the $FEV_1$ response (change from baseline for tiotropium compared to placebo) was generally lower for the 5 mcg dose compared to the 2.5 mcg dose. The peak $FEV_{1\ 0\text{-}3hr}$ response was 16% to 20% lower for the 5 mcg dose compared to the 2.5 mcg dose in all three trials, and, the trough $FEV_1$ response was 11% higher for the 5 mcg dose compared to the 2.5 mcg dose for one trial (Trial 1) and 18% and 24% lower for the 5 mcg dose compared to the 2.5 mcg dose for the other two trials (Trials 2 and 3).

Improvements in morning and evening peak expiratory flow (PEF) were consistent with the observed $FEV_1$ treatment response. Examination of age, gender, smoking history, and serum IgE level subgroups did not identify differences in response among these subgroups.

The improvement of lung function compared to placebo was maintained for 24 hours (Figure 2). The bronchodilator effects of SPIRIVA RESPIMAT 2.5 mcg were apparent after first dose; however, maximum bronchodilator effect took up to 4 to 8 weeks to be achieved.

**Figure 2    FEV₁ Response over 24-Hours following 24-Weeks of Treatment, Trial 3**



Placebo (N=83)
Salmeterol 100 mcg (N=84)
SPIRIVA RESPIMAT 2.5 mcg (N=81)

Asthma exacerbation was assessed in Trials 2 and 3 over the 24-week treatment periods. An asthma exacerbation was defined as an episode of progressive increase in ≥1 asthma symptom(s), such as shortness of breath, cough, wheezing, chest tightness or some combination of these symptoms or a decrease of a patient's best morning PEF of 30% from a patient's mean morning PEF for ≥2 consecutive days that required the initiation or increase in treatment with systemic steroids for ≥3 days. Results of asthma exacerbation are shown in Table 8.

**Table 8    Exacerbations in Patients on ICS over 24-Weeks**

|  | Trial 2 | | Trial 3 | |
|---|---|---|---|---|
|  | SPIRIVA RESPIMAT 2.5 mcg (N=259) | Placebo (N=265) | SPIRIVA RESPIMAT 2.5 mcg (N=256) | Placebo (N=253) |
| Number of patients with at least 1 event, n (%) | 9 (3.5) | 24 (9.1) | 13 (5.1) | 19 (7.5) |
| **Rate of exacerbations per patient year** | | | | |
| Mean rate of events | 0.08 | 0.24 | 0.13 | 0.18 |
| Comparison to Placebo, Rate ratio (95% CI) | 0.32 (0.20, 0.51) | | 0.70 (0.46, 1.08) | |
| **Time to first asthma exacerbation** | | | | |
| Comparison to Placebo, Hazard ratio (95% CI) | 0.37 (0.17, 0.80) | | 0.66 (0.33, 1.34) | |

Trials 2 and 3 also evaluated the rate of exacerbations and time to first asthma exacerbation for the SPIRIVA RESPIMAT 5 mcg dose. The rate of asthma exacerbations compared to placebo for SPIRIVA RESPIMAT 5 mcg was 0.78 (95% CI 0.55, 1.10) in Trial 2 and 0.76 (0.50, 1.16) in Trial 3. The hazard ratio for time to first asthma exacerbation for SPIRIVA RESPIMAT 5 mcg compared to placebo was 0.72 (95% CI 0.39, 1.35), in Trial 2 and 0.72 (0.36, 1.43) in Trial 3.

ACQ and AQLQ were assessed in Trials 2 and 3 at week 24. In Trial 2, the ACQ-7 (7 items) responder rate (defined as a change in score ≥0.5) for the SPIRIVA RESPIMAT 2.5 mcg treatment arm was 63% compared to 53% for placebo with an odds ratio of 1.47 (95% CI 1.02, 2.11). The ACQ-5 (derived from ACQ 7 by removing the FEV₁ component and rescue bronchodilator component) results also had a similar trend. In Trial 2, the AQLQ responder rate (defined as a change in score ≥0.5) for the SPIRIVA RESPIMAT 2.5 mcg treatment arm was 58% compared to 50% for placebo with an odds ratio of 1.34 (95% CI 0.94, 1.93).

<u>12-week and 48-week Parallel-Arm Design Trials in Adolescents 12-17 Years of Age</u>
Efficacy in adolescents was based on partial extrapolation of efficacy in adults and two randomized, double-blind, placebo-controlled trials of 12 and 48 weeks duration in a total of 789 asthma patients 12 to 17 years of age (252 receiving SPIRIVA RESPIMAT 2.5 mcg once-daily, 264 receiving 5 mcg once-daily, and 273 receiving placebo). The 12-week trial enrolled patients with severe asthma who were on background treatment of ICS plus one or more controller medications (e.g. LABA). The 48-week trial enrolled patients with moderate asthma on background treatment of at least ICS. The majority of the patients in the trials were male (63.4%), Caucasian (93.7%) and had never smoked (99.9%) with a mean age of 14.3 years.

The primary efficacy endpoint in both trials was change from pre-treatment baseline in peak $FEV_{1, 0-3hr}$. The primary endpoint evaluation for FEV₁ was defined at week 24 for the 48-week trial and at end of the treatment period (week 12) for the 12-week trial. Given the demonstration of efficacy in the adult population, the results of the 2 trials support the efficacy of SPIRIVA RESPIMAT 2.5 mcg once daily in adolescent patients 12-17 years of age with asthma (mean difference in peak $FEV_{1, 0-3hr}$ from placebo for SPIRIVA RESPIMAT 2.5 mcg were 0.13 L (95% CI 0.03, 0.23) and 0.11 L (0.002, 0.22) for the 48-week and 12-week trials, respectively).

<u>12-week and 48-week Parallel-Arm Design Trials in Pediatric Patients 6-11 Years of Age</u>
Efficacy in pediatric patients 6-11 years of age was based on partial extrapolation of efficacy in adults and two randomized, double-blind, placebo-controlled trials of 12 and 48 weeks duration in a total of 801 asthma patients 6 to 11 years of age (271 receiving SPIRIVA RESPIMAT 2.5 mcg once-daily, 265 receiving 5 mcg once-daily, and 265 receiving placebo). The 12-week trial enrolled patients with severe asthma who were on background treatment of ICS plus one or more controller medications (e.g. LABA). The 48-week trial enrolled patients with moderate asthma on background treatment of at least ICS. The primary efficacy endpoint in both trials was

change from pre-treatment baseline in peak $FEV_{1, 0-3hr}$ with the evaluation defined at week 24 for the 48-week trial and at end of the treatment period (week 12) for the 12-week trial. The majority of the patients in the trials were male (67.8%) and Caucasian (87.0%) with a mean age of 9.0 years.

Compared to placebo, SPIRIVA RESPIMAT 2.5 mcg once daily had a significant effect on the primary endpoint in the 48 week, but not the 12 week trial, with  mean differences in peak $FEV_{1, 0-3hr}$ from placebo of 0.17 L (95% CI 0.11, 0.23) and 0.04 L (95% CI -0.03, 0.10) for the 48-week and 12-week trials, respectively.  Given the demonstration of efficacy in the adult and adolescent population, the results support the efficacy of SPIRIVA RESPIMAT 2.5 mcg once daily in pediatric patients 6-11 years of age with asthma.

## 16      HOW SUPPLIED/STORAGE AND HANDLING
SPIRIVA RESPIMAT Inhalation Spray is supplied in a carton containing one SPIRIVA RESPIMAT cartridge and one SPIRIVA RESPIMAT inhaler.

The SPIRIVA RESPIMAT cartridge is provided as an aluminum cylinder with a tamper protection seal on the cap. The SPIRIVA RESPIMAT cartridge is only intended for use with the SPIRIVA RESPIMAT inhaler and should not be interchanged with any other RESPIMAT device delivered product.

The SPIRIVA RESPIMAT inhaler is a cylindrical shaped plastic inhalation device with a gray colored body and a clear base. The clear base is removed to insert the cartridge. The inhaler contains a dose indicator. The written information on the label of the gray inhaler body indicates that it is labeled for use with the SPIRIVA RESPIMAT cartridge.

SPIRIVA RESPIMAT Inhalation Spray is available in two dosage strengths, identified by dose delivered per actuation and by the color of the cap and associated container label: aqua represents 2.5 mcg per actuation; blue represents 1.25 mcg per actuation.

To deliver the recommended dosage for COPD:
- SPIRIVA RESPIMAT Inhalation Spray          2.5 mcg/actuation      60 metered actuations          (NDC 0597-0100-61)
- SPIRIVA RESPIMAT Inhalation Spray          2.5 mcg/actuation      10 metered actuations          (NDC 0597-0100-51) (institutional pack)

To deliver the recommended dosage for asthma:
- SPIRIVA RESPIMAT Inhalation Spray          1.25 mcg/actuation     60 metered actuations          (NDC 0597-0160-61)

The SPIRIVA RESPIMAT cartridge for each strength has a net fill weight of 4 grams and when used with the SPIRIVA RESPIMAT inhaler, is designed to deliver the labeled number of metered actuations after preparation for use.  Each actuation from the SPIRIVA RESPIMAT inhaler delivers 1.25 or 2.5 mcg of tiotropium (equivalent to 1.562 or 3.124 mcg, respectively, of tiotropium bromide monohydrate) from the mouthpiece.

When the labeled number of actuations has been dispensed from the inhaler, the RESPIMAT locking mechanism will be engaged and no more actuations can be dispensed.

After assembly, the SPIRIVA RESPIMAT inhaler should be discarded at the latest 3 months after first use or when the locking mechanism is engaged, whichever comes first.

Keep out of reach of children.  Do not spray into eyes.

*Storage*
Store at 20ºC to 25ºC (68ºF to 77ºF); excursions permitted to 15ºC to 30ºC (59ºF to 86ºF) [see USP Controlled Room Temperature].  Avoid freezing.

## 17      PATIENT COUNSELING INFORMATION
Advise the patient to read the FDA-approved patient labeling (Instructions for Use).

Not for Acute Use
Instruct patients that SPIRIVA RESPIMAT is a once-daily maintenance bronchodilator and should not be used for immediate relief of breathing problems, (i.e., as a rescue medication).

Immediate Hypersensitivity Reactions
Inform patients that anaphylaxis, angioedema (including swelling of the lips, tongue, or throat), urticaria, rash, bronchospasm, or itching, may occur after administration of SPIRIVA RESPIMAT.  Advise patient to immediately discontinue treatment and consult a physician should any of these signs or symptoms develop.

Paradoxical Bronchospasm
Inform patients that SPIRIVA RESPIMAT can produce paradoxical bronchospasm.  Advise patients that if paradoxical bronchospasm occurs, patients should discontinue SPIRIVA RESPIMAT.

Worsening of Narrow-Angle Glaucoma
Instruct patients to be alert for signs and symptoms of narrow-angle glaucoma (e.g., eye pain or discomfort, blurred vision, visual halos or colored images in association with red eyes from conjunctival congestion and corneal edema).  Instruct patients to consult a physician immediately should any of these signs and symptoms develop.

Inform patients that care must be taken not to allow the aerosol cloud to enter into the eyes as this may cause blurring of vision and pupil dilation.

Since dizziness and blurred vision may occur with the use of SPIRIVA RESPIMAT, caution patients about engaging in activities such as driving a vehicle or operating appliances or machinery.

Worsening of Urinary Retention
Instruct patients to be alert for signs and symptoms of urinary retention (e.g., difficulty passing urine, painful urination). Instruct patients to consult a physician immediately should any of these signs or symptoms develop.

Treatment of Asthma
Instruct asthma patients that the maximum benefits may only be apparent after 4 to 8 weeks of SPIRIVA RESPIMAT treatment.

Instructions for Administering SPIRIVA RESPIMAT
It is important for patients to understand how to correctly administer SPIRIVA inhalation spray using the SPIRIVA RESPIMAT inhaler.  Instruct patients that SPIRIVA inhalation spray should only be administered via the SPIRIVA RESPIMAT inhaler and the SPIRIVA RESPIMAT inhaler should not be used for administering other medications.

Instruct patients that priming SPIRIVA RESPIMAT is essential to ensure appropriate content of the medication in each actuation.

When using the unit for the first time, the SPIRIVA RESPIMAT cartridge is inserted into the SPIRIVA RESPIMAT inhaler and the unit is primed.  SPIRIVA RESPIMAT patients are to actuate the inhaler toward the ground until an aerosol cloud is visible and then to repeat the process three more times.  The unit is then considered primed and ready for use.  If not used for more than 3 days, patients are to actuate the inhaler once to prepare the inhaler for use.  If not used for more than 21 days, patients are to actuate the inhaler until an aerosol cloud is visible and then repeat the process three more times to prepare the inhaler for use.

Instruct caregivers of children that SPIRIVA RESPIMAT should be used with an adult's assistance.

Distributed by:
Boehringer Ingelheim Pharmaceuticals, Inc.
Ridgefield, CT 06877 USA

Licensed from:
Boehringer Ingelheim International GmbH

**Address medical inquiries to: (800) 542-6257.**

SPIRIVA®, HANDIHALER®, and RESPIMAT® are registered trademarks of and are used under license from Boehringer Ingelheim International GmbH

Copyright © 2021 Boehringer Ingelheim International GmbH
ALL RIGHTS RESERVED

COL10534AK082021

**Instructions for Use**
**SPIRIVA® RESPIMAT®** (speh REE vah - RES peh mat)
(tiotropium bromide inhalation spray), for oral inhalation use

**For oral inhalation only**
**Do not spray SPIRIVA RESPIMAT into your eyes.**

Read this Instructions for Use before you start using SPIRIVA RESPIMAT and each time you get a refill. There may be new information. This leaflet does not take the place of talking to your doctor about your medical condition or your treatment.

You will need to use this inhaler 1 time each day, at the same time each day. Each time you use it take 2 puffs.

**Use SPIRIVA RESPIMAT exactly as prescribed by your doctor.** Do not change your dose or how often you use SPIRIVA RESPIMAT without talking with your doctor. Children should use SPIRIVA RESPIMAT with the help of an adult, as instructed by their doctor.

**Tell your doctor about all of the medicines you take, including prescription and over-the-counter medicines, vitamins, and herbal supplements.** SPIRIVA RESPIMAT may affect the way some medicines work and some other medicines may affect the way SPIRIVA RESPIMAT works. Do not use other inhaled medicines with SPIRIVA RESPIMAT without talking to your doctor.

The SPIRIVA RESPIMAT inhaler has a slow moving mist that helps you inhale the medicine.

**Do not turn the clear base before inserting the cartridge.**

Your SPIRIVA RESPIMAT may have either an aqua or a blue cap, depending on the strength prescribed by your doctor. The steps shown below should be followed.



How to store your SPIRIVA RESPIMAT inhaler
- Store SPIRIVA RESPIMAT at room temperature between 68°F to 77°F (20°C to 25°C).
- **Do not** freeze your SPIRIVA RESPIMAT cartridge and inhaler.
- If SPIRIVA RESPIMAT has not been used for more than 3 days, release 1 puff towards the ground.
- If SPIRIVA RESPIMAT has not been used for more than 21 days, repeat steps 4 to 6 under the "Prepare for first use" until a mist is visible. Then repeat steps 4 to 6 three more times.
- **Keep your SPIRIVA RESPIMAT cartridge, inhaler, and all medicines out of the reach of children.**

**How to care for your SPIRIVA RESPIMAT inhaler**
Clean the mouthpiece, including the metal part inside the mouthpiece, with a damp cloth or tissue only, at least 1 time each week. Any minor discoloration in the mouthpiece does not affect your SPIRIVA RESPIMAT inhaler.

**When to get a new SPIRIVA RESPIMAT inhaler**
- The scale on your inhaler shows the number of puffs in the inhaler. You should use 2 puffs 1 time each day.
- The dose indicator shows approximately how many puffs are left in the inhaler.
- When the dose indicator enters the red area of the scale you need to refill your prescription as soon as possible.
- When the dose indicator reaches the end of the red scale, your SPIRIVA RESPIMAT is empty and automatically locks. At this point, the clear base cannot be turned any further.



- Three months after insertion of cartridge, throw away the SPIRIVA RESPIMAT even if it has not been used, or when the inhaler is locked, or when it expires, whichever comes first.

**Prepare for first use**

| | |
|---|---|
| **1. Remove clear base**<br><br>• Keep the cap closed.<br>• Press the safety catch while firmly pulling off the clear base with your other hand. Be careful not to touch the piercing element.<br>• Write the discard by date on the label (3 months from the date the cartridge is inserted). | |
| **2. Insert cartridge**<br><br>• Insert the narrow end of the cartridge into the inhaler.<br>• Place the inhaler on a firm surface and push down firmly until it clicks into place. | |
| **3. Replace clear base**<br><br>• Put the clear base back into place until it clicks.<br>• Do not remove the clear base or the cartridge after it has been put together. | |
| **4. Turn**<br><br>• Keep the cap closed.<br>• Turn the clear base in the direction of the arrows on the label until it clicks (half a turn). | |

| **5. Open** | |
|---|---|
| • Open the cap until it snaps fully open. |  |

| **6. Press** | |
|---|---|
| • Point the inhaler toward the ground.<br>• Press the dose-release button.<br>• Close the cap.<br>• If you do not see a mist, repeat steps 4 to 6 until a mist is seen.<br>• **After a mist is seen, repeat steps 4 to 6 three more times.**<br>• **After complete preparation of your inhaler, it will be ready to deliver the number of puffs on the label.** |  |

**Daily use (T O P)**

| <u>T</u>urn | |
|---|---|
| • Keep the cap closed.<br>• **Turn** the clear base in the direction of the arrows on the label until it clicks (half a turn). |  |

| <u>O</u>pen | |
|---|---|
| • **Open** the cap until it snaps fully open. | |

**Press**

- Breathe out slowly and fully.
- Close your lips around the mouthpiece without covering the air vents.
- Point the inhaler to the back of your throat.
- While taking a slow, deep breath through your mouth, **Press** the dose-release button and continue to breathe in.
- Hold your breath for 10 seconds or for as long as comfortable.
- Repeat **Turn, Open, Press (TOP)** for a total of 2 puffs.
- Close the cap until you use your inhaler again.



**Answers to Common Questions**

**It is difficult to insert the cartridge deep enough:**
**Did you accidentally turn the clear base before inserting the cartridge?** Open the cap, press the dose-release button, then insert the cartridge.

**Did you insert the cartridge with the wide end first?** Insert the cartridge with the narrow end first.

**I cannot press the dose-release button:**
**Did you turn the clear base?** If not, turn the clear base in a continuous movement until it clicks (half a turn).

**Is the dose indicator on the SPIRIVA RESPIMAT pointing to 0 (zero)?** The SPIRIVA RESPIMAT inhaler is locked after the labeled number of puffs have been used. Prepare and use your new SPIRIVA RESPIMAT inhaler.

**I cannot turn the clear base:**
**Did you turn the clear base already?** If the clear base has already been turned, follow steps "Open" and "Press" under "Daily use" to get your medicine.

**Is the dose indicator on the SPIRIVA RESPIMAT pointing to 0 (zero)?** The SPIRIVA RESPIMAT inhaler is locked after the labeled number of puffs have been used. Prepare and use your new SPIRIVA RESPIMAT inhaler.

**The dose indicator on the SPIRIVA RESPIMAT reaches 0 (zero) too soon:**
**Did you use SPIRIVA RESPIMAT as indicated (2 puffs 1 time each day)?**

**Did you turn the clear base before you inserted the cartridge?** The dose indicator counts each turn of the clear base regardless whether a cartridge has been inserted or not.

**Did you spray in the air often to check whether the SPIRIVA RESPIMAT is working?** After you have prepared SPIRIVA RESPIMAT, no test-spraying is required if used daily.

**Did you insert the cartridge into a used SPIRIVA RESPIMAT?** Always insert a new cartridge into a **new** SPIRIVA RESPIMAT.

**My SPIRIVA RESPIMAT sprays automatically:**
**Was the cap open when you turned the clear base?** Close the cap, then turn the clear base.

**Did you press the dose-release button when turning the clear base?** Close the cap, so the dose-release button is covered, then turn the clear base.

**Did you stop when turning the clear base before it clicked?** Turn the clear base in a continuous movement until it clicks (half a turn).

<u>**My SPIRIVA RESPIMAT does not spray:**</u>
**Did you insert a cartridge?** If not, insert a cartridge.

**Did you repeat Turn, Open, Press (TOP) less than 3 times after inserting the cartridge?** Repeat <u>T</u>urn, <u>O</u>pen, <u>P</u>ress (TOP) 3 times after inserting the cartridge as shown in steps 4 to 6 under "Prepare for first use".

**Is the dose indicator on the SPIRIVA RESPIMAT pointing to 0 (zero)?** You have used up all your medicine and the inhaler is locked.

For more information about SPIRIVA RESPIMAT, including current prescribing information, a video demonstration or a Quick Start Guide on how to use SPIRIVA RESPIMAT, go to www.spiriva.com, scan the code, or call 1-800-542-6257.



This Instructions for Use has been approved by the U.S. Food and Drug Administration.

Distributed by: Boehringer Ingelheim Pharmaceuticals, Inc., Ridgefield, CT 06877 USA

Licensed from:
Boehringer Ingelheim International GmbH

SPIRIVA® and RESPIMAT® are registered trademarks of and are used under license from Boehringer Ingelheim International GmbH

Copyright © 2021 Boehringer Ingelheim International GmbH
ALL RIGHTS RESERVED

Revised: November 2021

COL10534AK082021

# EXHIBIT B

US007284474B2

(12) **United States Patent**　　(10) **Patent No.:**　　**US 7,284,474 B2**
Eigemann et al.　　　　　　　　(45) **Date of Patent:**　　　**Oct. 23, 2007**

(54) **PISTON-PUMPING SYSTEM HAVING O-RING SEAL PROPERTIES**

(75) Inventors: **Jutta Eigemann**, Dortmund (DE); **Johannes Geser**, Ingelheim (DE)

(73) Assignee: **Boehringer Ingelheim International GmbH**, Ingelheim (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 267 days.

(21) Appl. No.: **10/727,286**

(22) Filed: **Dec. 3, 2003**

(65) **Prior Publication Data**

US 2004/0134495 A1　　Jul. 15, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/431,640, filed on Dec. 6, 2002.

(30) **Foreign Application Priority Data**

Dec. 6, 2002　(EP)　................................. 02027243

(51) **Int. Cl.**
**F16J 15/18**　　(2006.01)
(52) **U.S. Cl.** ........................ **92/168**; 417/416; 604/151; 604/152
(58) **Field of Classification Search** ................ 604/131, 604/134, 135, 151, 152; 277/438, 910; 92/168; 417/416
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,246,833 A | | 1/1981 | Burklund |
| 4,468,221 A | * | 8/1984 | Mayfield ..................... 604/152 |
| 4,813,932 A | * | 3/1989 | Hobbs .......................... 604/74 |
| 4,961,726 A | * | 10/1990 | Richter ........................ 604/74 |
| 6,132,755 A | | 10/2000 | Eicher et al. |
| 6,389,955 B1 | | 5/2002 | Schaefer |
| 6,409,175 B1 | * | 6/2002 | Evans et al. ................. 277/314 |
| 6,547,756 B1 | * | 4/2003 | Greter et al. ................. 604/74 |
| 6,916,159 B2 | * | 7/2005 | Rush et al. ................. 417/321 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 19921951 A1 | 11/1999 |
| EP | 0361260 A2 | 4/1990 |

* cited by examiner

*Primary Examiner*—Kevin C. Sirmons
*Assistant Examiner*—Laura C. Schell
(74) *Attorney, Agent, or Firm*—Michael P. Morris; Mary-Ellen M. Devlin; Alan R. Stempel

(57) **ABSTRACT**

The present invention relates to a piston pumping system for substantially gas-free measurement and/or pumping of predetermined quantities of liquids, preferably pharmaceutical liquids containing oxidation-prone ingredients. Preferably, the system is used as a micropump or as a component thereof in medical devices such as transdermal therapeutic systems, for example.

**17 Claims, 3 Drawing Sheets**





FIG. 1

# FIG. 2



# FIG. 3



# FIG. 4



US 7,284,474 B2

**1**

# PISTON-PUMPING SYSTEM HAVING O-RING SEAL PROPERTIES

## RELATED APPLICATIONS

Benefit of U.S. Provisional Application No. 60/431,640, filed Dec. 6, 2002 is herby claimed.

## FIELD OF THE INVENTION

The present invention relates to a piston pumping system for substantially gas-free measurement and/or pumping of predetermined quantities of liquids, preferably pharmaceutical liquids containing oxidation-prone ingredients. Preferably, the system is used as a mini- or micropump or as a component thereof in medical devices such as for example transdermal therapeutic systems.

## PRIOR ART

In medical devices for delivering pharmaceutical liquids it is often necessary to measure defined volumes of the liquid from a storage system using a pumping system and transfer them to the place of delivery. The smaller and handier the device, the smaller the pump must be. In conventional filling systems and/or pump-operated transporting systems it may happen that the liquid comes into contact with gas from the environment or this gas mixes with the liquid during the transfer from one space into another by means of the pump. This intermingling of gas and liquid is not always desirable. In some cases this effect is unacceptable. Thus, for example, there are liquids containing substances prone to oxidation and mixing with oxygen from the air, for example, critically affects the pharmaceutical quality of the formulation. In other cases the gas which has entered the measuring chamber can falsify the measuring process and thus alter the quantity of liquid to be delivered. In other cases in which the liquid is administered parenterally, e.g. intravenously, the liquid to be delivered must not of itself contain any appreciable amounts of gas, so as not to endanger the health of the patient.

This problem of gas penetration occurs particularly with piston pumping systems in which the liquid to be taken from a storage system is transferred into a measuring chamber by means of a cyclically reciprocating piston and from there is delivered to the intended location. In systems of this kind the pump piston moves within a guide tube and is sealed off from it. The seal is intended to prevent any liquid from escaping from the filling chamber or any gas from entering the filling chamber.

Examples of medical devices suitable for the invention include transdermal therapeutic systems as disclosed in EP 0840634. Such systems consist essentially of a reservoir for the medicament and at least one—typically several—micro-pins with capillary openings which are connected to the reservoir so that the pharmaceutical composition in the form of a solution containing an active substance travels from the reservoir into the micro-pins. When the transcorneal system is placed on the skin the pins pass through the stratum corneum and possibly the epidermis so that the pharmaceutical composition gains direct access to the innervated layer of the skin. In this way the pharmaceutical composition can flow from the reservoir through the capillary openings of the micro-pins into vascularised parts of the skin in order to be absorbed from there into the blood stream through the capillary system. In the systems the active substance is usually in the form of a solution to ensure satisfactory

**2**

transportation through the capillary openings of the micro-pins of the transcorneal system.

The medicament may be transported "actively"—e.g. by means of excess pressure stored in the reservoir or by electrostatic or capillary forces, or using a pump integrated in the system. An active system of this kind is described in EP 0840634 B1.

## DESCRIPTION OF THE INVENTION

The aim of the present invention is to provide a piston-operated pumping system which guarantees that during the measuring and/or pumping of liquids by means of a piston pumping system, substantially no gas can pass along the piston from outside and enter the filling or pumping chamber.

A further objective is to provide a pumping system for medical devices which prevents the pharmaceutical liquid from being mixed with oxygen, air or any other gas as a result of the measuring or pumping process.

A further objective is to overcome the disadvantages of pumping systems in medical devices known from the prior art.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention now relates to a piston pumping system which can be used as or in a small pump, e.g. a mini- or micropump, in medical devices for the direct administration of pharmaceutical formulations. Preferably, the device according to the invention is used in medical devices which require or may require a pump for delivering liquids. However, the invention may be used in any other piston pumping system, not restricted to medical devices, in which it is of advantage. The invention is also not restricted to mini-pumps or micropumps but may also be applied to larger pumping systems.

Within the scope of the present invention, the term medical device preferably denotes application devices for liquids such as transdermal therapeutic systems with active transportation of the active substance, devices for the intravenous administration of liquid formulations in small amounts, atomisers for liquids such as inhalers, particularly propellant-free inhalers, needleless injectors, eye sprays, etc. Medical devices of this kind also serve to some extent as primary packaging for pharmaceutical preparations or may be regarded as such, as the pharmaceutical preparation is initially stored in these devices before the device is used on or for the patient. Therefore, the concept also includes medical devices which serve as primary packaging.

According to the invention, a piston pumping system is provided which, using sealing materials suitable for food or drug use, improves the sealing of the piston in the pumping system against the diffusion of air or other gases from the outer environment into the liquid which is to be drawn up or measured and thus reduces the penetration of air or other gases into this liquid. The pumping system according to the invention overcomes the above mentioned disadvantages of current pumping systems.

A pumping and measuring system suitable for the invention may consist of a chamber having a liquid inlet and a liquid outlet, a piston being connected to the chamber in such a way that by a stroke-like movement of the piston along its longitudinal axis liquid can be taken in from a storage system in a predetermined quantity through the

US 7,284,474 B2

3

liquid inlet and from there can be delivered, optionally under pressure, through the liquid outlet.

Between two stroke movements the system can rest. In many cases the storage system is constructed as a flexible container which collapses as liquid is removed. In storage systems of this kind, particularly systems with very small dimensions, i.e. a measuring or pumping chamber with a capacity in the microliter range and corresponding cross sections for the inlets and outlets and a storage system, a static underpressure or static vacuum may be produced in the chamber in the resting phase. This means that the underpressure in the storage system is passed on to the pumping chamber.

The pumping system according to the invention is therefore designed both for dynamic high pressure loading and also for dynamic and/or static underpressure loading. By high pressure is meant pressures of more than 1 bar. The system is preferably designed for a pressure of up to 600 bar, more preferably up to 250 bar. This pressure may be maintained for up to about 10 seconds, preferably up to 5 seconds, more preferably up to 2 seconds.

By underpressure is meant a pressure difference of preferably less than 0.5 bar, preferably less than 100 mbar and most preferably less than 50 mbar. By a static underpressure is meant that this is maintained for a period of more than 5 minutes, preferably more than 1 hour, more preferably more than 10 hours and most preferably about 24 hours.

Within the scope of the present invention the above mentioned chamber is also referred to as a pumping chamber or measuring chamber. Preferably, the chamber has a fill volume of from 1 microliter to 1 ml, more preferably from 1 microliter to 500 microliters, most preferably from 5 microliters to 100 microliters. Volumes of 5 microliters to 30 microliters are most preferred.

The liquid inlet or the supply system connected to the liquid inlet, which brings the liquid from the storage system into the chamber, is preferably formed by pipes or tubes. The cross section of the tube opening is preferably less than 1 mm, more preferably less than 0.5 mm.

The supply system preferably has a non-return valve which prevents the liquid sucked in from running back into the storage container. The system comprising the liquid inlet and/or the supply system is also referred to as the intake system within the scope of the present description of the invention.

The intake system may optionally be integrated in the pump piston. In this case the pump piston is a hollow piston. The hollow interior of the piston then constitutes the feed for the liquid from the storage system into the chamber or is connected to such a feed. In this case the intake system contains a non-return valve, preferably as an integral part of the piston.

The liquid outlet or the release system for the liquid connected to the liquid outlet, which supplies the liquid from the pumping or measuring chamber to its intended destination, may have a non-return valve of this kind, but this is not essential. The liquid outlet will always have a non-return valve when the filling system is such that it is possible or undesirable for the liquid forced out of the measuring chamber to flow back from the destination through the liquid outlet and back into the pumping or measuring chamber.

The situation is comparable when there is a danger of air being drawn into the pumping chamber from outside through the release system. Here again a non-return valve is advisable.

4

The system of fluid inlet and/or the above-mentioned release system is also referred to as the release system within the scope of the present description.

The moveable piston projecting into the pumping or measuring chamber is guided within a cylindrical bore of a solid element, for example a block or a wall. A block or a wall of this kind may be an independent element in the pumping system or may be an integral part of the chamber. The piston may be inserted into the chamber or extracted from it by means of a predetermined stroke movement. This stroke movement fills and empties the chamber. The dimensions of the piston and the chamber should be matched to each other accordingly.

The piston preferably has a length of 5 mm to 10 cm, preferably from 1 cm to 7.5 cm. The diameter of the piston is preferably 0.25 to 4 mm, more preferably 0.5 to 3 mm and most preferably 0.75 to 2.25 mm.

The stroke movement of the piston along its longitudinal axis preferably covers a length of from 1 mm to 5 cm, particularly from 0.25 cm to 3 cm. Stroke movements of from 0.5 cm to 2 cm are most preferred.

A seal on the piston seals off the space between the piston and the chamber, independently of the movement of the piston, thus preventing liquid from escaping. In other words the piston is guided within the pumping system such that in normal operation it cannot escape from the cylindrical guide and always performs its sealing function. The sealing materials, like all other materials of systems for dosing pharmaceutical liquids, are subject to particular requirements. Thus, they may be of such a nature that there is no impairment of the pharmaceutical quality of the liquid and no contamination which could endanger the health of the end consumer. These requirements apply particularly to the sealing material as well, which is generally an elastic polymer, from which constituents can continue to escape during use, which are undesirable in the liquids being dosed, for the reasons stated above. In connection with this the public discussion regarding plasticisers etc in packaging materials for foodstuffs and the like might be borne in mind. Therefore, within the scope of the pump according to the invention, the sealing systems used for the piston must be selected primarily so that they do not affect the quality of the liquid. The outline conditions relating to function must be subordinate to this criterion. Such secondary properties of the sealing material include the density of the material and/or its permeation coefficient for air or other gases.

According to the invention, the guiding of the piston within the pumping system is preferably effected by means of silicon seals as silicon has the properties which make it acceptable for use with food or pharmaceuticals as referred to above. One disadvantage of this sealing material and other sealing materials which are suitable under food or drug regulations is the fact that these materials have a relatively high permeation coefficient for air, with the result that air and oxygen can diffuse through the sealing material into the liquid being dispensed. Current sealing materials such as NBR or PU, for example, cannot be used in every case for pharmaceutical reasons.

Preferably the seal is in the form of an O-ring seal. By an O-ring is meant an annular seal, irrespective of the shape of its cross section. O-ring seals with a circular cross section are preferred.

The piston may be sealed off by one or more O-rings. Preferably there is at least one seal in the guide tube for the piston close to the point of entry of the piston into the pumping chamber.

US 7,284,474 B2

5

When O-rings of this kind are incorporated for sealing dynamically loaded piston rods the prior art envisages cross sectional compression of 10% to about 15%. This is intended to provide a balanced ratio of wear to leaktightness.

Surprisingly, it has now been found that this installation ratio in the medical devices according to the invention does not provide a sufficient seal for static vacuum sealing. For seals of this kind compressions of more than 50% and a groove filling level of usually 80% or up to 100% in the case of vacuum seals are taught (Wilhelm Schmitt, "Kunststoffe und Elastomere in der Dichtungstechnik", W. Kohlhammer GmbH 1987, Chapter 2.1.4, page 228, Chapter 2.2.1, page 231). In the case of static vacuum seals, according to the prior art cited, compression levels of more than 50%, the use of vacuum grease, a peak-to-valley height of the groove and surrounding area of less than 0.5 microns and a very low gas permeability are essential prerequisites. The following O-ring basic elastomers are known, for ensuring low gas permeability:

Butyl rubber, epichlorohydrin, fluorocarbon rubber and nitrile rubber with a high acrylonitrile content.

Silicon rubbers are regarded as totally unsuitable as they have particularly high gas permeabilities.

The following table gives an overview of the gas permeabilities of different substances. The gas permeation is compared by means of the gas permeation coefficient P $[N*cm^3*mm/(m^2*h*bar)]$ for nitrogen ($N_2$):

|  | P at 20° C. | P at 80° C. |
| --- | --- | --- |
| Butyl | 0.2-0.6 | 8-15 |
| Epichlorohydrin Copolymer | 0.5-4 | 10-40 |
| Epichlorohydrin Homopolymer | 0.04 | 1-5 |
| Fluorocarbon | 0.2-2 | 12-48 |
| Nitrile | 0.5-5 | 15-100 |
| Ethylene-Propylene | 2-10 | 40-100 |
| Polytetrafluoroethylene | 1.5-5 | 5-30 |
| Polyurethane | 0.5-1.3 | 18-50 |
| Silicon | 100-500 | 500-1200 |

However, such high compression leads to unacceptable wear and very high frictional forces under dynamic loading. The wear not only jeopardises the function according to the invention, in the long term, but may also result in contamination of the liquid in the pumping chamber and hence the active substance formulation with abraded particles, which is unacceptable from a pharmaceutical point of view.

Surprisingly, it has now been found that, contrary to the assumptions from the prior art, the problem of inadequate sealing of the O-ring seal against permeation or diffusion in static vacuum seals using seals with a gas permeation coefficient of 100 to 500 $N*cm^3*mm/(m^2*h*bar)$ can be solved without either increasing the compression of the seal or degreasing the seal but solely by adjusting the level of filling of the seal in the groove which holds it (groove filling level) to the optimum.

According to the invention the O-ring seal is subjected to a radial and possibly axial compression of up to 30%, preferably up to 20%. By radial compression is meant the compression exerted on the sealing ring along the annular plane. According to the invention an O-ring seal with a gas permeation of 100 to 500 $N*cm^3*mm/(m^2*h*bar)$ and a cord thickness of 0.3 to 3 mm, preferably 0.5 to 2 mm, more preferably 0.75 to 1.5 mm, is proposed which seals off a piston reciprocating along its longitudinal axis in a guide tube and is held in a groove, the seal having a radial and possibly axial compression of up to 30%, preferably up to

6

20% and having a groove filling level of 90 to 100%. By a groove filling level of 90% is meant that 90% of the volume of the groove is filled by the seal.

The preferred sealing material is silicon.

The pump according to the invention can be operated mechanically or electrically. Details may be found in the prior art. These embodiments may be controlled electronically, preferably using a microchip.

The piston may be operated for example by coupling to a piezoelectric element. This coupling may be direct, via one or more lever arms or a diaphragm. Preferably, the piston is moved directly by the piezoelectric element. The piezoelectric element itself is actuated by the microchip, for example, in such a case.

The piston may also be operated by means of a spring, e.g. a helical spring, which is mechanically or electrically biased and connected to the piston via a flange. Details may be found from the prior art relating to medical devices, particularly the fields of transdermal therapeutic systems, atomisers, propellant-free inhalers, needleless injectors, etc.

Basically, any physiologically acceptable solvents or mixtures of solvents in which the active substance dissolves sufficiently may be used with the medical devices according to the invention and the pumping system described. By "sufficiently" is meant concentrations of active substance in the solvent such as to allow a therapeutically active quantity of active substance to be administered.

Preferred solvents are water and pharmacologically acceptable alcohols such as ethanol. If it should prove necessary, solubilisers and complexing agents may be used to increase the solubility of the active substance in the solvent. Sensitive or unstable active substances may contain additives to extend their shelf life.

The medical device according to the invention contains a reservoir for storing the active substance solution, a liquid-conveying connection between the reservoir and the pump according to the invention, and a liquid-conveying connection to at least one device which delivers the liquid. The latter may be a nozzle, a micro-pin or a microcutter along which the liquid is passed, a canula or an outlet. Microcutters and micro-pins are described in detail in EP 0840634 and in FIG. 6 therein, while nozzle systems may be inferred from EP 1017469. Such nozzle systems may comprise a single nozzle opening or a plurality of nozzle openings. Such a nozzle may be a body with at least two or more continuous bores extending parallel to one another or inclined relative to one another. In the case of bores which are inclined relative to one another the end with the acute angle is the nozzle outlet end and the other end is the nozzle inlet end.

The devices according to the invention are preferably used to measure out small volumes of liquids, e.g. less than 1 ml or even less than 100 microliters, from a storage system through the pumping and/or measuring system into a pumping chamber from where the liquid is conveyed to the device which delivers it. Such systems comprise, for example, transcorneal therapeutic systems (TTS, "patch" systems), atomisers, particularly pumping systems in nasal sprays, inhalers, eye washes, infusion systems, needleless injectors, etc, provided that they measure out and deliver propellant-free liquids in order to administer them to a patient.

Transcorneal therapeutic systems continuously or discontinuously transfer pharmaceutical formulations from a storage container through the skin into a patient. Thus the pumping system according to the invention may be incorporated, for example, in a TTS as described in EP 0840634, to which reference is hereby expressly made. A system of this kind may consist of a storage system, into which the

US 7,284,474 B2

7

pump piston of the pumping system according to the invention projects, which is preferably in the form of a hollow piston with an integrated non-return valve. The hollow piston opens into the measuring chamber from which a release system leads into one or more pin-like projections. The pin-like projection or projections is or are also hollow and constructed so as to penetrate into the corneum of the patient when the patch system is attached to the patient's skin ready for use, so that the liquid can be pumped in. In a system of this kind the release system which consists of at least one tube preferably has one or more non-return valves.

DESCRIPTION OF THE FIGURES

In a piston pump for metering very small volumes a quantity of liquid of about 15 microliter has to be conveyed very precisely in a single piston stroke. This must also be the case even when the device is actuated for the first time after a period of idleness. To ensure this, no air must enter the pump during the period of idleness as otherwise the metering can longer be carried out with the desired precision.

FIG. 1 shows a pumping system of this kind with a piston 1 having a diameter of 1.5 mm. The piston opens into the pumping chamber 5. The piston is guided within a guide tube 2 and sealed off by means of an O-ring seal 3 in a groove 4. The O-ring has a cord thickness of d1=1.1 mm, for example, and a radial compression of about 20% is set. This results in a groove depth of t =0.9 mm. In order to set the groove filling level a groove width of $b_1$=1.1 mm is selected so as to achieve a groove filling level of 95%

For chemical reasons a silicon elastomer is used as the sealing material.

The piston travels into the pumping and measuring chamber 5. Opening into the chamber is a feed tube 6 with a non-return valve 7 through which liquid is sucked in.

A release tube 8 with a non-return valve 9 draws liquid out of the chamber. The storage chamber is generally designed 6b.

The piston may also be operated by means of a spring 30, e.g. a helical spring, which is mechanically or electrically biased and connected to the piston via a flange. Details may be found from the prior art relating to medical devices, particularly the fields of transdermal therapeutic systems, atomisers, propellant-free inhalers, needleless injectors, etc.

The piston may be operated for example by coupling to a piezoelectric element 32. This coupling may be direct, via one or more lever arms or a diaphragm. Preferably, the piston is moved directly by the piezoelectric element 32. The piezoelectric element 32 itself is actuated by a microchip, for example, in such a case.

FIG. 2 shows the system according to FIG. 1 in which the feed tube 6 is integrated in the piston 1.

FIG. 3 shows a transdermal therapeutic system with the pump according to the invention. The drawing shows a section through a transcorneal system 10 with an active substance reservoir sealed off at the top by a bellows 13. In the active substance reservoir is the active substance solution 14 which is conveyed outwards at the lower end of the active substance reservoir through a system 15 according to FIG. 2 to the micro-pins with capillary openings 12 provided on the underside of the housing. The side parts 16 of the housing and the underside of the housing together with the micro-pins form a structural unit, preferably of thermoplastic plastics. The lid of the housing contains the energy supply in the form of a battery 17 for operating the pumping system

8

and an electronic control 18, e.g. a microchip. Venting means 19 allow the bellows to adapt to the decreased volume as active substance solution is delivered through the micro-pins. Before the transcorneal system is used the micro-pins are protected by a pin protector 20, for example in the form of a cap.

If desired, the micro-pins may contain microvalves 21 as shown in FIG. 4.

What is claimed is:

1. A piston pumping system comprising a piston guided within a guide tube and capable of performing a stroke movement along its longitudinal axis, opening into a pumping chamber, the pumping chamber being connected via a liquid-conveying connection with valve to a storage vessel and from the pumping chamber a liquid conveying connection leads to a device for delivering the liquid, wherein within the guide tube is formed an O-ring seal held by a groove which seals off the piston, has a gas permeation coefficient of 100 to 500 $N*cm^3*mm/(m^2*h*bar)$ for nitrogen ($N_2$) and a radial compression of less than 30% and the seal fills the groove with a groove filling level of more than 90%.

2. A piston pumping system according to claim 1, wherein the groove filling level is more than 95%.

3. A piston pumping system according to claim 1, wherein the valve is a non-return valve.

4. A piston pumping system according to claim 1, wherein a non-return valve is formed in the connection to a device for delivering the liquid.

5. A piston pumping system according to claim 1, wherein the piston has a diameter of 0.25 to 4 mm.

6. A piston pumping system according to claim 1, wherein the piston has a length of 5 mm to 10 cm.

7. A piston pumping system according to claim 1, wherein the stroke movement of the piston along its longitudinal axis covers a length from 1 mm to 5 cm.

8. A piston pumping system according to claim 1, wherein the O-ring seal consists of silicon.

9. A piston pumping system according to claim 1, wherein the piston is a hollow piston in which the liquid-conveying connection with a valve, which connects the pumping chamber to a storage vessel, is integrated.

10. A piston pumping system according to claim 1, wherein the movement of the piston is mechanically controlled.

11. A piston pumping system according to claim 10, wherein the piston is moved by a helical spring.

12. A piston pumping system according to claim 1, wherein the movement of the piston is electronically controlled.

13. A piston pumping system according to claim 12, wherein the piston is controlled by a microchip.

14. A piston pumping system according to claim 12, wherein the piston is moved by a piezoelectric element.

15. A piston pumping system according to claim 1, wherein the pump volume is from 1 microliter to 1 ml.

16. A piston pumping system according to claim 1, wherein the device for delivering the liquid is at least one nozzle, at least one micro-pin or at least one microcutter along which the liquid is guided, at least one canula and/or at least one outlet.

17. A piston pumping system according to claim 1, wherein the cord thickness of the O-ring is from 0.3 to 3 mm.

* * * * *

# EXHIBIT C

US007896264B2

(12) **United States Patent**

Eicher et al.

(10) **Patent No.:** **US 7,896,264 B2**

(45) **Date of Patent:** **Mar. 1, 2011**

(54) **MICROSTRUCTURED HIGH PRESSURE NOZZLE WITH BUILT-IN FILTER FUNCTION**

(75) Inventors: **Joachim Eicher**, Dortmund (DE); **Johannes Geser**, Ingelheim (DE); **Matthias Hausmann**, Dortmund (DE); **Holger Reinecke**, Dortmund (DE)

(73) Assignee: **Boehringer Ingelheim International GmbH**, Ingelheim am Rhein (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 335 days.

(21) Appl. No.: **10/877,134**

(22) Filed: **Jun. 25, 2004**

(65) **Prior Publication Data**

US 2005/0001076 A1      Jan. 6, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/489,348, filed on Jul. 23, 2003.

(30) **Foreign Application Priority Data**

Jun. 30, 2003    (DE)    ................................ 103 30 370
Dec. 4, 2003    (EP)    .................................. 03027927

(51) **Int. Cl.**
**B01D 50/00**        (2006.01)

(52) **U.S. Cl.** ............... **239/590**; 239/590.5; 128/200.14; 55/385.1; 55/321; 55/327

(58) **Field of Classification Search** ............... 55/385.1, 55/466, 320–321, 424–427, 503, 468, 327; 210/153, 317, 449, 489, 446, 488; 239/111, 239/189, 189.06, 222; 128/200.14
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,952,310 A | * | 8/1990 | McMahan et al. | ........ 210/195.3 |
| RE33,444 E | * | 11/1990 | Lerner | ......................... 95/221 |
| 5,456,533 A | * | 10/1995 | Streiff et al. | ............. 366/173.1 |
| 5,547,094 A | * | 8/1996 | Bartels et al. | .................. 216/33 |
| 5,997,263 A | | 12/1999 | Van Lintel et al. | |
| 6,110,247 A | * | 8/2000 | Birmingham et al. | ......... 55/442 |
| 6,503,362 B1 | | 1/2003 | Bartels et al. | |
| 6,846,413 B1 | * | 1/2005 | Kadel et al. | ........... 210/321.86 |
| 6,977,042 B2 | | 12/2005 | Kadel et al. | |
| 7,258,716 B2 | * | 8/2007 | Shekarriz et al. | .............. 55/442 |
| 7,645,383 B2 | | 1/2010 | Kadel et al. | |

FOREIGN PATENT DOCUMENTS

WO        WO 99/16530        *    4/1999

* cited by examiner

*Primary Examiner*—Duane Smith
*Assistant Examiner*—Ives Wu
(74) *Attorney, Agent, or Firm*—Michael P. Morris; David L. Kershner

(57)        **ABSTRACT**

A microstructured nozzle consists of a number of channels produced by microstructuring a plate-shaped member. In the nozzle the channels are located between projections which are arranged side by side in rows and project from a base plate. This microstructured base plate is covered with a cover plate. The channels are narrowly defined in terms of shape, cross sectional area and length. The nozzle contains a filter as the primary structure and a secondary structure downstream of the filter.

The nozzle is used, for example, with an atomiser which produces an aerosol from a fluid containing a medicament.

**37 Claims, 5 Drawing Sheets**





Fig.1

A-A

Fig.2    Fig.3



Fig.4                    Fig.5

Fig.6



Fig.7



*Fig. 8a*



Fig. 8b

US 7,896,264 B2

**1**

## MICROSTRUCTURED HIGH PRESSURE NOZZLE WITH BUILT-IN FILTER FUNCTION

The present invention relates to a microstructured high pressure nozzle with built-in filter function for a high pressure atomiser for nebulising medical fluids.

### PRIOR ART

Inhalation therapy is of ever increasing importance in the treatment of respiratory complaints such as asthma or COPD.

Since chlorofluorocarbon-operated propellant formulations were banned there has been more and more success in developing equally effective or better approaches to the production of aerosols for inhalation into the lungs.

International Patent Applications WO 91/14468 and WO 97/12687 provided a new approach to inhalers which are characterised not only in that they deliver a propellant-free aerosol on a well-tolerated aqueous base the droplet distribution of which is tailor-made for absorption into the lungs, but also in that they are a handy size which is comparable to the size of the known propellant-driven inhalers.

This nebuliser, also known as Respimat®, is able to atomise liquid pharmaceutical solutions in an amount of preferably less than 20 microlitres by a single operation into an aerosol with an average particle size of less than 10 microns. As a result the therapeutically effective dose of the drug can be administered to the patient in tiny volumes.

In this nebuliser, a pharmaceutical solution is first of all pumped out of a reservoir through a cannula with an integrated valve body into a pressure chamber and from there is converted into a aerosol intended for the lungs, using high pressures of up to 500 bar, through a nozzle and sprayed. The pressure is generated by means of a helical spring which is re-tensioned by the patient by the application of slight force before each actuation.

At the same time as the tensioning action the pressure chamber is filled with the pharmaceutical solution. Details of this mechanism can be found in FIGS. 6a und 6b of WO 97/12687.

This atomiser essentially consists of

an upper housing part,

a nozzle in the upper housing part,

a spring housing which is connected to the upper housing part and on which the lower housing part is placed,

a storage container which can be inserted in an inner space defined by the spring housing and

a hollow plunger with an integrated valve body, the hollow plunger leading from the storage container towards the nozzle.

In the upper housing part there is also a pump housing on one end of which is located the nozzle body with the nozzle or nozzle arrangement. The hollow plunger also opens into the pump housing. There is a pressure chamber between it and the nozzle.

The spring housing is rotatably connected to the upper housing part and the spring is finally tensioned by the rotary movement via a tensioning locking mechanism in the upper housing part.

The tensioning of the spring moves a power takeoff flange which is located in the upper part of the spring housing and from which the hollow plunger is suspended.

The hollow piston with valve body corresponds to an apparatus disclosed in WO 97/12687.

The nozzle used is preferably a nozzle or nozzle body produced by microengineering. A microstructured nozzle body of this kind is disclosed for example in WO-94/07607 or

**2**

WO 99/16530. The nozzle of WO 99/16530 is the starting point for the present invention.

Reference is therefore made to the entire specification of WO 99/16530, particularly the embodiment claimed by EP 1017469 B1, with all its features.

The nozzle body consists of two sheets, preferably of glass and/or silicon, securely fixed together, at least one of which has one or more microstructured channels which connect the nozzle inlet end to the nozzle outlet end. The nozzle outlet end with the nozzle openings is preferably on the opposite side from the nozzle inlet end.

The nozzle inlet end [has] a fluid inlet or a plurality of fluid inlets. The inlet or inlets may be constructed as a prefilter or prefilters. Alternatively, the prefilter may be connected separately downstream of the inlet/inlets in the direction of flow.

After passing through the prefilter the fluid flows through a main filter formed by a plurality of projections.

Behind the main filter, viewed in the direction of flow, is a filtrate collecting chamber for fluid which has already been filtered.

From the fluid collecting chamber the fluid goes to an outlet which is preferably constructed in the form of a nozzle with one or more nozzle openings.

The main filter comprises a plurality of projections arranged in rows, preferably in a zigzag shape, projecting from a—preferably flat—base plate and hence an integral part of the base plate. The base plate is completely covered by a—preferably flat—cover plate. This forms a plurality of channels between the projections, the base plate and the cover plate. These channels form a passage from the inlet side to the outlet side of the filter nozzle. The spacing between the base plate in the area around the projections and the cover plate within a row of projections is about the same size as the width of the channels on the side of the projections where the fluid enters the series of channels. Unfiltered fluid enters the filter through one or more oblong inlet slot(s). The inlet slot(s) are about the same height as the projections protruding from the base plate on the inlet side of the filter.

The base plate preferably consists of silicon. This plate is preferably covered from above by a glass plate.

To produce the nozzles, the following steps are carried out:

structuring a batch of the base plates;

joining the batch of base plates and cover plates together; and

separating the individual nozzle arrangements.

The base plate is preferably structured by etching techniques in a manner known per se. The heights of the structures described above are between 2 and 40 microns, usually between 3 and 20 microns, preferably between about 4 and 14 microns, and particularly between 5 and 7 microns. The material used for the base plate is preferably a monocrystalline silicon, as it is cheap and available in a state (i.e. in wafers) in which it is sufficiently flat and parallel with a slight surface roughness, and it can be attached to the cover plate without the additional application of adhesives or other materials during the subsequent connection process. In order to produce a plurality of nozzle arrangements in parallel manner, a plurality of structured base plates are made from a silicon wafer.

After structuring the silicon plate is cleaned. The silicon plate is then attached to a cover plate by anodic bonding (cf. U.S. Pat. No. 3,397,278 of Aug. 13, 1968, Pomerantz et al.).

Suitable cover plates may be, for example, sheets of glass such as alkali borosilicate glass, e.g. Pyrex, (#7740 Corning) or Tempax (Schott). These may be attached by anodic bonding of the silicon and glass.

US 7,896,264 B2

**3**

After the bonding process the composite structure is divided into individual units (e.g. squares) using a high speed rotating diamond circular saw.

This known filter has set out to achieve the objective of economically producing a nozzle of this kind for an inhaler of the type mentioned above (Respimat®).

Surprisingly, it has now been found that the nozzles in their entirety exhibit a spray pattern which is more uniform and advantageous for long-term use if the configuration of the microstructures inside the nozzle is modified.

DESCRIPTION OF THE INVENTION

Against this background the aim of the present invention is to improve the average spray pattern through a plurality of nozzles.

A further aim is to avoid substantially increasing the flow resistance in the nozzle.

Another aim is to use the nozzle according to the invention in an inhaler of the Respimat® type.

This aim is achieved in that in the nozzle of the type in question a second type of microstructure, which differs from the filter structure, is formed in the region between the filter structure and the nozzle outlet, i.e. the filtrate collecting chamber. This second type of microstructure is referred to hereinafter as the secondary structure and the filter structures are classed as the primary structure. In the direction of flow this secondary structure comes after the primary structure.

According to the invention, in order to form the secondary structure in the filtrate collecting chamber additional pillar-shaped built-in elements are constructed. Preferably, they are cylindrical elevations extending from the bottom of the base plate to the cover plate. They are preferably cylinders of circular cross section.

It is advantageous to use built-in elements the height of which corresponds to the height of the filtrate collecting chamber.

The built-in elements may be formed out of the base plate.

In preferred embodiments, the built-in elements are arranged in parallel rows in an ABAB arrangement with preferably equidistant intervals within rows A and B and between rows A and B. The adjacent rows A and B are preferably displaced in the direction of flow by the diameter of the built-in elements. The use of built-in elements of circular cross section produces a geometry in which each of the built-in elements forms the centre of an equilateral hexagon, each angle being formed by an adjacent built-in element (hexagonal design). Naturally, this applies only partly or not at all to the built-in elements positioned at the edge.

The dimensions of the built-in elements are selected so that they do not substantially increase the flow resistance. This is achieved by making the spacings between the built-in elements, each of which forms a throughflow channel for the liquid passing through, such that the resulting cross sectional area perpendicular to the direction of flow which is effectively permeable to the liquid is greater than the corresponding effective cross sectional surface area of the throughflow channels formed by the filter structures. Thus the flow characteristics of the liquid inside the nozzle are most strongly influenced by the structures of the main filter.

The cross section of the built-in elements is preferably such that the flow resistance for a fluid flowing through is minimised. Round or oval cross sections are preferred for this.

As an alternative to the cross sections described above they may also be triangular, trapezoidal or rectangular, while the angles should be aligned in the direction of flow.

**4**

Advantageously there may be embodiments in which the dimensions and the spacings of the built-in elements relative to one another are such that they influence the vaporisability of the solution, by making use of the surface tension of the fluid.

Most preferably, the built-in elements have a spacing in the range from 0.005 mm to 0.02 mm. According to a preferred feature the built-in elements themselves have a diameter in the range from 0.005 mm to 0.02 mm. The spacings should be greater than the smallest spacings of the structures which form the zigzag-shaped filter structure.

The density of the built-in elements is preferably 200,000 to 300,000 per square centimetre, more preferably 250,000 per square centimetre.

However, it has also proved favourable to construct the built-in elements with a concave or, alternatively, a convex circumferential wall.

Advantageously the structures of the main filter are projections extending in a zigzag configuration over the entire width of the interior of the nozzle. The spikes in this configuration point alternately in the direction of the inlet and outlet. An imaginary central line at right angles to the main direction of flow divides the configuration into two areas of roughly equal size.

Because of the zigzag arrangement of the built-in elements of the main filter, the direction of the fluid is changed substantially at right angles, viewed from the original direction of flow. Then in the fluid collecting chamber the direction of flow is changed again, this time back into the opposite direction to the first direction of rotation, at an internal angle of less than 90°.

The above-mentioned projections may be arranged side by side over the entire width of the filter in order to build up the zigzag-shaped configuration.

In a first preferred embodiment the built-in elements are formed on the outlet side behind the zigzag configuration in the direction of flow. The built-in elements may extend from the imaginary central line of the zigzag-shaped configuration to the nozzle openings.

Alternatively in a second embodiment the built-in elements may be formed right into the spikes of the filter system projecting in the direction of the inlet, but preferably with the exception of the region in front of the zigzag-shaped configuration.

In a third alternative embodiment the built-in elements may be arranged in the direction of flow both in front of and behind the zigzag configuration.

In an alternative embodiment the projections of the main filter may be arranged in several rows in a cascade. The projections arranged closer to the inlet side of the filter may be larger than the projections arranged more on the outlet side of the filter.

The spacing between the flat base plate and the flat cover plate in the area around each row of projections arranged in a cascade is about the same as the width of the channels on the side of the projections where the fluid enters the row of channels. This spacing is between half and twice the width of the channel. This spacing may decrease from row to row—viewed in the direction of flow. The channels thus have a substantially square cross section at their entry end for the fluid.

In all the embodiments the spacing between the flat base plate in the area around the projections and the flat cover plate within a row of projections of the main filter may be constant. The spacing may be greater in the region of the end of the row which is close to the outlet side of the filter than in the region of the end of the row which is close to the inlet side of the

US 7,896,264 B2

5

filter. This spacing may preferably increase in substantially linear fashion from one end of the row of projections to the other.

The facing sides of two adjacent rows of projections define a cohesive chamber into which the fluid flows from all the channels between the projections of a first row and from which the fluid flows into all the channels between the projections of the adjacent row. In front of the first row of projections of the main filter there is a collecting chamber of oblong cross section into which the unfiltered or coarsely filtered fluid is conveyed and from which the fluid flows into all the channels between the projections of the first row. Behind the last row of projections is the filtrate collecting chamber of oblong cross section into which the fluid from all the channels of the last row flows and from which the filtered fluid is discharged.

The projections of the main filter may take the form of posts which are straight or curved, viewed in the direction of flow. In addition, the projections may be in the form of—preferably straight—columns of any desired cross section, preferably of circular or polygonal cross section.

The length of the channels extending between the posts is at least twice as great as their height at the entry side for the fluid. The cross section of the channels is approximately square or barrel-shaped or trapezoidal; in the latter case the longer side of the trapezium may be formed by the cover plate. The channels may for example have a length of 5 to 50 μm, a height of 2.5 to 25 μm and a width of 2.5 to 25 μm. The width of the channels may increase towards the outlet side.

The spacing between the rows of projections of the main filter is preferably twice as great as the width of the channel on the entry side. The rows of projections may run parallel to one another or in a meandering pattern or preferably in a zigzag. The rows arranged in a zigzag pattern may be inclined relative to one another at an angle of 2 to 25°.

The particles to be filtered out are initially deposited, as a result of the rows of projections arranged in a zigzag configuration, in the areas on the fluid inlet side located close to the outlet side of the filter, the space between the rows of projections gradually increases, starting in the region of the outlet side of the filter. The filter is not completely blocked and the filter capacity used up until the inlet space between two rows of projections is almost entirely filled with particles to be filtered out.

The degree of separation of the filter is relatively clearly defined owing to the limited fluctuations in the dimensions of the channels. The filter does not require any inflow distributor for the fluid which is to be filtered or any filtrate collector for the fluid once it has been filtered.

The filtered fluid is conveyed in the filtrate collecting chamber to a nozzle. This preferably has two openings inclined towards each other. The fluid is thereby divided by the nozzle into two streams which are directed towards each other so as to meet behind the nozzle opening.

In preferred embodiments, first the primary filter structure and then the secondary structure are formed inside the nozzle in the direction of flow. The filter structure extends over the entire width of the cavity formed inside the nozzle and over a length of preferably 30 to 70%, more preferably 40 to 50% of the entire length of the cavity formed inside the nozzle. Preferably, the filter structures start immediately after or at the nozzle inlet. In particularly preferred embodiments the filter area has two types of filter systems: a preliminary coarse filter and a fine main filter. The coarse filter may be made up of a single row of structural elements formed in parallel over the width of the chamber. The main filter preferably has the

6

zigzag configuration already described. The secondary structure is then formed in the area between the end of the filter and the nozzle outlet.

The nozzle according to the invention may be produced by the methods discussed above from metal, silicon, glass, ceramics or plastics. The base plate may be made of the same material as the cover plate, or a different material. The filter is suitable for high pressure operation, e.g. up to 30 MPa (300 bar).

In the manufacture of the nozzle according to the invention, in a departure from the method known in the art, the underside of the microstructured silicon wafer firmly attached to the glass plate is provided with an adhesive film before the individual nozzles are formed from the plate.

The microstructured filter nozzle according to the invention is of particular importance for filtering and atomising a pharmaceutical composition dissolved in a solvent, in order to produce an aerosol for administration by inhalation. Suitable solvents are water or ethanol or mixtures thereof. Suitable pharmaceutical preparations include for example Berotec (fenoterol hydrobromide), Atrovent (ipratropium bromide), Berodual (ipratropium bromide plus fenoterol hydrobromide), salbutamol (as the sulphate or free base), Combivent (ipratropium bromide plus salbutamol), Oxivent, tiotropium bromide and others.

The present invention thus comprises not only the nozzles according to the invention which are described above but also their mass production, the nozzles thus produced, as well as inhalers, preferably those of the Respimat® type, which contain these nozzles and with which medicinally active inhalant formulations can preferably be atomised.

The microstructured filter nozzle according to the invention has the following advantages in addition to those already mentioned:

thanks to the large number of channels over a small area it remains operational even when some of the channels are blocked by contaminants from the fluid. This property is critical to the usability of the filter, which is combined with a nozzle. When used in an atomiser for dispensing a medicament, failure of the atomiser within a given usage period may have serious consequences for the user.

The channels are narrowly defined in terms of shape, cross sectional area and length. According to one particular embodiment, the dimensions of all the channels within a filter are the same.

The cross section of the channel may be adapted to suit other requirements, e.g. so as to fit the cross section of a nozzle downstream thereof.

A large filtering surface can be accommodated within a small filter volume.

The flow of the fluid before it enters the channels between the rows arranged in a zigzag configuration is substantially directed perpendicularly to the flow in the channels.

The open filter surface (sum of the cross sectional area of all the channels) is at least 50% of the total filter surface.

The filter has a small dead volume, particularly when there is a high density of built-in elements.

The nozzles can be mass-produced in large numbers with low rejection rates.

Crystallisation or precipitation processes in the pharmaceutical fluid in the filtrate collecting chamber are reduced by the built-in elements.

Finally, the change to the structure of the nozzle according to the invention has meant that in mass production the proportion of nozzles which do not exhibit a perma-

US 7,896,264 B2

**7**

nently uniform spray pattern has been reduced by roughly a factor of 100, from 0.1-0.5% to 0.001-0.005%.

The invention will now be explained in more detail with reference to the drawings.

FIG. **1** shows an embodiment of the filter nozzle, viewed from the side which is initially open, which is subsequently covered with the cover plate (not shown). The base plate (**1**) is microstructured between the edge regions (**2**a, **2**b). The rows (**3**) of projections are arranged in a zigzag; the rows are inclined towards each other by an angle α. At the fluid inlet side in front of the zigzag arrangement there is another row of projections (**4**) which act as prefilters. In front of the projections (**4**) there are inlet slots (**5**), through which the unfiltered fluid enters the filter. In this embodiment, adjacent to the filter there is a nozzle (**6**) from which the filtered fluid emerges. The nozzle is an integral part of the base plate. The space between the filter rows (**3**) and the nozzle (**6**) is the filtrate collecting chamber. In this, a secondary structure (**50**) is disposed between the base plate and the cover plate. This secondary structure comprises a large number of built-in elements (**51**) which extend between these two plates. The partial enlargement shown on the right illustrates this state of affairs. The spacings between the built-in elements (**51**) are preferably 0.02 mm from centre to centre. Similarly, the diameter of the built-in elements (**51**) is ideally 0.01 mm.

FIG. **2** shows, on a larger scale, the arrangement of the projections in the rows (**3**). The projections (**7**) are in this case rectangular posts.

FIG. **3** shows a cross section through a row of projections along the line A-A in FIG. **2**. The projections (**7**) have concave curved longitudinal sides between which there are channels (**8**) of barrel-shaped cross section.

FIG. **4** shows several embodiments of projections, in each case viewed from the initially open side of the filter. The drawing shows a rectangular post (**11**), an oblong post (**12**) of constant width and rounded short sides, a wing-like post (**13**), a post (**14**) of constant width and a sloping short side and a post (**15**) curved in the shape of a segment of a circle. The drawing also shows: a square column (**16**), a triangular column (**17**), a round column (**18**) and an octagonal column (**19**).

FIG. **5** shows cross sections through various posts, specifically a rectangular cross section (**21**), a cross section (**22**) with concave curved longitudinal sides, a trapezoidal cross section (**23**), wherein the long side of the trapezium is connected to the base plate (**1**), a trapezoidal cross section (**24**) wherein the short side of the trapezium is connected to the base plate (**1**), and a post (**25**) with two rounded longitudinal edges.

FIG. **6** shows various arrangements of projections, the projections—irrespective of their shape—being indicated by dots of different sizes. The projections may be arranged in a matrix (**31**) or in linear fashion in a row (**32**) or in a meandering shape (**33**) or zigzag shape (**34**). A plurality of projections arranged in a row (**35**), in a meandering shape or in a zigzag shape (**36**) may be arranged in a cascade behind one another.

FIG. **7** shows the orientation of posts in relation to the direction of inflow (**41**) of the fluid. The posts (**42**) are arranged parallel to the direction of inflow, the posts (**43**) are arranged perpendicularly to the direction of inflow and the posts (**44**) are inclined by different amounts to the direction of inflow.

FIGS. **8**a/b, which are identical to FIGS. **6**a/b of WO 97/12687, illustrate the nebuliser (Respimat®) with which the aqueous aerosol preparations according to the invention can advantageously be inhaled.

FIG. **8**a shows a longitudinal section through the atomiser with the spring biased,

**8**

FIG. **8**b shows a longitudinal section through the atomiser with the spring relaxed.

The upper housing part (**77**) contains the pump housing (**78**) on the end of which is mounted the holder (**79**) for the atomiser nozzle. In the holder is the nozzle body (**80**) and the filter according to the invention (**55**). The hollow plunger (**57**) fixed in the power takeoff flange (**56**) of the locking mechanism projects partially into the cylinder of the pump housing. At its end the hollow plunger carries the valve body (**58**). The hollow plunger is sealed off by means of the seal (**59**). Inside the upper housing part is the stop (**60**) on which the power takeoff flange abuts when the spring is relaxed. On the power takeoff flange is the stop (**61**) on which the power takeoff flange abuts when the spring is biased. After the biasing of the spring the locking member (**62**) moves between the stop (**61**) and a support (**63**) in the upper housing part. The actuating button (**64**) is connected to the locking member. The upper housing part ends in the mouthpiece (**65**) and is sealed off by means of the protective cover (**66**) which can be placed thereon.

The spring housing (**67**) with compression spring (**68**) is rotatably mounted on the upper housing part by means of the snap-in lugs (**69**) and rotary bearing. The lower housing part (**70**) is pushed over the spring housing. Inside the spring housing is the exchangeable storage container (**71**) for the fluid (**72**) which is to be atomised. The storage container is sealed off by the stopper (**73**) through which the hollow plunger projects into the storage container and is immersed at its end in the fluid (supply of active substance solution).

A spindle (**74**) for the mechanical counter is mounted in the covering of the spring housing. At the end of the spindle facing the upper housing part is a drive pinion (**75**). A slider (**76**) sits on the spindle.

An atomiser with which an aerosol is to be produced from a medicament-containing fluid contains the nozzle according to the invention which is of similar construction to the nozzle shown in FIG. **1**.

A preferred embodiment will now be described. The numerical values given are preferred numerical values inclusive of 20% deviations. A nozzle of this kind has a base plate 2.6 mm wide and about 5 mm long. Over a width of about 2 mm it preferably contains 40 rows of projections arranged in a zigzag. Each row is 1.3 mm long. The projections are rectangular posts which are 10 μm long and 2.5 μm wide; they project 5 μm from the base plate. Between the posts there are channels which are 5 μm high and 3 μm wide. The built-in elements of the secondary structure have a diameter of 0.01 mm. The spacing of the built-in elements is also 0.01 mm. At the fluid inlet side into the nozzle there is a row of 10 rectangular posts which are 200 μm long and 50 μm wide; they project 100 μm from the base plate. Between these posts are the channels, which are 100 μm high and 150 μm wide. At a spacing of about 300 μm in front of the row of posts is the inlet slot which is about 22 mm wide and 100 μm high.

Behind the rows of posts arranged in a zigzag configuration is the filtrate collecting chamber which is 5 μm high and gradually narrows from a width of 2 mm and opens into a nozzle of rectangular cross section which is 5 μm high and 8 μm wide. This nozzle opening has been produced at the same time as the microstructuring of the base plate.

US 7,896,264 B2

9

Also shown in FIG. 1 is the central line 52 which runs through the zigzag-shaped arrangement of the rows 3 about halfway between the spike 53 on the inlet side and the spike 54 on the outlet side.

LIST OF REFERENCE NUMERALS

1 base plate
2a, 2b edge region
3 row of projections (7)
4 projections (prefilter)
5 inlet slot
6 nozzle
7 projections
8 channel
11, 12, 13, 14, 15 projections (7) in the form of posts
16, 17, 18, 19 projections (7) in the form of columns
21 rectangular cross section of post
22 cross section of post with concave long sides
23 trapezoidal cross section of post (long side attached)
24 trapezoidal cross section of post (short side attached)
25 post with rounded longitudinal edges
31 matrix-like arrangement of projections (7)
32 linear arrangement of projections (7)
33 meander-shaped arrangement of projections (7)
34 zigzag-shaped arrangement of projections (7)
35 projections (7) arranged in several rows
36 projections (7) arranged in a cascade
41 inlet opening for fluid
42 posts aligned parallel with the inlet opening
43 posts aligned perpendicular to the inlet opening
50 secondary structure
50a filtrate collecting chamber
51 built-in elements
52 central line
53 spikes at the inlet side
54 spikes at the outlet side
55 filter
56 power takeoff flange
57 hollow plunger
58 valve body
59 seal
60 stop
61 stop
62 locking member
63 support
64 actuating button
65 mouthpiece
66 protective cover
67 spring housing
68 compression spring
69 snap-in lugs
70 lower housing part
71 storage container
72 fluid
73 stopper
74 spindle
75 drive pinion
76 slider
77 upper housing part
78 pump housing
79 holder
80 nozzle body

10

What is claimed is:

1. Microstructured nozzle comprising:
an inlet for unfiltered fluid,
an outlet for filtered fluid defining a flow direction,
a main filter between the inlet and outlet, the main filter comprising
a plurality of zigzag projections extending transversely to the flow direction from a base plate, defining a plurality of channels and forming spikes in directions of the inlet and the outlet, and
a filtrate collecting chamber between the main filter and the outlet, the filtrate collecting chamber comprising a plurality of pillar-shaped built-in elements extending from the base plate transversely to the flow direction covering an area between the outlet and the main filter and at least part of an area extending between the zigzag projections directed towards the outlet,
wherein one or more spacings between the built-in elements, each of which forms a throughflow channel for the liquid passing through, are such that a resulting cross sectional area transverse to the direction of flow which is effectively permeable to the liquid is greater than a corresponding effective cross sectional surface area of the throughflow channels formed by the projections of the main filter such that the built-in elements do not substantially increase a flow resistance.

2. Microstructured nozzle according to claim 1, wherein the built-in elements have a cylindrical circumferential wall.

3. Microstructured nozzle according to claim 1, wherein the built-in elements are at a spacing of from 0.005 mm to 0.02 mm from one another.

4. Microstructured nozzle according to claim 1, wherein the built-in elements have a diameter of from 0.005 mm to 0.02 mm.

5. Microstructured nozzle according to claim 1, wherein the built-in elements have a concave circumferential wall.

6. Microstructured nozzle according to claim 1, wherein the built-in elements have a convex circumferential wall.

7. Microstructured nozzle according to claim 1, wherein the pillar-shaped built-in elements extend from the base plate to a cover plate.

8. Microstructured nozzle according to claim 1, wherein the projections are formed defining an inlet side of the zigzag configuration between the inlet and the projections, an outlet side of the zigzag configuration between the projections and the outlet, and a central line of the zigzag configuration.

9. Microstructured nozzle according to claim 1, wherein the projections are arranged side by side over an entire width of the filter.

10. Microstructured nozzle according to claim 8, wherein the built-in elements are formed as an integral part of the base plate on the side of the outlet of the zigzag configuration up to the central line.

11. Microstructured nozzle according to claim 8, wherein the built-in elements are formed right into the spikes projecting in the direction of the inlet.

12. Microstructured nozzle according to claim 8, wherein the built-in elements are formed in front of and behind the zigzag configuration in the direction of flow.

13. Microstructured nozzle according to claim 1, wherein a spacing between the base plate in an area around the projections and a cover plate within a row of projections is about the same size as a width of the channels on a side of the projections where the fluid enters the row of projections defining channels.

US 7,896,264 B2

11

14. Microstructured nozzle according to claim 1, wherein the plurality of projections are in the form of columns with a round shape, wherein

several rows of the projections are arranged in a zigzag shaped arrangement,

a cross section of the channels decreases from row to row perpendicularly to the direction of flow of the fluid, viewed in the direction of flow,

the projections that are closer to a side of the inlet of the main filter are larger or are more numerous, so that the channels between them are smaller than the channels between the projections arranged more on a side of the outlet of the filter,

a spacing between the base plate and a cover plate in an area around each row of projections is about a same size as a width of the channels on the side of the inlet where the fluid enters,

an oblong inlet slot for the unfiltered fluid extends over approximately an entire width of the main filter and is about a same height as the projections protruding from the base plate on the inlet side of the main filter, and

an oblong outlet slot for the filtered fluid extends over approximately the entire width of the filter and is about a same height as the projections protruding from the base plate on the outlet side of the filter.

15. Microstructured nozzle according to claim 1, wherein all the projections of the main filter and the built-in elements are formed on the base plate.

16. Microstructured nozzle according to claim 1, wherein the base plate is flat, a spacing between the flat base plate in an area around the projections and a flat cover plate within a row of projections is between half and twice a width of the channels on a side of the projections where the fluid enters the row of projections defining channels.

17. Microstructured nozzle according to claim 1, wherein facing sides of two adjacent rows of projections define a cohesive chamber into which the fluid from all the channels flows between the projections of a first row and out of which the fluid flows into all the channels between the projections of a next row in the direction of flow.

18. Microstructured nozzle according to claim 1, wherein the collecting chamber has an oblong cross section between an inlet slot and a first row of projections into which the unfiltered fluid is conveyed and out of which the fluid flows into all the channels between the projections of the first row, and the collecting chamber has an oblong cross section between a last row of projections and an outlet slot into which the fluid from all the channels of the last row flows, and out of which the filtered fluid is discharged.

19. Microstructured nozzle according to claim 1, wherein

the projections are in a form of posts which are straight or curved, viewed in the direction of flow, or

the projections are in a form of columns.

20. Microstructured nozzle according to claim 1, wherein the channels are at least twice a height of the channels at the entry side for the fluid, a cross section of the channels remaining constant.

21. Microstructured nozzle according to claim 1, wherein the channels have a length of 5 μm to 50 μm, and a height of 2.5 to 25 μm.

22. Microstructured nozzle according to claim 1, wherein the channels are barrel-shaped or trapezoidal in cross section.

23. Microstructured nozzle according to claim 1, wherein the channels are of approximately square cross section on a side of the fluid inlet and the cross section becomes wider towards a side of the fluid outlet.

12

24. Microstructured nozzle according to claim 1, wherein the rows of projections are space apart a distance that is twice a size of a width of the channel on a side of the inlet.

25. Microstructured nozzle according to claim 8, wherein rows in the zigzag configuration are inclined towards one another at an angle α of 2° to 25°.

26. Microstructured nozzle according to claim 1, characterised by a constant spacing between the base plate, which is flat, in an area around the projections and a flat cover plate within a row of projections.

27. Microstructured nozzle according to claim 1, characterised by a spacing between the base plate and a cover plate which tapers in the direction of flow.

28. Microstructured nozzle according to claim 8, characterised by a spacing between the base plate, which is flat, in an area around the projections and a flat cover plate within a row of projections arranged in the zigzag configuration that increases from a region of an end of a row located close to the inlet side of the filter towards a region of an end of a row located close to the outlet side of the filter.

29. Microstructured nozzle according to claim 1, wherein the base plate is structured by isotropic or anisotropic wet or dry etching or a combination of these methods, preferably by anisotropic dry etching.

30. Microstructured nozzle according to claim 1, wherein the base plate is made of silicon, and the nozzle further comprises a cover plate made of glass, attached by anodic bonding.

31. Microstructured nozzle according to claim 1, wherein the filtrate collecting chamber tapers conically in the direction of flow and has at least one nozzle as the outlet.

32. Microstructured nozzle according to claim 1, wherein the base plate is made of silicon, and the nozzle further comprises a cover plate made of silicon, attached by direct bonding.

33. Microstructured nozzle according to claim 1, wherein spacings between the built-in elements, each of which forms a throughflow channel for the liquid passing through, are such that a resulting cross sectional area perpendicular to the direction of flow which is effectively permeable to the liquid is greater than a corresponding effective cross sectional surface area of the throughflow channels formed by the projections of the main filter.

34. Atomiser for inhalation therapy which comprises a microstructured filter according to claim 1.

35. Process for producing a nozzle according to claim 1, wherein in one step microstructures in a form of the filter projections, built-in elements, nozzle inlet and nozzle outlet are etched into one side of a silicon wafer for a large number of nozzles, in a subsequent step a glass plate is firmly attached to this side of the silicon wafer, in an independent step the silicon wafer is placed on an adhesive film and in a final step the individual nozzles are produced from an assembly comprising the silicon wafer and glass plate with the adhesive film on an underside of the silicon wafer, starting from the glass plate side, using a diamond saw.

36. Microstructured nozzle according to claim 1, wherein at least some built-in elements form equilateral hexagonal designs, wherein a center of each of the hexagonal designs is formed by a built-in element and each angle of each of the hexagonal designs is formed by adjacent built-in elements.

37. Microstructured nozzle according to claim 1, wherein the built-in elements are 200000 to 300000 per square centimeter.

*    *    *    *    *

# EXHIBIT D

US007396341B2

## (12) United States Patent
### Schyra et al.

(10) Patent No.: **US 7,396,341 B2**
(45) Date of Patent: **Jul. 8, 2008**

(54) **BLOCKING DEVICE FOR A LOCKING STRESSING MECHANISM HAVING A SPRING-ACTUATED OUTPUT DRIVE DEVICE**

(75) Inventors: **Michael Schyra**, Wuppertal (DE); **Herbert Wachtel**, Bingen (DE)

(73) Assignee: **Boehringer Ingelheim International GmbH**, Ingelheim (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1140 days.

(21) Appl. No.: **10/650,869**

(22) Filed: **Aug. 27, 2003**

(65) **Prior Publication Data**

US 2004/0094147 A1      May 20, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/458,212, filed on Mar. 27, 2003.

(30) **Foreign Application Priority Data**

Aug. 28, 2002    (DE)    ................................ 102 39 443

(51) **Int. Cl.**
*A61M 31/00* (2006.01)

(52) **U.S. Cl.** ............... **604/92**; 128/203.15; 128/203.12; 604/82; 604/48

(58) **Field of Classification Search** ................. 604/192, 604/92; 221/151, 265, 222, 237, 203, 204, 221/154, 152, 2, 6, 7; 70/278.7; 116/240, 116/241, 281, 288, 294, 319, 321, 324
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,263,475 A * 11/1993 Altermatt et al. ....... 128/203.15

5,740,792 A * 4/1998 Ashley et al. .......... 128/203.15
5,829,434 A * 11/1998 Ambrosio et al. ...... 128/203.15

(Continued)

FOREIGN PATENT DOCUMENTS

WO      WO 93 21980 A      11/1993

(Continued)

*Primary Examiner*—Terrell Mckinnon
*Assistant Examiner*—Ian K Holloway
(74) *Attorney, Agent, or Firm*—David A. Dow; Michael P. Morris; Mary-Ellen M. Devlin

(57) **ABSTRACT**

A locking-stressing-mechanism with spring-actuated output drive and a counter with which an apparatus of this kind is fitted, accommodated in a two part housing the two parts of which are mounted to be rotatable relative to each other, can be blocked by means of a pre-stressed leaf spring. The leaf spring is initially accommodated in a recess in the wall of one housing part. As soon as the permitted number of actuations has been reached a push rod pushes the leaf spring out of its resting position. The leaf spring then jumps into a recess in the wall of the other housing part and the two housing parts can no longer be rotated relative to each other. The push rod may be mounted on the pointer of the counter. This blocking device can only be overcome by the application of a force which is sufficient to destroy the device. The device is suitable for blocking a high pressure atomiser or a needleless injector with which a fluid is atomised to form an aerosol or a fluid is injected into a biological tissue.

**11 Claims, 2 Drawing Sheets**



**US 7,396,341 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,871,007 A * | 2/1999 | Clark, Jr. | ............... | 128/200.23 |
| 5,988,496 A * | 11/1999 | Bruna | ..................... | 235/91 R |
| 6,065,471 A * | 5/2000 | Schaeffer et al. | ....... | 128/203.15 |
| 6,453,795 B1 * | 9/2002 | Eicher et al. | .................. | 92/23 |
| 6,729,330 B2 * | 5/2004 | Scarrott et al. | ......... | 128/205.23 |
| 6,948,495 B2 * | 9/2005 | Seppala | ................ | 128/203.15 |

| | | | | |
|---|---|---|---|---|
| 2006/0285987 A1 * | 12/2006 | Jaeger et al. | ................ | 417/572 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 95 34874 A | 12/1995 |
| WO | WO 97 12687 | 4/1997 |
| WO | WO 97 24586 A | 7/1997 |

* cited by examiner



Fig. 1          Fig. 2



Fig. 4



Fig. 3

US 7,396,341 B2

**1**

## BLOCKING DEVICE FOR A LOCKING STRESSING MECHANISM HAVING A SPRING-ACTUATED OUTPUT DRIVE DEVICE

The priority benefit of DE 10239443.1, filed Aug. 28, 2002 and U.S. Provisional Application No. 60/458,212, filed Mar. 27, 2003 are hereby claimed, both of which are incorporated by reference herein.

### FIELD OF THE INVENTION

The invention relates to a blocking device by means of which the proper use of a device equipped with a locking-stressing mechanism and a spring-actuated output drive is prevented after a given number of actuations. The device may be, for example, a high pressure atomiser or a needleless injector.

### BACKGROUND AND DESCRIPTION OF THE INVENTION

The aim of the invention is to reliably limit the period of use of such a device and meet safety requirements. The reasons for the limitation may be based on hygiene, medical or technical considerations.

The locking-stressing-mechanism, which is to be blocked after the permitted period of use has elapsed preferably comprises a helical thrust gear accommodated in a manually operated device, by means of which a rotary movement is converted into a linear movement and an operating spring is put under tension. The operating spring acts on a spring component of the locking-stressing-mechanism the movement of which is initially blocked as soon as the operating spring has reached the tensioned state. Secured in the spring component there may be a piston movably mounted in a cylinder. Inside the cylinder, in front of the piston, is a liquid which is expelled out through a nozzle as the locking mechanism of the locking-stressing mechanism is actuated by the piston driven by the operating spring. The number of actuations of the locking-stressing-mechanism and hence of the device can be counted by a mechanical counter.

WO-93/21980 describes a metered-dose inhaler. The dose of a substance to be inhaled is introduced, by means of a hand-operated device, from a supply of the substance contained in the inhaler, into a chamber from which the dose is expelled with the current of air which the user sucks in through the inhaler as they breathe in. The metered-dose inhaler is fitted with a counter which comprises a rotatable screw spindle and a rod, one end of which engages in the form of a nose in the thread of the screw spindle. The rod moves parallel to the screw spindle as the rotation of the spindle increases. The counter indicates, by means of the position of the nose-like end of the rod, the number of doses which have already been taken out of the supply of substance, or those which can still be taken out. The other end of the rod is movably held in a guide shaft into which the rod extends more deeply as the rotation of the screw spindle increases. As soon as the supply of substance in the inhaler is coming to an end, the nose-like end of the rod engaging in the screw spindle reaches that part of the spindle which has a number of courses of thread having a greater pitch than the rest of the screw spindle. As a result, on each rotation of the screw spindle, the rod moves along faster than before. The other end of the rod meanwhile bears on a flexible lever, and further actuation of the metered-dose inhaler is prevented.

**2**

WO-97/20590 describes a locking stressing mechanism for a spring-actuated output drive. WO-97/24586 describes a mechanical counter for a metering device. WO-97/12687 describes a device for generating high pressure in a fluid in a miniature arrangement provided with a locking stressing mechanism and a counter. The apparatus is used to atomise a fluid to produce an inhalable aerosol. WO-01/64268 describes a needleless injector which contains a locking stressing mechanism.

The pieces of equipment mentioned above by way of example are intended for repeated use, e.g. for repeated atomisation of a given amount of liquid to produce an aerosol for inhalation into the lungs, or for needleless injection of a given quantity of liquid underneath the skin of humans or animals. The quantity of liquid atomised or injected may contain a therapeutically active substance.

An object of the present invention is to provide a device for an apparatus which will reliably, effectively and finally prevent further use of the apparatus after a given number of actuations if there is a compelling reason for this. The apparatus comprises a locking-stressing-mechanism with an operating spring and a spring transfer member in which is accommodated a piston which is mounted to be movable in a cylinder. The components are housed in a two-part housing which comprises an upper housing part and a lower housing part. The two housing parts are mounted to be rotatable relative to each other. The operating spring is tensioned by means of a screw thrust gear by manually rotating the two housing parts relative to each other. At the same time as the housing parts are rotated relative to each other, a mechanical counter is actuated which comprises a threaded spindle and a slider. The threaded spindle is mounted in the wall of the lower housing part. The slider is moved up or down the spindle by an amount which depends on the number of rotations of the two housing parts relative to each other.

This problem is solved according to the invention by a device having the following characterising features:

A recess is provided in the outer wall of the lower housing part and in the inner wall of the upper housing part. The two recesses are opposite each other when the two housing parts are in a given rotary position.

In the recess in the lower housing part there is a movable blocking element which is located only in this recess before the blocking device is activated and allows the two housing parts to rotate relative to each other. After the activation of the blocking device the blocking element is located in both recesses and prevents the two housing parts from rotating relative to each other.

By means of a push-rod which co-operates with the slider on the spindle of the counter, the blocking element is moved out of its resting position into the position which it occupies after activation of the blocking device.

On the one hand, the push-rod may be mounted on the slider to the side of the spindle of the counter. In this embodiment of the blocking device, during normal use of the device, the slider moves towards the upper spindle mounting and towards the upper housing part. The recess in the wall of the lower housing part is mounted next to the axis of the counter spindle. Before the slider makes contact with the upper spindle mounting, the push-rod moves the blocking element located in the recess in the wall of the lower housing part out of its resting position and thereby activates the blocking device.

The push-rod can also be constructed as an extension of the blocking element. In this embodiment, the end of the push-rod projects into the path travelled by the slider during normal use of the device before the slider comes to abut on the upper

US 7,396,341 B2

**3**

mounting of the counter spindle. This embodiment works in exactly the same way as the embodiment described above.

In another embodiment of the blocking device the push rod may be constructed as an extension of the counter spindle and may project beyond the upper spindle mounting. In this case the counter spindle is mounted to be axially moveable. The recess in the wall of the lower housing part is preferably provided on the axis of the counter spindle. Before the blocking device is activated the counter spindle is pressed against the lower spindle mounting by a spring, e.g. a helical spring. In this embodiment of the blocking device the slider moves towards the lower spindle mounting during normal use of the device. As soon as the slider comes to abut on the lower spindle mounting, the counter spindle moves axially towards the upper housing part as it continues to rotate. The extension of the counter spindle in the form of a push rod moves the blocking element located in the recess in the wall of the lower housing part out of its resting position, thereby activating the blocking device.

In a reversal of the embodiments described, the blocking element may be pulled out of its resting position by the slider.

The blocking element located in the wall of the lower housing part may be axially or radially moveable. The blocking element may be a leaf spring, preferably a pre-stressed leaf spring with two legs preferably made of metal.

The blocking device according to the invention has the following advantages:

It is suitable for miniaturised equipment.

It is arranged between the housing parts which overlap one another and in its position of use in a device it is inaccessible to the user.

It is easy to assemble.

A blocking element in the form of a pre-stressed leaf spring with two legs is secured against movement in its resting position without any additional effort.

A pre-stressed leaf spring can be pushed into or pulled out of its resting position with relatively little force.

A pre-stressed leaf spring with two legs jumps abruptly from its resting position into the position it occupies when the blocking device is activated, as soon as it has been moved a certain distance by means of a push rod. Thus the response point of the blocking device is precisely fixed.

The rotation of the two housing parts relative to one another is blocked directly as soon as the blocking element, which was originally located in the recess in the wall of the lower housing part, is situated in both recesses at the same time.

The activated blocking device which contains a prestressed metal leaf spring can only be overcome by a force moment amounting to several Newton metres, which will destroy the blocked device.

The blocking device according to the invention is used for example in a high pressure atomiser or in a needleless injector. A medical liquid administered using such a device may contain a drug dissolved in a solvent. Suitable solvents include, for example, water, ethanol or mixture thereof. The drugs in question may be, for example, Berotec (fenoterol hydrobromide; 1-(3,5-dihydroxy-phenyl)-2-[[1-(4-hydroxy-benzyl)-ethyl]-amino]-ethanol-hydrobromide), Atrovent (ipratropium bromide), Berodual (combination of fenoterol hydrobromide and ipratropium bromide), salbutamol (or albuterol), Combivent, Oxivent (oxitropium bromide), Ba 679 (tiotropium bromide), BEA 2108 (tropenol di-(2-thienyl glycolate), flunisolide, budesonide and others.

**4**

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a partial longitudinal section through the wall of the lower and upper housing part of a blocking device in the resting position.

FIG. **2** shows a partial longitudinal section through the wall of an upper housing part of a blocking device in the active position.

FIG. **3** shows a longitudinal elevation of a blocking device cut open in the region of the counter of the blocking device in the resting position.

FIG. **4** shows a longitudinal elevation of a device cut open in the region of the counter of the blocking device in the active position.

DESCRIPTION OF THE PREFERRED
EMBODIMENT

A preferred embodiment of the blocking device according to the invention will be explained in more detail with reference to the figures. FIGS. **1** and **2** show partial longitudinal sections through the wall of the lower and upper housing part as well as a leaf spring as a blocking element and a push rod level with the recesses in the walls. The longitudinal section runs parallel to the axis of the lower and upper housing parts.

FIGS. **3** and **4** show a longitudinal elevation of a device cut open in the region of the counter and the blocking device.

In FIGS. **1** and **3** the blocking device is shown in the resting position. The blocking element is in its resting position and is located only in the recess in the wall of the lower housing part. FIGS. **2** and **4** show the blocking device activated. The blocking element has been moved out of its resting position and is located in both recesses in the walls of the two housing parts.

The upper housing part (**1**) overlaps the lower housing part (**2**). The gap (**3**) between the two housing parts, mounted to be rotatable relative to each other, is exaggerated in the drawing. In the upper housing part there is the recess (**4**) and in the lower housing part the recess (**5**). The recess (**5**) contains an undercut projection (**6**) which is connected to the lower housing part at the side walls of the recess (**5**). The push rod (**8***a*, **8***b*) projects into the recess in the wall of the lower housing part. The push rod is mounted on the slider (not shown in FIGS. **1** and **2**) which is located on the spindle (not shown in FIGS. **1** and **2**) of the counter. The blocking element is a leaf spring with two legs. In its resting position the leaf spring (**7***a*) is jammed between the base of the recess (**5**) and the undercut projection (**6**). The push rod (**8***a*) is shown in a position which it occupies shortly before making contact with the leaf spring (**7***a*). As the device is further actuated the push rod moves towards the leaf spring and pushes it out of its resting position, until the end of the leaf spring jumps forward behind the projection (**6**). If the two recesses (**4**) and (**5**) are not yet located opposite each other at this moment the end of the leaf spring which has jumped forward behind the projection (**6**) first makes contact with the inner wall of the upper housing part. As soon as the two recesses (**4**) and (**5**) are located opposite one another, as the rotation of the two housing parts relative to each other continues, the end of the leaf spring jumps into the recess (**4**). The leaf spring (**7***b*) is thus located in both recesses and the blocking device is activated.

FIG. **3** shows the spindle (**10**) of the counter on which the slider (**9**) is located in its (lower) starting position before the device is used for the first time. The push rod (**8***a*) is at some distance from the leaf spring (**7***a*).

In FIG. **4** the slider on the spindle is in its (top) end position in which it has made contact with the end of the leaf spring

US 7,396,341 B2

**5**

(**8**b) and pushed the leaf spring out of its resting position, as a result of which the blocking device has been activated.

The pre-stressed leaf spring (**7**a; **7**b) shown in the figures as a blocking element consists for example of spring steel about 0.2 mm thick and is about 3.5 mm wide. The two recesses in the walls of the two housing parts are about 4 mm wide and about 1 mm deep. Once the blocking device has been activated the two housing parts can only be rotated relative to one another by the application of considerable force (force moment about 3 Newton metres), but this destroys the device and makes it unusable.

What is claimed is:

1. Blocking device for an apparatus which comprises a locking-stressing-mechanism with an operating spring and a spring transfer member in which is accommodated a piston which is mounted to be moveable in a cylinder, and these components are housed in a two part housing which comprises an upper housing part and a lower housing part, said upper housing part having an inner wall and said lower housing part having an outer wall, and the two parts are mounted to be rotatable relative to each other, and said operating spring is tensioned by means of a screw thrust gear by manually rotating said two housing parts relative to each other, and at the same time as said housing parts are rotated relative to each other a mechanical counter is actuated which comprises a threaded spindle and a slider, and said threaded spindle is mounted in said wall of the lower housing part, and said slider is moved along said spindle by an amount which depends on the number of rotations of said two housing parts relative to each other, wherein a recess is provided in said outer wall of said lower housing part and in said inner wall of said upper housing part, and the two recesses are opposite each other when said two housing parts are in a given rotary position, and a moveable blocking element is provided which is located

**6**

initially only in the recess in said lower housing part and a push rod for moving said blocking element partially into the recess in said upper housing part to prevent the upper and lower housing parts from rotating relative to each other is provided which cooperates with said slider on said spindle of said counter.

2. Blocking device according to claim **1**, wherein said push rod is mounted on the slider.

3. Blocking device according to claim **1**, wherein said push rod is mounted on the blocking element.

4. Blocking device according to claim **1**, wherein said push rod is constructed as an extension of the spindle of the counter and the spindle is mounted to be axially moveable.

5. Blocking device according to claim **1**, wherein said blocking element is moveable in the axial direction.

6. Blocking device according to claim **1**, wherein said blocking element is a pre-stressed leaf spring.

7. Blocking device according to claim **1**, wherein said blocking element is a pre-stressed leaf spring with two legs.

8. Blocking device according to claim **7**, wherein said pre-stressed leaf spring is further comprised of metal.

9. Use of a blocking device according to claim **1** for blocking an atomiser for atomising a liquid which contains a pharmaceutically active substance.

10. Use of the blocking device according to claim **1** for blocking a needleless injector for injecting a liquid which contains a pharmaceutical active substance into animal or human tissue.

11. A method for blocking a needleless injector for injecting a liquid which contains a pharmaceutically active substance into animal or human tissue, said method comprised of the use of a blocking device according to claim **1**.

\*   \*   \*   \*   \*

# EXHIBIT E

US009027967B2

## (12) United States Patent
### Geser et al.

(10) Patent No.: **US 9,027,967 B2**
(45) **Date of Patent:** **May 12, 2015**

(54) **DEVICE FOR CLAMPING A FLUIDIC COMPONENT**

(75) Inventors: **Johannes Geser**, Ingelheim (DE); **Matthias Hausmann**, Dortmund (DE)

(73) Assignee: **Boehringer Ingelheim International GmbH**, Ingelheim am Rhein (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 813 days.

(21) Appl. No.: **12/641,424**

(22) Filed: **Dec. 18, 2009**

(65) **Prior Publication Data**

US 2010/0154792 A1     Jun. 24, 2010

**Related U.S. Application Data**

(62) Division of application No. 11/031,171, filed on Jan. 7, 2005, now Pat. No. 7,837,235.

(30) **Foreign Application Priority Data**

Jan. 8, 2004     (DE) ......................... 10 2004 001 451

(51) **Int. Cl.**
**B05B 1/00**          (2006.01)
(52) **U.S. Cl.**
CPC ....................................... **B05B 1/00** (2013.01)
(58) **Field of Classification Search**
USPC ........ 285/249, 331, 332, 332.1–332.4, 334.1, 285/334.3, 382.4, 382.5
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,181,060 A | 4/1916 | Bennett |
| 2,278,479 A | 4/1942 | Parker |
| 2,331,020 A | 10/1943 | Frances |
| 2,669,465 A | 2/1954 | Newell |
| 3,249,372 A | 5/1966 | Pollack |
| 3,747,960 A | 7/1973 | Bawa |
| 3,757,960 A | 9/1973 | Hill et al. |
| 3,997,111 A | 12/1976 | Thomas et al. |
| 4,073,157 A | 2/1978 | Aylmer et al. |
| 4,150,794 A | 4/1979 | Higgins |
| 4,244,521 A | 1/1981 | Guse |
| 4,313,570 A | 2/1982 | Olsen |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2291737 A1 | 12/1998 |
| CA | 2404360 A1 | 9/2001 |

(Continued)

OTHER PUBLICATIONS

Advisory Action for parent U.S. Appl. No. 11/031,171, filed Aug. 31, 2009.

(Continued)

*Primary Examiner* — Aaron Dunwoody

*Assistant Examiner* — Fannie Kee

(74) *Attorney, Agent, or Firm* — Michael P. Morris; Mary-Ellen M. Devlin

(57)          **ABSTRACT**

A fluidic component is arranged in an elastomeric shaped part the contour of which is matched to the outer contour of the component and to the inner contour of a holder. The elastomeric shaped part is chamfered towards the fluidic component on its pressure side. When the holder is assembled the elastomeric shaped part is deformed by a projection provided on a mating part and is put under uniformly distributed internal tension, after which the elastomeric shaped part surrounds the fluidic component to its full height.

**11 Claims, 4 Drawing Sheets**



**US 9,027,967 B2**

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,602,809 A * | 7/1986 | Ross et al. ....................... 285/50 |
| 4,660,773 A * | 4/1987 | O'Hanlon ..................... 239/596 |
| 4,936,512 A * | 6/1990 | Tremoulet, Jr. ............... 239/596 |
| 5,033,681 A | 7/1991 | Munoz |
| 5,497,944 A | 3/1996 | Weston et al. |
| 5,716,082 A * | 2/1998 | Vogel et al. ................... 285/343 |
| 5,848,753 A | 12/1998 | Wands et al. |
| 5,964,416 A | 10/1999 | Jaeger et al. |
| 6,176,442 B1 | 1/2001 | Eicher et al. |
| 6,223,933 B1 | 5/2001 | Hochrainer et al. |
| 6,481,435 B2 | 11/2002 | Hochrainer et al. |
| 6,491,897 B1 | 12/2002 | Freund et al. |
| 6,685,691 B1 | 2/2004 | Freund et al. |
| 6,846,413 B1 | 1/2005 | Kadel et al. |
| 6,977,042 B2 | 12/2005 | Kadel et al. |
| 6,986,346 B2 | 1/2006 | Hochrainer et al. |
| 7,040,311 B2 | 5/2006 | Hochrainer et al. |
| 7,090,093 B2 | 8/2006 | Hochrainer et al. |
| 7,314,187 B2 | 1/2008 | Hochrainer et al. |
| 7,837,235 B2 | 11/2010 | Geser et al. |
| 2001/0008632 A1 | 7/2001 | Freund et al. |
| 2001/0032642 A1 | 10/2001 | Bach et al. |
| 2002/0007155 A1 | 1/2002 | Freund et al. |
| 2003/0064032 A1 | 4/2003 | Lamche et al. |
| 2003/0066524 A1 | 4/2003 | Hochrainer et al. |
| 2004/0010239 A1 | 1/2004 | Hochrainer et al. |
| 2004/0143235 A1 | 7/2004 | Freund et al. |
| 2004/0159319 A1 | 8/2004 | Kadel et al. |
| 2004/0182867 A1 | 9/2004 | Hochrainer et al. |
| 2005/0001076 A1 | 1/2005 | Eicher et al. |
| 2005/0032494 A1 | 2/2005 | Swant |
| 2005/0159441 A1 | 7/2005 | Hochrainer et al. |
| 2005/0194472 A1 | 9/2005 | Geser et al. |
| 2005/0263618 A1 | 12/2005 | Spallek et al. |

| | | | |
|---|---|---|---|
| 2006/0196500 A1 | 9/2006 | Hochrainer et al. |
| 2006/0239930 A1 | 10/2006 | Lamche et al. |
| 2006/0258993 A1 | 11/2006 | Hochrainer et al. |
| 2006/0285987 A1 | 12/2006 | Jaeger et al. |
| 2009/0114215 A1 | 5/2009 | Boeck et al. |
| 2009/0185983 A1 | 7/2009 | Freund et al. |
| 2010/0154792 A1 | 6/2010 | Geser et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2653183 A1 | 12/2007 |
| CA | 2653422 A1 | 12/2007 |
| DE | 4115131 A1 | 11/1991 |
| DE | 19722338 A1 | 12/1998 |
| EP | 0046664 A1 | 3/1982 |
| WO | 9114468 A1 | 10/1991 |
| WO | 9407607 A1 | 4/1994 |
| WO | 9701329 | 1/1997 |
| WO | 9712683 A1 | 4/1997 |
| WO | 9712687 A1 | 4/1997 |
| WO | 9827959 A2 | 7/1998 |
| WO | 9916530 A1 | 4/1999 |
| WO | 0164268 A1 | 9/2001 |
| WO | 03002045 A1 | 1/2003 |
| WO | 2005065836 A1 | 7/2005 |
| WO | 2007141201 A1 | 12/2007 |
| WO | 2007141203 A1 | 12/2007 |

OTHER PUBLICATIONS

Office Action for parent U.S. Appl. No. 11/031,171, filed Jun. 1, 2009.

Office Action for parent U.S. Appl. No. 11/031,171, filed Aug. 19, 2008.

International Search Report for PCT/EP2004/014764 mailed Apr. 15, 2004.

* cited by examiner



Fig. 2



Fig. 1c

Fig. 1b

Fig. 1a

Case 2:23-cv-03530-CCC-LDW   Document 1   Filed 06/29/23   Page 84 of 119 PageID: 84



Fig. 5b   Fig. 4b   Fig. 3b

Fig. 5a   Fig. 4a   Fig. 3a

# FIG. 6





Fig. 8c
Prior Art



Fig. 7c



Fig. 8b
Prior Art



Fig. 7b




Fig. 8a
Prior Art



Fig. 7a

US 9,027,967 B2

# DEVICE FOR CLAMPING A FLUIDIC COMPONENT

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to a device for clamping a fluidic component, particularly a nozzle, particularly in the high pressure region. Of particular interest are holders for micro-engineered components, particularly micro-engineered nozzles which are to be produced by micro-engineering. Such nozzles are used for example in nebulizers for producing propellant-free medicinal aerosols used for inhalation.

The aim of the invention is to further improve the clamping of a fluidic component consisting of a wear-resistant, hard, and generally brittle material, and to increase the reliability of the holder.

2. Brief Description of the Prior Art

Micro-engineered nozzles having for example a nozzle aperture of less than 10 μm are described for example in WO 94/07607 and WO 99/16530. The inhalable droplets produced thereby have a mean diameter of about 5 μm, when the pressure of the liquid to be nebulized is from 5 MPa (50 bar) to 40 MPa (400 bar). The nozzles may for example be made from thin sheets of silicon and glass. The external dimensions of the nozzles are in the millimeter range. A typical nozzle consists for example of a cuboid with sides measuring 1.1 mm, 1.5 mm and 2.0 mm, made up of two sheets. Nebulizers for producing propellant-free aerosols in which the device according to the invention for clamping a fluidic component can be used are known from WO 91/14468 or WO 97/12687.

The term fluidic component denotes a component which is exposed to a pressurized fluid, and the pressure is also present inside the component, for example in a nozzle bore. Such a component may be kept pressure-tight for example by pressing into a holder of hard material if the material of the component can withstand mechanical forces without collapsing or deforming to an unacceptable degree. At high pressures, seals of deformable material, e.g. copper, or hard material which can be pressed in with great force are used. In the case of components made of brittle material the known processes for pressure-tight clamping of the component require considerable effort and great care. It is impossible to predict with any reliability the service life of a fluidic component clamped in this way.

U.S. Pat. No. 3,997,111 describes a fluid jet cutting device with which a high-speed fluid jet is produced which is used for cutting, drilling or machining material. The nozzle body is cylindrical and consists e.g. of sapphire or corundum. The setting ring is pressed into an annular recess in the nozzle carrier and seals off the nozzle body against the nozzle carrier.

U.S. Pat. No. 4,313,570 describes a nozzle holder for a water jet cutting device wherein the nozzle body is surrounded by a ring of elastomeric material which is in turn mounted in a recess in the holder. The recess is in the form of a straight cylinder. The cross-section of the ring is rectangular. The outer surface of the recess and the outer and inner surfaces of the ring are arranged concentrically to the axis of the nozzle body and run parallel to one another and to the axis of the nozzle body.

WO 97/12683 discloses a device for clamping a fluidic component which is subjected to fluid pressure, which is suitable for components consisting of a wear-resistant, hard and hence generally brittle material, and which does not produce any excessively great local material tensions in the component. The fluidic component is arranged in a holder which makes contact with the fluidic component on its low pressure side. The fluidic component is surrounded by an elastomeric shaped part the outer contour of which is adapted to the inner contour of the holder and the inner contour of which is adapted to the outer contour of the fluidic component. The elastomeric component surrounds the entire circumference of the fluidic component. At least one free surface of the elastomeric component is exposed to the pressurized fluid. The holder may have a projection on the inside underneath which the elastomeric shaped part is pushed. It has proved difficult to generate internal tension in the elastomeric shaped part which is sufficiently great, even at low fluid pressures, and which is spatially roughly uniformly distributed in the elastomeric shaped part.

This known device has proved pressure-tight when subjected substantially constantly to moderate and high fluid pressures. When subjected to alternating fluid pressures fluctuating between a high peak value and a very low value, the known device is in need of improvement for long-term use.

The problem thus arises of providing a device for clamping a fluidic component which is reliably leak-tight even when subjected to alternating loading from a sharply fluctuating fluid pressure in long-term use. The components needed should be cheap to manufacture and should also be capable of being assembled with relative ease.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1a is a cross-sectional, elevational view of a pot-shaped holder (1).

FIG. 1b is a cross-sectional, elevational view of an elastomeric shaped part (4) and a cuboid, fluidic component (5).

FIG. 1c is a cross-sectional, elevational view of a mating part (9) with a bore (10) and an annular projection (11).

FIG. 2 is an elevational view of the underside of the mating part (9).

FIGS. 3a, 4a, and 5a show the elastomeric shaped part viewed perpendicularly.

FIGS. 3b, 4b, and 5b, are cross-sections through the elastomeric shaped part.

FIG. 6 shows a cross section through the assembled holder which is mounted on a container for a fluid.

FIGS. 7a, 7b and 7c show the holder according to the invention in cross-hatched cross-section.

FIGS. 8a, 8b, and 8c show a prior-art embodiment.

## SUMMARY OF THE INVENTION

This problem is solved according to the invention by a device for clamping a fluidic component which is subjected to alternating fluid pressure and which comprises a holder within which the fluidic component is arranged. The holder makes contact with the fluidic component at its low pressure end. The device comprises an elastomeric shaped part which surrounds the fluidic component over its entire circumference. The outer contour of the elastomeric shaped part is adapted to the inner contour of the holder and the inner contour of the elastomeric shaped part is adapted to the outer contour of the fluidic component. The elastomeric shaped part has at least one free surface which is exposed to the pressurised fluid. The holder is secured at the high pressure end to a mating part, and

before the assembly of the device the elastomeric shaped part is chamfered towards the fluidic component on its side facing the fluid pressure, and

the mating part is provided with an annular projection the outer contour of which is adapted to the inner contour of the holder; after the assembly of the holder with the

US 9,027,967 B2

3

mating part the projection projects into the holder and deforms the elastomeric shaped part, as a result of which a uniformly distributed internal tension is generated in the elastomeric shaped part, and

the volume of the projection on the mating part is adapted to the volume that is missing from the elastomeric shaped part in the region of the chamfer, and

the elastomeric shaped part which is deformed and subjected to internal tension after the assembly of the holder with the mating part almost totally fills the space up to the mating part.

The elastomeric shaped part is chamfered into a recess at its high pressure end. The chamfer begins in the outer surface of the high pressure end of the elastomeric shaped part at a solid line which may be, for example, circular, elliptical, or rectangular. The chamfer may, for example, have a constant angle of inclination, or the angle of inclination may vary in the azimuthal direction. In the latter case, it is preferably smaller along the longer side of a cuboid, fluidic component than along the shorter side of the cuboid, fluidic component. The line of intersection of the chamfer with the recess in the elastomeric shaped part may extend at a constant level, or the line of intersection may be curved.

The projection on the mating part may preferably be annular and of constant width. The outer contour of the projection is preferably adapted to the inner contour of the holder. Moreover, the inner contour of the projection may be adapted to the outer contour of the fluidic component. The projection on the mating part may have a constant width and have a constant height on its circumference, or the projection may vary in width and/or height; it may, for example, be higher in the two areas located opposite the two longer sides of a cuboid, fluidic component than in the two areas located opposite the two shorter sides of a cuboid, fluidic component. In this way, the elastomeric shaped part may deform to different degrees in some areas when the holder and mating part are put together and influence the spatial distribution of the internal tension in the elastomeric shaped part. The internal tension in the elastomeric shaped part is produced substantially by the deformation of the elastomeric shaped part, not by its compression. The deformation of the elastomeric shaped part and the distribution of the tension in the elastomeric shaped part can be determined by the finite elements method (FEM).

The elastomeric shaped part is preferably constructed as an injection-molded part. The pre-elastomer is poured without bubbles into a mould that is adapted to the contours of the holder and the fluidic component. An elastomeric shaped part of this kind behaves somewhat like an incompressible fluid. It fits precisely into the holder and fluidic component. The elastomeric shaped part is only exposed to fluid pressure at the pressure end, not at the sides where it abuts on the holder and on the fluidic component. The elastomeric shaped part allows pressure compensation on the fluidic component. The elastomeric shaped part has no free surface towards the low pressure side. The elastomeric shaped part may consist, for example, of natural rubber or synthetic rubber, such as silicon rubber, polyurethane, ethene-propene rubber (EPDM), fluorine rubber (FKM) or nitrile-butadiene rubber (NBR) or of a corresponding rubber.

The fluidic component may consist of a wear-resistant, hard and hence generally brittle material (such as silicon, glass, ceramics, gemstone, e.g., sapphire, ruby, diamond) or of a ductile material with a wear-resistant hard surface (such as plastics, chemically metallized plastics, copper, hard chromium-plated copper, brass, aluminum, steel, steel with a hardened surface, wear-resistant surfaces produced by physical vapor deposition (PVD) or chemical vapor deposition

4

(CVD), for example, titanium nitride (TiN) or polycrystalline diamond on metal and/or plastics. The fluidic component may be made in one piece or composed of a number of pieces, while the pieces may consist of different materials. The fluidic component may contain cavities, voids or channel structures. In the voids there may be microstructures which act as filters or anti-evaporation means, for example. The channels may be nozzle channels for an atomizer nozzle. An atomizer nozzle may contain one or more nozzle channels the axes of which may extend parallel to one another or be inclined relative to one another. If, for example, there are two nozzle channels the axes of which are located in one plane and which intersect outside the nozzle, the two fluid jets that emerge meet at the point of intersection of the axes and the fluid is atomized.

The holder may consist of virtually any desired material, preferably metal or plastics, and may be a body of revolution or a body of any other shape. The holder may, for example, be a pot-shaped body of revolution which contains a rotationally symmetrical recess, starting from its lid end, the axis of which coincides with the axis of the body of revolution. This recess may be cylindrical or in the shape of a truncated cone, the end of the truncated cone with the larger diameter being located at the lid end of the holder. The outer surface of the recess forms the inner contour of the holder. It may be produced as a molding, as a casting or by processing to remove material (e.g., by machining, etching, erosion, elision).

The mating part may consist of metal or plastics.

The holder which contains the elastomeric molding and the fluidic component is assembled with the mating part. The side of the elastomeric shaped part which contains the chamfer faces towards the mating part. The edge of the holder rests on the mating part. The fluidic component may be pushed into the elastomeric shaped part, preferably before the elastomeric shaped part is inserted in the recess in the holder. The holder may be attached to the mating part by screwing, gluing, welding, crimping, casting or press-fitting or snap-fitting onto the mating part. The holder may preferably be secured to the mating part by a union nut.

In a preferred embodiment the mating part is formed as a body of revolution in the area where it is connected to the holder. The fluid which is under high pressure is conducted to the holder through a channel in the mating part which is coaxial, for example. The fluid enters the channel structure in the fluidic component and leaves the fluidic component at the low pressure end thereof in the region of the base of the holder. The fluid pressure acts within the dead volume on the elastomeric shaped part.

The device according to the invention has the following advantages:

The tension within the elastomeric shaped part is spatially more uniformly distributed than the tension which may be produced in the known embodiment of the holder by an annular projection formed on the inside of the holder, underneath which the elastomeric shaped part is pushed during assembly.

The tension within the elastomeric shaped part may be adjusted, not only by the material properties of the shaped part itself, but by the ratio of the volume of the projection on the mating part to the volume which is absent from the tensionless elastomeric shaped part as a result of the chamfer.

The fluidic component is surrounded to its full height by the elastomeric shaped part which is under tension.

The device according to the invention is pressuretight in long-term use at fluctuating pressures with a large dif-

US 9,027,967 B2

**5**

ference between the maximum pressure (40 Mpa or more) and the minimum pressure (about 0.1 Mpa).

The dead volume between the deformed elastomeric shaped part subjected to internal tension and the side of the mating part facing the holder can be kept small. It serves at the same time to equalise the tolerances when the holder is joined to the mating part.

The controlled deformation of the elastomeric shaped part during the joining of the holder to the mating part prevents the elastomeric shaped part from swelling out through the opening in the fluidic component.

The device according to the invention for clamping a fluidic component is used, for example, in a miniaturized high pressure atomizer (e.g., according to WO 91/12687), in a needle-less injector (e.g., according to WO 01/64268) or in an applicator for opthalmologic, medicinal formulations (e.g., according to WO 03/002045). A medicinal fluid administered with a device of this kind may contain a pharmaceutical substance dissolved in a solvent. Suitable solvents include for example water, ethanol, or mixtures thereof. Examples of the pharmaceutical substances include berotec (fenoterol-hydrobromide, atrovent (ipratropium bromide), berodual (combination of fenoterol-hydrobromide and ipratropium bromide), salbutamol (or albuterol), 1-(3,5-dihydroxy-phenyl)-2-[[1-(4-hydroxy-benzyl)-ethyl]-amino]-ethanol-hydrobromide), combivent, oxivent (oxitropium-bromide), Ba 679 (tiotropium bromide), BEA 2180 (di-(2-thienyl)glycolic acid-tropenolester), flunisolide, budesonide and others. Examples may be found in WO 97/01329 or WO 98/27959.

DESCRIPTION OF THE INVENTION

The device according to the invention is explained more fully with reference to the Figures:

FIG. 1a shows in cross-section and diagonal elevation a pot-shaped holder (1) provided with a recess (2). An opening (3) is provided in the base of the holder.

FIG. 1b shows in cross-section and diagonal elevation an elastomeric shaped part (4) and a cuboid, fluidic component (5), which is made up of two parts and which has been inserted in the elastomeric shaped part. In the contact surface of the two parts a nozzle structure is provided which extends as far as the nozzle aperture (6). The top surface of the elastomeric shaped part (4) at the high pressure end stands in the annular region (7) perpendicular to the axis of the elastomeric shaped part. The chamfer (8) of the elastomeric shaped part begins on the top surface of the elastomeric shaped part and extends as far as the outer surface of the fluidic component.

FIG. 1c shows in cross section and in diagonal elevation a mating part (9) with a bore (10) and an annular projection (11) on its side facing the elastomeric shaped part.

FIG. 2 shows another embodiment of the projection (11) on the mating part (21) in diagonal elevation. The projection (11) is higher in the two diametrically opposite regions (22a, 22b) than in the two diametrically opposite regions (23a, 23b). When the holder is joined to the mating part the higher regions (22a, 22b) of the projection (11) deform the elastomeric shaped part more than the regions (23a, 23b).

FIGS. 3a, 4a, and 5a show the elastomeric shaped part viewed perpendicularly. FIGS. 3b, 4b and 4b show cross-sections through the elastomeric shaped part.

The elastomeric shaped part contains a cuboid recess (31) for a cuboid fluidic component. The cross-section in FIG. 3a runs along the line A-A in FIG. 3a; the line A-A runs perpendicularly to the longer side of the recess (31). The cross section in FIG. 4b runs along the line B-B in FIG. 4a; the line B-B runs perpendicularly to the shorter side of the recess (31).

**6**

The cross section in FIG. 5b runs along the line C-C in FIG. 5a; the line C-C runs diagonally to the recess (31). The line of intersection (32) of the chamfer (8) with the recess (31) runs at a constant level. The angle of inclination (measured from the main axis of the component) of the chamfer (8) is at its greatest in FIG. 3b and at its smallest in FIG. 5b, and in FIG. 4b the angle of inclination has an intermediate value.

FIG. 6 shows a cross section through the assembled holder which is mounted on a container for a fluid. The holder (1) contains in its recess an elastomeric shaped part (4) with the fluidic component (5). A mating part (9) is located on the edge of the holder. The projection (11) on the mating part (9) projects into the recess in the holder (1) and has deformed the elastomeric shaped part (4). The side (61) of the elastomeric shaped part exposed to the fluid is convex, but the deformed elastomer does not extend right up to the nozzle structure in the fluidic component. The dotted lines (64 a) and (64 b) indicate the contour of the chamfered shaped part (4) before the assembly of the holder. The dead volume (63) serves to equalize the tolerances during the assembly of the holder; it has been reduced to the minimum. The holder is secured to the mating part (9) and to the housing (65) for the fluid by a union nut (62). The direction of flow of the fluid is indicated by arrows. The low pressure end of the holder is located in the surface which contains the nozzle aperture (6). The high pressure in the fluid acts in the channel structure within the fluidic component (5), within the dead volume (63), within the bore (10) in the mating part (9) and within the housing that contains the fluid.

FIGS. 7a, 7b, 7c show the holder according to the invention in cross-hatched cross-section and FIGS. 8a, 8b, and 8c compare it with the embodiment in the cross-hatched cross section according to the prior art.

FIG. 7a shows a chamfered elastomeric shaped part (4a) with a fluidic component (5) inserted therein before the assembly of the holder according to the invention. The elastomeric shaped part is almost as high as the fluidic component at its outer edge but lower in the area of contact with the fluidic component at the recess. The elastomeric shaped part is still un-deformed and is not yet under internal tension. FIG. 7b shows the situation after the insertion of a ring (71), causing the elastomeric shaped part (4b) to be deformed and internal tension to be produced inside the elastomeric shaped part. The deformed elastomeric shaped part (4b) extends over the fluidic component as far as its upper edge. The convexity of the elastomeric shaped part scarcely projects beyond the height of the fluidic component. FIG. 7c shows the deformed elastomeric shaped part (4c) after the assembly of the holder. The inserted projection (11) has deformed the elastomeric shaped part (4c). A small dead volume (63) is present between the deformed elastomeric shaped part (4c) and the base of the mating part.

FIG. 8a shows a (non-chamfered) elastomeric shaped part (74a) with a fluidic component (5) inserted therein before the assembly of the holder according to the prior art. The elastomeric shaped part is lower than the fluidic component. The elastomeric shaped part is un-deformed and is not under internal tension. FIG. 8b shows the situation after the addition of a ring (71) which prevents the elastomeric shaped part (74b) from falling out of the holder or from sliding inside the holder but does not deform the elastomeric shaped part. FIG. 8c shows the un-deformed elastomeric shaped part (74c) after the assembly of the holder using a mating part (9), on which an annular projection (11) is provided. The dead volume (75) in FIG. 8c is larger than the dead volume (63) in FIG. 7c.

US 9,027,967 B2

7

### Example

### Mount for an Atomizer Nozzle of Miniature Construction

This device consists of a cylindrical holder made of steel with an external diameter of 6.0 mm and a height of 2.6 mm. It contains a truncated cone-shaped recess with an internal diameter of 4.0 mm at the base of the truncated cone. The base of the holder contains a bore 0.8 mm in diameter. The base of the holder is 0.4 mm thick in the vicinity of the bore.

The outer contour of the elastomeric shaped part made of silicon rubber is cylindrical. Before it is inserted in the holder the cylinder has a diameter of 4.2 mm and is 2.1 mm high on its outer surface. It contains a symmetrically arranged recess 1.3 mm wide and 2.8 mm long which passes axially through the elastomeric shaped part.

The elastomeric shaped part is chamfered towards the recess at its high pressure end. The chamfer begins in the cover surface of the cylinder over a circle with a diameter of 3.2 mm. The chamfer runs at different inclinations towards the rectangular recess to a constant depth of 0.7 mm at the line of intersection with the recess.

The fluidic component is constructed as an atomizer nozzle. The nozzle is a cuboid made up of two sheets of silicon and is 1.4 mm wide, 2.7 mm long, and 2.1 mm high. In the contact surface of the sheets the nozzle contains a recess which is provided with a micro-engineered filter and a micro-engineered evaporation device. On the side of the nozzle where the fluid leaves the nozzle, the recess merges into two channels each of which is 8 μm wide, 6 μm deep, and about 200 μm long. The axes of the two channels are located in one plane and are inclined at about 90 degrees to one another. The two nozzle apertures are spaced from one another by about 100 μm on the outside of the atomizer nozzle.

The essentially cylindrical mating part is provided with an annular projection on its side facing the holder. The projection has an external diameter of 3.15 mm, an internal diameter of 2.9 mm, and a constant height of 0.6 mm. The mating part contains an axial bore 0.4 mm in diameter.

The device is secured to the mating part by means of a union nut. The mating part is part of a container which contains the liquid to be atomized. The liquid is conveyed from the container to the atomizer nozzle by means of a miniaturized high pressure piston pump in amounts of about 15 microliters.

The peak value of the fluid pressure inside the atomizer nozzle is about 65 MPa (650 bar) and falls back to virtually normal air pressure (about 0.1 MPa) after the end of the atomization.

What is claimed is:

1. An apparatus, comprising:

an annular elastomeric part including: (i) an internal passage extending along a central axis from a first end surface thereof to an opposite, second end surface; (ii) a chamfer surface within the internal passage and extending from the first end surface radially inwardly toward the central axis and toward the second end surface thereof, thereby defining an annular rim at a periphery of the first end surface of the annular elastomeric part;

a nozzle including an outer contour and an internal, narrowing nozzle bore extending from a first end to a nozzle aperture at a second end for permitting an aerosol to exit, the nozzle being disposed within the internal passage of the annular elastomeric part such that the first end of the nozzle is adjacent to the chamfer surface of the internal passage; and

8

a mating element including: (i) a bore for delivering pressurized fluid to the first end of the nozzle, and (ii) an annular projection that engages the annular rim of the annular elastomeric part and deforms the annular elastomeric part at the first end of the nozzle when the annular projection is pressed against the annular rim.

2. The apparatus of claim 1, wherein at least one of: the chamfer surface is at a constant or varying angle of inclination at each point along the chamfer surface; and a line of intersection of the chamfer surface with the internal passage in the annular elastomeric part extends at a constant level or is curved.

3. The apparatus of claim 1, wherein the deformation of the annular elastomeric part includes a deformation of the chamfer surface of the annular elastomeric part.

4. The apparatus of claim 1, further comprising a holder, within which the nozzle and annular elastomeric part are arranged, the holder comprising: (i) an inner surface in contact with the second end of the nozzle, (ii) an inner contour that at least one of mates and aligns with an outer contour of the annular elastomeric part, and (iii) an annular end secured to the mating element with at least one of: screwing, gluing, welding, crimping, casting, press-fitting, snap-fitting, and employing a union-nut.

5. The apparatus of claim 1, wherein the annular elastomeric part surrounds the outer contour of the nozzle.

6. The apparatus of claim 1, wherein the projection on the mating element has a width and a height that are independently constant or varying.

7. A method for making a fluidic component clamping assembly, comprising:

inserting a nozzle of the fluidic component into an internal passage of an annular elastomeric part, where:

the annular elastomeric part includes: (i) an internal passage extending along a central axis from a first end surface thereof to an opposite, second end surface; (ii) a chamfer surface within the internal passage and extending from the first end surface radially inwardly toward the central axis and toward the second end surface thereof, thereby defining an annular rim at a periphery of the first end surface of the annular elastomeric part, and

the nozzle includes an outer contour and an internal, narrowing nozzle bore extending from a first end to a nozzle aperture at a second end for permitting an aerosol to exit, the nozzle being disposed within the internal passage of the annular elastomeric part such that the first end of the nozzle is adjacent to the chamfer surface of the internal passage,

engaging a mating element against the annular elastomeric part, where the mating element includes: (i) a bore for delivering pressurized fluid to the first end of the nozzle, and (ii) an annular projection that engages the annular rim of the annular elastomeric part and deforms the annular elastomeric part at the first end of the nozzle when the annular projection is pressed against the annular rim.

8. The method of claim 7, further comprising:

arranging the nozzle and the annular elastomeric part inside an internal volume of a holder; and

bearing a union member against the holder and engaging a housing such that: (i) the mating element is pressed toward the holder, and (ii) the annular projection of the mating element deforms the annular elastomeric part at the first end of the nozzle as the annular projection is pressed against the annular rim.

US 9,027,967 B2

9

10

**9**. The method of claim **8**, wherein the annular elastomeric part surrounds the outer contour of the nozzle such that: (i) the first end of the nozzle is in fluid communication with, and receives the pressurized fluid from, the bore of the mating element, and (ii) both the first end of the nozzle and the adjacent first end surface of the annular elastomeric part are spaced away from the bore of the mating element, thereby defining an unoccupied volume within the internal volume of the holder, and exposing the first end surface of the annular elastomeric part to the pressurized fluid.

**10**. The method of claim **7**, further comprising deforming the chamfer surface of the annular elastomeric part as the annular projection is pressed against the annular rim.

**11**. The method of claim **7**, further comprising internally tensioning the annular elastomeric part via the annular projection of the mating element such that the internal tension is substantially uniformly distributed.

* * * * *

# EXHIBIT F

US007837235B2

## (12) United States Patent
### Geser et al.

(10) Patent No.: **US 7,837,235 B2**
(45) Date of Patent: **Nov. 23, 2010**

(54) **DEVICE FOR CLAMPING A FLUIDIC COMPONENT**

(75) Inventors: **Johannes Geser**, Ingelheim (DE); **Matthias Hausmann**, Dortmund (DE)

(73) Assignee: **Boehringer Ingelheim International GmbH**, Ingelheim am Rhein (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1161 days.

(21) Appl. No.: **11/031,171**

(22) Filed: **Jan. 7, 2005**

(65) **Prior Publication Data**

US 2005/0194472 A1     Sep. 8, 2005

(30) **Foreign Application Priority Data**

Jan. 8, 2004     (DE)     ....................... 10 2004 001 451

(51) **Int. Cl.**
**F16L 25/00**     (2006.01)

(52) **U.S. Cl.** .................... **285/332.2**; 285/249; 285/331; 285/334.3; 285/382.5

(58) **Field of Classification Search** ................. 285/249, 285/332, 332.1–332.4, 334.1, 334.3, 382.4, 285/382.5, 331
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 1,181,060 | A | * | 4/1916 | Bennett | ....................... 277/625 |
| 2,278,479 | A | * | 4/1942 | Parker | ........................... 285/54 |
| 2,331,020 | A | * | 10/1943 | Frances | ................... 285/295.2 |
| 2,669,465 | A | * | 2/1954 | Newell | ......................... 285/53 |
| 3,249,372 | A | * | 5/1966 | Pollack | .................... 285/332.3 |
| 3,747,960 | A | * | 7/1973 | Bawa | ........................... 285/39 |
| 3,757,960 | A | | 9/1973 | Hill et al. | |
| 3,997,111 | A | | 12/1976 | Thomas et al. | |
| 4,073,157 | A | * | 2/1978 | Aylmer et al. | ............... 405/170 |
| 4,150,794 | A | | 4/1979 | Higgins | |
| 4,244,521 | A | | 1/1981 | Guse | |
| 4,313,570 | A | | 2/1982 | Olsen | |
| 5,033,681 | A | | 7/1991 | Munoz | |
| 5,497,944 | A | | 3/1996 | Weston et al. | |
| 5,848,753 | A | | 12/1998 | Wands et al. | |
| 5,964,416 | A | | 10/1999 | Jaeger et al. | |
| 6,176,442 | B1 | | 1/2001 | Eicher | |
| 6,223,933 | B1 | | 5/2001 | Hochrainer et al. | |

(Continued)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2291737 | A1 | 12/1998 |

(Continued)

#### OTHER PUBLICATIONS

International Search Report for PCT/EP2004/014764 mailed Apr. 15, 2004.

*Primary Examiner*—Aaron Dunwoody
*Assistant Examiner*—Fannie Kee
(74) *Attorney, Agent, or Firm*—Michael P. Morris; David L. Kershner

(57)     **ABSTRACT**

A fluidic component is arranged in an elastomeric shaped part, the contour of which is matched to the outer contour of the component and to the inner contour of a holder. The elastomeric shaped part is chamfered towards the fluidic component on its pressure side. When the holder is assembled, the elastomeric shaped part is deformed by a projection provided on a mating part and is put under uniformly distributed internal tension, after which the elastomeric shaped part surrounds the fluidic component to its full height.

**9 Claims, 4 Drawing Sheets**



**US 7,837,235 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,481,435 | B2 | 11/2002 | Hochrainer et al. |
| 6,491,897 | B1 | 12/2002 | Freund |
| 6,685,691 | B1 | 2/2004 | Freund et al. |
| 6,846,413 | B1 | 1/2005 | Kadel et al. |
| 6,977,042 | B2 | 12/2005 | Kadel et al. |
| 6,986,346 | B2 | 1/2006 | Hochrainer et al. |
| 7,040,311 | B2 | 5/2006 | Hochrainer et al. |
| 7,090,093 | B2 | 8/2006 | Hochrainer et al. |
| 7,314,187 | B2 | 1/2008 | Hochrainer |
| 2001/0008632 | A1 | 7/2001 | Freund et al. |
| 2001/0032642 | A1 | 10/2001 | Bach et al. |
| 2002/0007155 | A1 | 1/2002 | Freund et al. |
| 2003/0064032 | A1 | 4/2003 | Lamche et al. |
| 2003/0066524 | A1 | 4/2003 | Hochrainer et al. |
| 2004/0010239 | A1 | 1/2004 | Hochrainer |
| 2004/0143235 | A1 | 7/2004 | Freund et al. |
| 2004/0159319 | A1 | 8/2004 | Kadel et al. |
| 2004/0182867 | A1 | 9/2004 | Hochrainer et al. |
| 2005/0001076 | A1 | 1/2005 | Eicher et al. |
| 2005/0032494 | A1 | 2/2005 | Swant |
| 2005/0159441 | A1 | 7/2005 | Hochrainer et al. |
| 2005/0263618 | A1 | 12/2005 | Spallek et al. |
| 2006/0196500 | A1 | 9/2006 | Hochrainer et al. |
| 2006/0239930 | A1 | 10/2006 | Lamche et al. |
| 2006/0258993 | A1 | 11/2006 | Hochrainer et al. |
| 2006/0285987 | A1 | 12/2006 | Jaeger et al. |
| 2009/0114215 | A1 | 5/2009 | Boeck et al. |
| 2009/0185983 | A1 | 7/2009 | Freund et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | | 2404360 | A1 | 9/2001 |
| CA | | 2653183 | A1 | 12/2007 |
| CA | | 2653422 | A1 | 12/2007 |
| DE | | 4115131 | A1 | 11/1991 |
| DE | | 19722338 | A1 | 12/1998 |
| EP | | 0046664 | | 3/1982 |
| WO | | 9114468 | | 10/1991 |
| WO | WO 94/07607 | | 4/1994 |
| WO | | 9701329 | | 1/1997 |
| WO | | 9712683 | | 4/1997 |
| WO | | 9712687 | | 4/1997 |
| WO | | 9827959 | | 7/1998 |
| WO | | 9916530 | | 4/1999 |
| WO | | 0164268 | | 9/2001 |
| WO | | 03002045 | | 1/2003 |
| WO | | 2005065836 | A1 | 7/2005 |
| WO | | 2007141201 | A1 | 12/2007 |
| WO | | 2007141203 | A1 | 12/2007 |

* cited by examiner



Fig. 2



Fig. 1c

Fig. 1b

Fig. 1a

U.S. Patent     Nov. 23, 2010     Sheet 2 of 4     US 7,837,235 B2

Fig. 3b



A - A

Fig. 4b



B - B

Fig. 5b



C - C



Fig. 3a



Fig. 4a



Fig. 5a

# FIG. 6



U.S. Patent

Nov. 23, 2010

Sheet 4 of 4

US 7,837,235 B2



Fig. 8a
Prior Art

Fig. 8b
Prior Art

Fig. 8c
Prior Art

Fig. 7a

Fig. 7b

Fig. 7c

US 7,837,235 B2

## 1

## DEVICE FOR CLAMPING A FLUIDIC COMPONENT

### BACKGROUND OF THE INVENTION

1.Field of the Invention

The invention relates to a device for clamping a fluidic component, particularly a nozzle, particularly in the high pressure region. Of particular interest are holders for micro-engineered components, particularly micro-engineered nozzles which are to be produced by micro-engineering. Such nozzles are used for example in nebulizers for producing propellant-free medicinal aerosols used for inhalation.

The aim of the invention is to further improve the clamping of a fluidic component consisting of a wear-resistant, hard, and generally brittle material, and to increase the reliability of the holder.

2.Brief Description of the Prior Art

Micro-engineered nozzles having for example a nozzle aperture of less than 10 μm are described for example in WO 94/07607 and WO 99/16530.The inhalable droplets produced thereby have a mean diameter of about 5 μm, when the pressure of the liquid to be nebulized is from 5 MPa (50 bar) to 40 MPa (400 bar). The nozzles may for example be made from thin sheets of silicon and glass. The external dimensions of the nozzles are in the millimeter range. A typical nozzle consists for example of a cuboid with sides measuring 1.1 mm, 1.5 mm and 2.0 mm, made up of two sheets. Nebulizers for producing propellant-free aerosols in which the device according to the invention for clamping a fluidic component can be used are known from WO 91/14468 or WO 97/12687.

The term fluidic component denotes a component which is exposed to a pressurized fluid, and the pressure is also present inside the component, for example in a nozzle bore. Such a component may be kept pressure-tight for example by pressing into a holder of hard material if the material of the component can withstand mechanical forces without collapsing or deforming to an unacceptable degree. At high pressures, seals of deformable material, e.g. copper, or hard material which can be pressed in with great force are used. In the case of components made of brittle material the known processes for pressure-tight clamping of the component require considerable effort and great care. It is impossible to predict with any reliability the service life of a fluidic component clamped in this way.

U.S. Pat. No. 3,997,111 describes a fluid jet cutting device with which a high-speed fluid jet is produced which is used for cutting, drilling or machining material. The nozzle body is cylindrical and consists e.g. of sapphire or corundum. The setting ring is pressed into an annular recess in the nozzle carrier and seals off the nozzle body against the nozzle carrier.

U.S. Pat. No. 4,313,570 describes a nozzle holder for a water jet cutting device wherein the nozzle body is surrounded by a ring of elastomeric material which is in turn mounted in a recess in the holder. The recess is in the form of a straight cylinder. The cross-section of the ring is rectangular. The outer surface of the recess and the outer and inner surfaces of the ring are arranged concentrically to the axis of the nozzle body and run parallel to one another and to the axis of the nozzle body.

WO 97/12683 discloses a device for clamping a fluidic component which is subjected to fluid pressure, which is suitable for components consisting of a wear-resistant, hard and hence generally brittle material, and which does not produce any excessively great local material tensions in the component. The fluidic component is arranged in a holder which makes contact with the fluidic component on its low

## 2

pressure side. The fluidic component is surrounded by an elastomeric shaped part the outer contour of which is adapted to the inner contour of the holder and the inner contour of which is adapted to the outer contour of the fluidic component. The elastomeric component surrounds the entire circumference of the fluidic component. At least one free surface of the elastomeric component is exposed to the pressurized fluid. The holder may have a projection on the inside underneath which the elastomeric shaped part is pushed. It has proved difficult to generate internal tension in the elastomeric shaped part which is sufficiently great, even at low fluid pressures, and which is spatially roughly uniformly distributed in the elastomeric shaped part.

This known device has proved pressure-tight when subjected substantially constantly to moderate and high fluid pressures. When subjected to alternating fluid pressures fluctuating between a high peak value and a very low value, the known device is in need of improvement for long-term use.

The problem thus arises of providing a device for clamping a fluidic component which is reliably leak-tight even when subjected to alternating loading from a sharply fluctuating fluid pressure in long-term use. The components needed should be cheap to manufacture and should also be capable of being assembled with relative ease.

### BREIF DESCRIPTION OF THE DRAWINGS

FIG. 1*a* is a cross-sectional, elevational view of a pot-shaped holder (**1**).

FIG. 1*b* is a cross-sectional, elevational view of an elastomeric shaped part (**4**) and a cuboid, fluidic component (**5**).

FIG. 1*c* is a cross-sectional, elevational view of a mating part (**9**) with a bore (**10**) and an annular projection (**11**).

FIG. **2** is an elevational view of the underside of the mating part (**9**).

FIGS. **3***a*, **4***a*, and **5***a* show the elastomeric shaped part viewed perpendicularly.

FIGS. **3***b*, **4***b*, and **5***b* are cross-sections through the elastomeric shaped part.

FIGS. **7***a*, **7***b*, and **7***c* show the holder according to the invention in cross-hatched cross-section.

FIGS. **8***a*, **8***b*, and **8***c* show a prior-art embodiment.

### SUMMARY OF THE INVENTION

This problem is solved according to the invention by a device for clamping a fluidic component which is subjected to alternating fluid pressure and which comprises a holder within which the fluidic component is arranged. The holder makes contact with the fluidic component at its low pressure end. The device comprises an elastomeric shaped part which surrounds the fluidic component over its entire circumference. The outer contour of the elastomeric shaped part is adapted to the inner contour of the holder and the inner contour of the elastomeric shaped part is adapted to the outer contour of the fluidic component. The elastomeric shaped part has at least one free surface which is exposed to the pressurised fluid. The holder is secured at the high pressure end to a mating part, and

before the assembly of the device the elastomeric shaped part is chamfered towards the fluidic component on its side facing the fluid pressure, and

the mating part is provided with an annular projection the outer contour of which is adapted to the inner contour of the holder; after the assembly of the holder with the mating part the projection projects into the holder and deforms the elastomeric shaped part, as a result of which

US 7,837,235 B2

**3**

a uniformly distributed internal tension is generated in the elastomeric shaped part, and

the volume of the projection on the mating part is adapted to the volume that is missing from the elastomeric shaped part in the region of the chamfer, and

the elastomeric shaped part which is deformed and subjected to internal tension after the assembly of the holder with the mating part almost totally fills the space up to the mating part.

The elastomeric shaped part is chamfered into a recess at its high pressure end. The chamfer begins in the outer surface of the high pressure end of the elastomeric shaped part at a solid line which may be, for example, circular, elliptical, or rectangular. The chamfer may, for example, have a constant angle of inclination, or the angle of inclination may vary in the azimuthal direction. In the latter case, it is preferably smaller along the longer side of a cuboid, fluidic component than along the shorter side of the cuboid, fluidic component. The line of intersection of the chamfer with the recess in the elastomeric shaped part may extend at a constant level, or the line of intersection may be curved.

The projection on the mating part may preferably be annular and of constant width. The outer contour of the projection is preferably adapted to the inner contour of the holder. Moreover, the inner contour of the projection may be adapted to the outer contour of the fluidic component. The projection on the mating part may have a constant width and a constant height on its circumference, or the projection may vary in width and/or height; it may, for example, be higher in the two areas located opposite the two longer sides of a cuboid, fluidic component than in the two areas located opposite the two shorter sides of a cuboid, fluidic component. In this way, the elastomeric shaped part may deform to different degrees in some areas when the holder and mating part are put together and influence the spatial distribution of the internal tension in the elastomeric shaped part. The internal tension in the elastomeric shaped part is produced substantially by the deformation of the elastomeric shaped part, not by its compression. The deformation of the elastomeric shaped part and the distribution of the tension in the elastomeric shaped part can be determined by the finite elements method (FEM).

The elastomeric shaped part is preferably constructed as an injection-molded part. The pre-elastomer is poured without bubbles into a mould that is adapted to the contours of the holder and the fluidic component. An elastomeric shaped part of this kind behaves somewhat like an incompressible fluid. It fits precisely into the holder and fluidic component. The elastomeric shaped part is only exposed to fluid pressure at the pressure end, not at the sides where it abuts on the holder and on the fluidic component. The elastomeric shaped part allows pressure compensation on the fluidic component. The elastomeric shaped part has no free surface towards the low pressure side. The elastomeric shaped part may consist, for example, of natural rubber or synthetic rubber, such as silicon rubber, polyurethane, ethene-propene rubber (EPDM), fluorine rubber (FKM) or nitrile-butadiene rubber (NBR) or of a corresponding rubber.

The fluidic component may consist of a wear-resistant, hard and hence generally brittle material (such as silicon, glass, ceramics, gemstone, e.g., sapphire, ruby, diamond) or of a ductile material with a wear-resistant hard surface (such as plastics, chemically metallized plastics, copper, hard chromium-plated copper, brass, aluminum, steel, steel with a hardened surface, wear-resistant surfaces produced by physical vapor deposition (PVD) or chemical vapor deposition (CVD), for example, titanium nitride (TiN) or polycrystalline diamond on metal and/or plastics. The fluidic component may

**4**

be made in one piece or composed of a number of pieces, while the pieces may consist of different materials. The fluidic component may contain cavities, voids or channel structures. In the voids there may be microstructures which act as filters or anti-evaporation means, for example. The channels may be nozzle channels for an atomizer nozzle. An atomizer nozzle may contain one or more nozzle channels the axes of which may extend parallel to one another or be inclined relative to one another. If, for example, there are two nozzle channels the axes of which are located in one plane and which intersect outside the nozzle, the two fluid jets that emerge meet at the point of intersection of the axes and the fluid is atomized.

The holder may consist of virtually any desired material, preferably metal or plastics, and may be a body of revolution or a body of any other shape. The holder may, for example, be a pot-shaped body of revolution which contains a rotationally symmetrical recess, starting from its lid end, the axis of which coincides with the axis of the body of revolution. This recess may be cylindrical or in the shape of a truncated cone, the end of the truncated cone with the larger diameter being located at the lid end of the holder. The outer surface of the recess forms the inner contour of the holder. It may be produced as a molding, as a casting or by processing to remove material (e.g., by machining, etching, erosion, elision).

The mating part may consist of metal or plastics.

The holder which contains the elastomeric molding and the fluidic component is assembled with the mating part. The side of the elastomeric shaped part which contains the chamfer faces towards the mating part. The edge of the holder rests on the mating part. The fluidic component may be pushed into the elastomeric shaped part, preferably before the elastomeric shaped part is inserted in the recess in the holder. The holder may be attached to the mating part by screwing, gluing, welding, crimping, casting or press-fitting or snap-fitting onto the mating part. The holder may preferably be secured to the mating part by a union nut.

In a preferred embodiment the mating part is formed as a body of revolution in the area where it is connected to the holder. The fluid which is under high pressure is conducted to the holder through a channel in the mating part which is coaxial, for example. The fluid enters the channel structure in the fluidic component and leaves the fluidic component at the low pressure end thereof in the region of the base of the holder. The fluid pressure acts within the dead volume on the elastomeric shaped part.

The device according to the invention has the following advantages:

The tension within the elastomeric shaped part is spatially more uniformly distributed than the tension which may be produced in the known embodiment of the holder by an annular projection formed on the inside of the holder, underneath which the elastomeric shaped part is pushed during assembly.

The tension within the elastomeric shaped part may be adjusted, not only by the material properties of the shaped part itself, but by the ratio of the volume of the projection on the mating part to the volume which is absent from the tensionless elastomeric shaped part as a result of the chamfer.

The fluidic component is surrounded to its full height by the elastomeric shaped part which is under tension.

The device according to the invention is pressuretight in long-term use at fluctuating pressures with a large difference between the maximum pressure (40 Mpa or more) and the minimum pressure (about 0.1 Mpa).

US 7,837,235 B2

**5**

The dead volume between the deformed elastomeric shaped part subjected to internal tension and the side of the mating part facing the holder can be kept small. It serves at the same time to equalise the tolerances when the holder is joined to the mating part.

The controlled deformation of the elastomeric shaped part during the joining of the holder to the mating part prevents the elastomeric shaped part from swelling out through the opening in the fluidic component.

The device according to the invention for clamping a fluidic component is used, for example, in a miniaturized high pressure atomizer (e.g., according to WO 91/12687), in a needle-less injector (e.g., according to WO 01/64268) or in an applicator for ophthalmologic, medicinal formulations (e.g., according to WO 03/002045). A medicinal fluid administered with a device of this kind may contain a pharmaceutical substance dissolved in a solvent. Suitable solvents include for example water, ethanol, or mixtures thereof. Examples of the pharmaceutical substances include berotec (fenoterol-hydrobromide, atrovent (ipratropium bromide), berodual (combination of fenoterol-hydrobromide and ipratropium bromide), salbutamol (or albuterol), 1-(3,5-dihydroxy-phenyl)-2-[[1-(4-hydroxy-benzyl)-ethyl]-amino]-ethanol-hydrobromide), combivent, oxivent (oxitropium-bromide), Ba 679 (tiotropium bromide), BEA 2180 (di-(2-thienyl)glycolic acid-tropenolester), flunisolide, budesonide and others. Examples may be found in WO 97/01329 or WO 98/27959.

DESCRIPTION OF THE INVENTION

The device according to the invention is explained more fully with reference to the Figures:

FIG. 1*a* shows in cross-section and diagonal elevation a pot-shaped holder (**1**) provided with a recess (**2**). An opening (**3**) is provided in the base of the holder.

FIG. 1*b* shows in cross-section and diagonal elevation an elastomeric shaped part (**4**) and a cuboid, fluidic component (**5**), which is made up of two parts and which has been inserted in the elastomeric shaped part. In the contact surface of the two parts a nozzle structure is provided which extends as far as the nozzle aperture (**6**). The top surface of the elastomeric shaped part (**4**) at the high pressure end stands in the annular region (**7**) perpendicular to the axis of the elastomeric shaped part. The chamfer (**8**) of the elastomeric shaped part begins on the top surface of the elastomeric shaped part and extends as far as the outer surface of the fluidic component.

FIG. 1*c* shows in cross section and in diagonal elevation a mating part (**9**) with a bore (**10**) and an annular projection (**11**) on its side facing the elastomeric shaped part.

FIGS. 3*a*, 4*a*, and 5*a* show the elastomeric shaped part viewed perpendicularly.

FIGS. 3*b*, 4*b*, and 5*b* show cross-sections through the elastomeric shaped part.

The elastomeric shaped part contains a cuboid recess (**31**) for a cuboid fluidic component. The cross-section in FIG. 3*b* runs along the line A-A in FIG. 3*a*; the line A-A runs perpendicularly to the longer side of the recess (**31**). The cross section in FIG. 4*b* runs along the line B-B in FIG. 4*a*; the line B-B runs perpendicularly to the shorter side of the recess (**31**). The cross section in FIG. 5*b* runs along the line C-C in FIG. 5*a*; the line C-C runs diagonally to the recess (**31**). The line of intersection (**32**) of the chamfer (**8**) with the recess (**31**) runs at a constant level. The angle of inclination (measured from the main axis of the component) of the chamfer (**8**) is at its greatest in FIG. 3*b* and at its smallest in FIG. 5*b* and in FIG. 4*b* the angle of inclination has an intermediate value.

**6**

FIG. **6** shows a cross section through the assembled holder which is mounted on a container for a fluid. The holder (**1**) contains in its recess an elastomeric shaped part (**4**) with the fluidic component (**5**). A mating part (**9**) is located on the edge of the holder. The projection (**11**) on the mating part (**9**) projects into the recess in the holder (**1**) and has deformed the elastomeric shaped part (**4**). The side (**61**) of the elastomeric shaped part exposed to the fluid is convex, but the deformed elastomer does not extend right up to the nozzle structure in the fluidic component. The dotted lines (**64***a*) and (**64***b*) indicate the contour of the chamfered shaped part (**4**) before the assembly of the holder. The dead volume (**63**) serves to equalize the tolerances during the assembly of the holder; it has been reduced to the minimum. The holder is secured to the mating part (**9**) and to the housing (**65**) for the fluid by a union nut (**62**). The direction of flow of the fluid is indicated by arrows. The low pressure end of the holder is located in the surface which contains the nozzle aperture (**6**). The high pressure in the fluid acts in the channel structure within the fluidic component (**5**), within the dead volume (**63**), within the bore (**10**) in the mating part (**9**) and within the housing that contains the fluid.

FIGS. 7*a*, 7*b*, and 7*c* show the holder according to the invention in cross-hatched cross-section and FIGS. 8*a*, 8*b*, and 8*c* compare it with the embodiment in the cross-hatched cross section according to the prior art.

FIG. 7*a* shows a chamfered elastomeric shaped part (**4***a*) with a fluidic component (**5**) inserted therein before the assembly of the holder according to the invention. The elastomeric shaped part is almost as high as the fluidic component at its outer edge but lower in the area of contact with the fluidic component at the recess. The elastomeric shaped part is still un-deformed and is not yet under internal tension. FIG. 7*b* shows the situation after the insertion of a ring (**71**), causing the elastomeric shaped part (**4***b*) to be deformed and internal tension to be produced inside the elastomeric shaped part. The deformed elastomeric shaped part (**4***b*) extends over the fluidic component as far as its upper edge. The convexity of the elastomeric shaped part scarcely projects beyond the height of the fluidic component. FIG. 7*c* shows the deformed elastomeric shaped part (**4***c*) after the assembly of the holder. The inserted projection (**11**) has deformed the elastomeric shaped part (**4***c*). A small dead volume (**63**) is present between the deformed elastomeric shaped part (**4***c*) and the base of the mating part.

FIG. 8*a* shows a (non-chamfered) elastomeric shaped part (**74***a*) with a fluidic component (**5**) inserted therein before the assembly of the holder according to the prior art. The elastomeric shaped part is lower than the fluidic component. The elastomeric shaped part is un-deformed and is not under internal tension. FIG. 8*b* shows the situation after the addition of a ring (**71**) which prevents the elastomeric shaped part (**74***b*) from falling out of the holder or from sliding inside the holder but does not deform the elastomeric shaped part. FIG. 8*c* shows the un-deformed elastomeric shaped part (**74***c*) after the assembly of the holder using a mating part (**9**), on which an annular projection (**11**) is provided. The dead volume (**75**) in FIG. 8*c* is larger than the dead volume (**63**) in FIG. 7*c*.

EXAMPLE

Mount for an Atomizer Nozzle of Miniature Construction

This device consists of a cylindrical holder made of steel with an external diameter of 6.0 mm and a height of 2.6 mm. It contains a truncated cone-shaped recess with an internal

US 7,837,235 B2

7

8

diameter of 4.0 mm at the base of the truncated cone. The base of the holder contains a bore 0.8 mm in diameter. The base of the holder is 0.4 mm thick in the vicinity of the bore.

The outer contour of the elastomeric shaped part made of silicon rubber is cylindrical. Before it is inserted in the holder the cylinder has a diameter of 4.2 mm and is 2.1 mm high on its outer surface. It contains a symmetrically arranged recess 1.3 mm wide and 2.8 mm long which passes axially through the elastomeric shaped part.

The elastomeric shaped part is chamfered towards the recess at its high pressure end. The chamfer begins in the cover surface of the cylinder over a circle with a diameter of 3.2 mm. The chamfer runs at different inclinations towards the rectangular recess to a constant depth of 0.7 mm at the line of intersection with the recess.

The fluidic component is constructed as an atomizer nozzle. The nozzle is a cuboid made up of two sheets of silicon and is 1.4 mm wide, 2.7 mm long, and 2.1 mm high. In the contact surface of the sheets the nozzle contains a recess which is provided with a micro-engineered filter and a micro-engineered evaporation device. On the side of the nozzle where the fluid leaves the nozzle, the recess merges into two channels each of which is 8 μm wide, 6 μm deep, and about 200 μm long. The axes of the two channels are located in one plane and are inclined at about 90 degrees to one another. The two nozzle apertures are spaced from one another by about 100 μm on the outside of the atomizer nozzle.

The essentially cylindrical mating part is provided with an annular projection on its side facing the holder. The projection has an external diameter of 3.15 mm, an internal diameter of 2.9 mm, and a constant height of 0.6 mm. The mating part contains an axial bore 0.4 mm in diameter.

The device is secured to the mating part by means of a union nut. The mating part is part of a container which contains the liquid to be atomized. The liquid is conveyed from the container to the atomizer nozzle by means of a miniaturized high pressure piston pump in amounts of about 15 microliters.

The peak value of the fluid pressure inside the atomizer nozzle is about 65 MPa (650 bar) and falls back to virtually normal air pressure (about 0.1 MPa) after the end of the atomization.

What is claimed is:

1. An apparatus, comprising:

a housing including a bore for delivering pressurized fluid;

a holder including an internal volume;

a mating element that engages the holder and covers the internal volume thereof, the mating element including: (i) a bore in fluid communication with the bore of the housing for delivering the pressurized fluid into the internal volume of the holder, and (ii) an annular projection that extends into the internal volume of the holder;

a nozzle including an outer contour and an internal, narrowing nozzle bore extending from a first end to a nozzle aperture at a second end through which an aerosol exits;

an annular elastomeric part surrounding the outer contour of the nozzle and being disposed in the internal volume of the holder such that: (i) the first end of the nozzle is in fluid communication with, and receives the pressurized fluid from, the bore of the mating element, and (ii) both the first end of the nozzle and an adjacent end surface of the annular elastomeric part are spaced away from the bore of the mating element, thereby defining an unoccupied volume within the internal volume of the holder, and exposing the end surface of the annular elastomeric part to the pressurized fluid; and

a union member bearing against the holder and engaging the housing such that: (i) the mating element is pressed toward the holder, and (ii) the annular projection of the mating element deforms the annular elastomeric part at the first end of the nozzle.

2. The apparatus according to claim 1, wherein the annular projection of the mating element internally tensions the annular elastomeric part such that the internal tension is substantially uniformly distributed.

3. The apparatus of claim 1, wherein the annular elastomeric part includes an internal passage in which the nozzle is disposed such that the annular elastomeric part surrounds the outer contour of the nozzle.

4. The apparatus of claim 3, wherein the internal passage extends from the end surface of the annular elastomeric part to an opposite end thereof.

5. The apparatus of claim 4, wherein the internal passage includes a chamfer surface at the end surface of the annular elastomeric part that would not bear against the nozzle absent the deformation of the annular elastomeric part by the annular projection of the mating element.

6. The apparatus according to claim 5, wherein the chamfer surface is chamfered at a constant or varying angle of inclination at each point along the chamfer surface absent the deformation of the annular elastomeric part by the annular projection of the mating element.

7. The apparatus according to claim 5, wherein a line of intersection of the chamfer surface with the internal passage of the annular elastomeric part extends at a constant level or is curved.

8. The apparatus according to claim 1, wherein the annular projection on the mating element has a width and a height that are independently constant or varying along a length of the annular projection.

9. The apparatus according to claim 1, wherein the holder further includes: (i) an inside surface in contact with the second end of the nozzle, (ii) an inside contour that mates and/or aligns with an outside contour of the annular elastomeric part, and (iii) an annular end secured to the mating element.

*    *    *    *    *

# **EXHIBIT G**

US008733341B2

## (12) United States Patent
### Boeck et al.

(10) **Patent No.:**    **US 8,733,341 B2**
(45) **Date of Patent:**    **May 27, 2014**

(54) **ATOMIZER AND METHOD OF ATOMIZING FLUID WITH A NOZZLE RINSING MECHANISM**

(75) Inventors: **Georg Boeck**, Laupheim (DE); **Michael Spallek**, Ingelheim (DE)

(73) Assignee: **Boehringer Ingelheim International GmbH**, Ingelheim am Rhein (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1148 days.

(21) Appl. No.: **12/299,650**

(22) PCT Filed: **Apr. 16, 2007**

(86) PCT No.: **PCT/EP2007/003322**
§ 371 (c)(1),
(2), (4) Date: **Dec. 24, 2008**

(87) PCT Pub. No.: **WO2007/128381**
PCT Pub. Date: **Nov. 15, 2007**

(65) **Prior Publication Data**
US 2009/0114215 A1    May 7, 2009

(30) **Foreign Application Priority Data**
May 10, 2006    (DE) ........................ 10 2006 022 002

(51) **Int. Cl.**
*A61M 15/00* (2006.01)
*A61M 15/02* (2006.01)
*A61M 11/00* (2006.01)

(52) **U.S. Cl.**
USPC ............ **128/200.14**; 128/200.17; 128/200.21; 128/203.15; 128/203.23

(58) **Field of Classification Search**
USPC ............. 128/200.14–200.23, 203.15, 203.19, 128/203.21, 204.25; 222/148, 149, 153.11, 222/153.12, 319, 464.3; 604/68–72, 604/122–127
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,157,179 | A | * | 11/1964 | Allen et al. .............. 128/200.23 |
| 3,675,825 | A | * | 7/1972 | Morane ......................... 222/148 |
| 4,048,997 | A | * | 9/1977 | Raghavachari et al. ...... 604/189 |
| 5,433,343 | A | * | 7/1995 | Meshberg ....................... 222/25 |
| 5,497,944 | A | | 3/1996 | Weston |
| 5,593,069 | A | * | 1/1997 | Jinks ............................ 222/246 |
| 5,662,098 | A | * | 9/1997 | Yoshida .................. 128/200.22 |
| 5,662,271 | A | | 9/1997 | Weston |
| 5,833,088 | A | | 11/1998 | Kladders |
| 5,964,416 | A | | 10/1999 | Jaeger |
| 6,401,987 | B1 | | 6/2002 | Oechsel et al. |
| 6,402,055 | B1 | | 6/2002 | Jaeger et al. |

(Continued)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2297174 | A1 | 2/1999 |
| DE | 19733651 | A1 | 2/1999 |

(Continued)

#### OTHER PUBLICATIONS

International Search Report for PCT/EP2007/003322 mailed Aug. 17, 2007.

*Primary Examiner* — Justine Yu
*Assistant Examiner* — Douglas Sul
(74) *Attorney, Agent, or Firm* — Michael P. Morris; Mary-Ellen M. Devlin

(57) **ABSTRACT**

An atomizer and a method of dispensing and atomizing fluid into individual containers through a nozzle are proposed, where in order to improve the dosing accuracy, a preliminary amount of fluid, flushing the nozzle, is dispensed before each dose is dispensed.

**16 Claims, 3 Drawing Sheets**



**US 8,733,341 B2**

Page 2

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,578,741 | B2 * | 6/2003 | Ritsche et al. | 222/153.13 |
| 6,890,517 | B2 * | 5/2005 | Drechsel et al. | 424/45 |
| 2003/0145849 | A1 * | 8/2003 | Drinan et al. | 128/200.14 |
| 2004/0015126 | A1 * | 1/2004 | Zierenberg et al. | 604/72 |
| 2005/0061314 | A1 * | 3/2005 | Davies et al. | 128/200.23 |
| 2005/0098172 | A1 * | 5/2005 | Anderson | 128/200.23 |
| 2005/0183718 | A1 | 8/2005 | Wuttke et al. | |
| 2006/0285987 | A1 | 12/2006 | Jaeger | |

| | | | | |
|---|---|---|---|---|
| 2008/0092885 | A1 * | 4/2008 | von Schuckmann | 128/203.15 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1003478 | A1 | 5/2000 |
| JP | 2004097617 | A  * | 4/2004 |
| WO | 9114468 | A1 | 10/1991 |
| WO | 9606011 | A2 | 2/1996 |
| WO | 9712687 | A1 | 4/1997 |
| WO | 98/12511 | A2 | 3/1998 |

* cited by examiner



# Fig. 1



Fig. 2



Fig. 3

US 8,733,341 B2

**1**

### ATOMIZER AND METHOD OF ATOMIZING FLUID WITH A NOZZLE RINSING MECHANISM

This application is the national phase entry under 35 U.S.C. §371 of International Application No. PCT/EP2007/003322, filed Apr. 16, 2007, which claims priority to German Application No. DE 10 2006 022 002.1, filed May 10, 2006, each of which is hereby incorporated by reference in its entirety.

### BACKGROUND

1. Field of the Invention

The present invention relates to an atomizer according to the preamble of claim **1**, a process according to the preamble of claim **12** and a use of the atomizer.

2. Related Art

An atomizer is known under the brand name "Respimat" in the form of an inhaler as disclosed in general terms in WO 91/14468 A1 and specifically illustrated in WO 97/12687 A1 (FIG. 6*a*, 6*b*). The atomizer has, as a reservoir for a fluid which is to be atomised, an insertable container, a pressure generator with a drive spring and a nozzle through which the fluid is expelled and atomised.

After the container is used for the first time or left unused for any length of time, air in the pressure generator or nozzle system may cause the metering accuracy to be negatively affected when fluid is next expelled and atomised. This is not the case during the subsequent expulsion and atomisation, as any air present has been displaced by the fluid. Before the atomizer is used for the first time and after lengthy periods of non-use, it is therefore recommended that at least one dose of fluid should be expelled without being inhaled. This preliminary actuation is also referred to as "priming". Priming leads to an increased consumption of fluid and requires special care on the part of the user.

### SUMMARY OF THE INVENTION

The aim of the present invention is to provide an atomizer and a process and a use of such an atomizer, such that particularly accurate metering is possible by simple means and with easy operation, and in particular so that there is no need for any priming.

This aim is achieved by an atomizer as disclosed and described herein.

A fundamental idea of the present invention is that in each case a preliminary amount of fluid, which is very small in relation to the dose, for rinsing the nozzle and any other delivery means of the atomizer in question, should be expelled preferably automatically before each intended delivery of a dose or each time the atomizer is tensioned. The term "intended" makes it clear that during the very first priming, the so-called dry priming, of the atomizer there is no intention of delivering a dose, nor is any dose delivered, and also no preliminary amount is expelled, in particular when initially only air is forced out of the conveying system of the atomizer. The delivery or production of the pre-spray has a number of advantages.

Rinsing with the preliminary amount can further improve the metering accuracy of the atomizer.

The air and other gases contained in the pressure generator or the like are displaced or at least substantially reduced by the preliminary amount. This improves the dosing accuracy during the next delivery.

The preliminary amount makes it possible for example to achieve a definite closure or other assumption of a defined

**2**

position of a valve, particularly of the pressure generator, so that more defined states can be achieved during the actual use of the atomizer and dosing of the fluid intended for inhalation, in particular.

Moreover, thanks to the preliminary amount a defined break-off of fluid at the nozzle can be achieved, which corresponds substantially to that which occurs during the expulsion of fluid that takes place immediately after, as a result of which again the metering accuracy is further improved.

The rinsing of the nozzle by the preliminary amount can eliminate or detach deposits, contamination or microbial impurities.

Increases in concentration—e.g. as a result of evaporation during non-use—can also be reduced or prevented.

In the present invention, the term "rinsing the nozzle" preferably relates not only to the nozzle or nozzle system of the atomizer, but alternatively or additionally also relates to the pressure generator or other parts of the atomizer for conveying, expelling and atomising fluid, such as any filter, pressure chamber, valve, intake line, pressure line or the like which may be provided.

If oligodynamic silver compounds or other ion-releasing compounds are used in the atomizer, the silver ions or other ions may be expelled by the preliminary amount so that fewer ions are expelled and inhaled during actual use.

The proposed rinsing by the preliminary amount preferably occurs automatically, i.e. without separate operation or actuation by the user, particularly each time the atomizer or any spring contained therein is put under tension. Accordingly, very simple operation is achieved. Particularly preferably, the above-mentioned priming can be omitted altogether or at least reduced.

It has been found that a surprisingly small preliminary amount is sufficient in particular to achieve the advantages mentioned above. Even if the nozzle is rinsed with the preliminary amount on every actuation or use of the atomizer, the prospective overall fluid consumption is less, as priming leads to the expulsion of a full dose of fluid, even if it is not carried out before every use of the atomizer.

The preliminary amount of fluid is delivered as a spray mist and/or as drops, depending in particular on the pressure through the nozzle. The rinsing of the nozzle by the preliminary amount and its delivery through the nozzle—irrespective of whether it is in the form of a spray mist or drops—is also referred to as "pre-spray".

Further advantages, features, properties and aspects of the present invention will become apparent from the claims and the following description of a preferred embodiment by reference to the drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic section through an atomizer in the non-tensioned state;

FIG. **2** is a schematic section through the atomizer in the tensioned state after rotation through 90° relative to FIG. **1**;

FIG. **3** is a schematic section through an atomizer with additional functionality.

In the Figures the same reference numerals have been used for identical or similar parts, and corresponding or comparable properties and advantages are achieved even if the associated description is not repeated.

### DETAILED DESCRIPTION OF THE INVENTION

FIGS. **1** and **2** show an atomizer **1** for atomising a fluid **2**, particularly a highly effective medicament or the like, shown

US 8,733,341 B2

3

schematically in the non-tensioned state (FIG. 1) and in the tensioned state (FIG. 2). The atomizer 1 is embodied in particular as a portable inhaler and preferably operates without propellant gas.

Atomisation of the fluid 2, preferably a liquid, more particularly a medicament, produces an aerosol which can be breathed in or inhaled by a user (not shown). Normally, the medicament is inhaled at least once a day, more particularly several times a day, preferably at predetermined intervals, depending on the ailment affecting the patient.

The atomizer 1 has a preferably insertable and preferably replaceable container 3 containing the fluid 2. The container 3 thus forms a reservoir for the fluid 2 which is to be atomised, which is held in particular in a fluid chamber 4 formed by a collapsible bag in the container 3.

Preferably, the container 3 contains a sufficient amount of fluid 2 or active substance to provide, for example, up to 200 dosage units or doses, i.e. to allow up to 200 sprays or applications. A typical container 3 as disclosed in WO 96/06011 A2 holds a volume of about 2 to 10 ml.

The atomizer 1 also comprises a pressure generator 5 for delivering and atomising the fluid 2, particularly in a predetermined or adjustable dosage amount. The fluid 2 can thus be expelled and atomised in individual doses, particularly from about 5 to 30 μl.

The pressure generator 5 has a holder 6 for the container 3, an associated drive spring 7 which is only partly shown, a locking element 8 which is preferably manually operable to release it, a movable conveying element, particularly a conveying tube 9, a non-return valve 10, a pressure chamber 11 and a nozzle 12 in the region of a mouthpiece 13. The container 3 is fixed, particularly by latching, in the atomizer 1 via the holder 6 such that the conveying tube 9 dips into the container 3. The holder 6 may be embodied such that the container 3 can be detached and replaced.

For axially tensioning the drive spring 7, the holder 6 with the container 3 and the conveying tube 9 is moved downwards in the drawings and fluid 2 is sucked out of the container 3 through the non-return valve 10 into the pressure chamber 11 of the pressure generator 5.

During the subsequent release of tension after actuation of the locking element 8 to release the holder 6, the fluid 2 in the pressure chamber 11 is put under pressure by moving the conveying tube 9 with its now closed non-return valve 10 back upwards, by releasing the drive spring 7 (main movement), i.e. to act as a ram. This pressure expels the fluid 2 through the nozzle 12, during which time it is atomised into an aerosol 14, as indicated in FIG. 1.

A user or patient (not shown) can inhale the aerosol 14, while a supply of air can be sucked into the mouthpiece 13 through at least one air inlet opening 15.

The atomizer 1 has an upper housing part 16 and an inner part 17 which is rotatable relative thereto (FIG. 2) having an upper part 17a and a lower part 17b (FIG. 1), while an in particular manually operable housing part 18 is releasably attached to, in particular pushed onto, the inner part 17, preferably by means of a holding element 19. For inserting and/or changing the container 3, the housing part 18 can be detached from the atomizer 1.

The housing part 18 can be rotated relative to the upper housing part 16, carrying the inner part 17 with it. The upper part 17a rotates the holder 6 by corresponding engagement therewith, so that this holder is axially moved counter to the force of the drive spring 7 by means of a gear 20 which is merely indicated in FIG. 2 and the drive spring 7 is tensioned.

During tensioning, the container 3 is moved axially downwards. Finally, the container 3 assumes an end position as

4

shown in FIG. 2. In this end position, the drive spring 7 is under tension. The locking element 8 can then secure the holder 6 and hence the conveying tube 9 and the container 3 against movement in the upward direction in the Figure, i.e. prevent the drive spring 7 from relaxing. In the view shown in FIG. 2 the holder 6 together with the conveying tube 9 and the container 3 and the drive spring 7 are in the tensioned state or in the tensioning position, but the locking element 8 is not in its transversely or radially shifted locking position that blocks the holder 6.

After the holder 6 has been released by the locking element 8—i.e. starting from the clamping position shown in FIG. 2 and in the position of the locking element 8 shown in FIG. 2—the atomising process takes place. The holder 6 together with the conveying tube 9 and the container 3 is returned to the starting position shown in FIG. 1 by the force of the drive spring 7. This movement is also referred to hereinafter as the main movement H, for short. During the main movement, the valve 10 is closed and the conveying tube 9 puts the fluid 2 contained in the pressure chamber 11 under pressure, so that this fluid is expelled through the nozzle 12 and atomised.

The container 3 thus preferably performs a lifting movement during the clamping process or for the withdrawal of fluid and during the atomising process.

In the embodiment shown the gear 20 for clamping the atomizer 1 or drive spring 7 and for axially moving the holder 6 in the tensioning direction preferably has sliding surfaces 21 and 22 on the upper housing part 18 and/or on the holder 6, which extend in particular in a helical configuration and lead to the desired axial movement of the holder 6 when the holder 6 is rotated relative to the upper housing part 16.

When the holder 6 reaches the clamping position shown in FIG. 2, the sliding surfaces 21, 22 move out of engagement, and the gear 20 releases the holder 6 for the opposite movement in the axial direction, particularly the main movement. At the same time, the locking element 8 is shifted into its locking position (shown in FIG. 3) transversely, particularly radially, to the axial movement or axial direction, such that the holder 6 and hence the conveying tube 9 and container 3 are blocked or secured in the tensioning position. In particular the locking element 8 is of annular construction and in its locking position is radially shifted out of the normally concentric arrangement with the holder 6, so that the holder 6 abuts with its end face on a portion of the locking element 8 and is blocked thereby.

To initiate the atomising process, the locking element 8 which is provided in particular with a button 23 or other actuating element is actuated and thereby moved back radially into its concentric position as shown in FIG. 2, as a result of which the blocking of the holder 6 is cancelled and the holder is able to perform the main movement in the direction of the arrow H. Any fluid 2 then contained in the pressure chamber 11 is expelled through the nozzle 12 and atomised.

The structure and mode of operation of a proposed atomizer are hereinafter explained by reference to the schematic sectional view in FIG. 3, which is not to scale and which substantially corresponds to the view in FIG. 2. The earlier remarks particularly relating to FIGS. 1 and 2 still apply or have a complementary value.

The proposed atomizer 1 is constructed so that before each delivery and atomisation of a dose of fluid 2 a specific preliminary amount of fluid 2 is expelled. This preliminary amount rinses the nozzle 12 or other conveying means, components or the like of the atomizer 1, particularly the conveying tube 9, the valve 10, the pressure chamber 11, a channel leading to the nozzle 12, an optional filter in front of the nozzle 12, the nozzle 12 or the like. The rinsing with the

US 8,733,341 B2

5

preliminary amount takes place in particular automatically on each actuation of the atomizer 1, particularly on each tensioning of the atomizer 1, and results in the pre-spray and the advantages described above.

The preliminary amount is preferably very small, but requires a certain minimum amount in order to achieve the desired advantages. It is preferably at least 0.5 μl, particularly 0.5 to 3 μl, most preferably about 1 to 2 μl. This is very little compared with the usual dose of fluid 2 (in particular about 15 to 20 μl), which is delivered on each atomisation. Preferably, the preliminary amount is at least 1%, more particularly at least 2%, most preferably about 3 to 10%, of the amount of a dose of the fluid 2 delivered during a normal atomisation process.

Particularly preferably, the preliminary amount is at least five times the volume of the nozzle 12 or of a nozzle block forming the nozzle 12. This of itself guarantees effective rinsing of the nozzle 12.

The following is an explanation of how the preliminary amount and the rinsing with the preliminary amount of fluid 2 are obtained.

During the tensioning of the atomizer 1 or the drive spring 7 in the tensioning direction S, the holder 6 and hence the conveying element 9 is moved into an over-tensioning position as shown in FIG. 3. In this over-tensioning position, the gear 20 releases the holder 6, so that an opposite movement can then take place as a result of the spring force, as in the normal atomisation process. The present invention envisages that a first movement—hereinafter referred to as the preliminary movement—takes place in this direction H, but initially only until the (normal) tensioning position is reached, i.e. until the holder 6 comes to abut on the locking element 8 which is in the locking position, in the embodiment shown. FIG. 3 shows the locking element 8 in the locking position with the button 23 extended. FIG. 2 shows the locking element 8 in the non-locking position, i.e. in the position in which the holder 6 is not blocked, with the button 23 pushed in, or in a concentric position.

The holder 6 and hence also the conveying element or conveying tube 9 automatically perform the preliminary movement into the tensioning position, from the over-tensioning position shown in FIG. 3, i.e. until blocked by the locking element 8. This preliminary movement, which preferably takes place in the same direction as the main movement H mentioned earlier during the normal atomising process, leads to the production and delivery of the desired preliminary amount of fluid 2.

The preliminary movement is very short by comparison with the main movement. In particular its stroke d, i.e. the distance from the over-tensioning position into the tensioning position, is only about 0.2 to 1 mm, in particular about 0.4 to 0.8 mm.

If required, the stroke d may be adjusted or fixed to adapt to the nozzle 12, the pressure generator 5 or the like and/or to adapt to the particular fluid 2. The volume of the preliminary amount can be varied accordingly by varying the stroke d.

Depending on the volume of the preliminary amount and the pressure increase—particularly the speed of return of the conveying element or conveying tube 9 from the over-tensioning position into the clamping position—and depending on the fluid 2, the preliminary amount is expelled in the form of drops and/or as a spray mist or spray jet. The user can if necessary wipe or shake off the drop and optionally other residual amounts of fluid 2 remaining on the nozzle 12 during normal use of the atomizer 1. Alternatively or additionally, the drop or the residual amounts can also be wiped away or absorbed by means of a covering cap (not shown) for closing

6

off the mouthpiece 13, particularly a wiper or absorption means, such as a piece of non-woven fabric or the like, accommodated in the covering cap.

The covering cap may be of transparent construction, at least in parts, so that the user can monitor the expulsion of the preliminary amount. Alternatively, it is also possible that the user will not monitor the expulsion of the preliminary amount and in particular will not notice it either. In fact, the expulsion of the preliminary amount may take place almost imperceptibly and so fast that it does not interfere with the normal handling and use of the atomizer 1 for delivering and atomising fluid 2.

According to a further feature (not shown) an additional barrier or delay may be provided, so that the tensioned atomizer 1—i.e. the tensioning element 8 or the button 23 in this embodiment—can only be actuated when the preliminary amount of fluid 2 has been expelled or the holder 6 and the conveying tube 9 have reached the tensioning position, i.e. the holder 6 is abutting on the locking element 8. This is a way of preventing the preliminary amount from being expelled and atomised together with the actual dose of fluid 2, i.e. so that the normal dose is undesirably increased by the preliminary amount.

After the preliminary amount has been expelled, the user can operate the atomizer 1 completely normally, in particular by pressing the button 23 to move the locking element 8 out of the locking position into the position, which is concentric in this embodiment, which does not block the holder 6. Thus the holder 6 is freed and normal delivery and atomisation take place. As a result of the spring force of the drive spring 7 the conveying tube 9 performs the main movement H, while any fluid 2 contained in the pressure chamber 11 is expelled and atomised through the nozzle 12.

Surprisingly, it was found that the deliberately selected preliminary amount can be used to rinse the nozzle 12 or the entire nozzle or delivery system, in particular in order to expel or detach any deposits, dirt or microbial contamination immediately before using the atomizer 1, i.e. immediately before inhalation, in particular. The proposed rinsing with the preliminary amount also decreases the risk of blockage of the nozzles caused by deposits, contamination, crystallisation or the like.

In addition, undesirable increases in concentration, particularly in the nozzle region, can be avoided or at least minimised. Such concentrations—e.g. an undesirable increase in an active substance or other material—occur particularly with fluids 2 that contain solvent, particularly ethanolic or ethanol-containing fluids 2. The prevention or reduction of concentrations in the nozzle region also helps to ensure greater metering accuracy.

The metering accuracy can also be further improved by the fact that the preliminary amount moistens parts of the pressure generator 5 or nozzle system before they are actually used.

A particular advantage of the proposed rinsing with the preliminary amount is that it occurs on each actuation, particularly each tensioning, of the atomizer 1—i.e. in particular automatically—and cannot or need not be influenced by the user.

The proposed rinsing can also be used to improve the microbiological condition of the inhaler still further. In particular, any pathogens formed are expelled. If oligodynamic silver compounds are used in the atomizer 1, any silver ions produced are expelled by the rinsing with the preliminary amount, so that fewer silver ions are delivered and inhaled.

The proposed rinsing with the preliminary amount also causes the valve 10 to be moved into a defined closed position,

US 8,733,341 B2

7

so that during the subsequent actual operation of the atomizer **1**, the fluid **2** is immediately put under pressure and expelled. The closure time of the valve **10** is in fact reduced and stabilised. As a result the variability of the volume delivered is reduced, i.e. a further improvement in the metering accuracy can be obtained.

The above-mentioned effects and advantages can be obtained with a surprisingly small preliminary amount, in particular with the volumes or ratios mentioned hereinbefore.

It should be noted that the proposed rinsing before the actual delivery of the fluid can generally be implemented in other atomizers as well. In particular other constructional solutions and alternatives to the proposed rinsing or production of the preliminary amount can also be used. Different constructional solutions to the locking and unlocking in the tensioning position are also possible. Generally, instead of the drive spring **7** it is also possible to use a different spring or drive means. Even if the conveying element is manually driven in the main direction or direction of delivery, it is possible to produce and expel the preliminary amount for rinsing purposes.

In contrast to freestanding apparatus or the like, the proposed atomizer **1** is preferably designed to be portable and in particular it is a mobile hand-held device.

However, the proposed solution may be used not only in the atomizers **1** that are specifically described here but also in other atomizers or inhalers, e.g. powder inhalers or so-called "metered dose inhalers".

The atomizer **1** is particularly preferably embodied as an inhaler, particularly for medicinal aerosol therapy. Alternatively, however, the atomizer **1** can also be designed for other uses, preferably for atomising a cosmetic liquid and particularly as a perfume atomizer. The container **3** correspondingly contains, for example, a medicament formulation or a cosmetic liquid such as perfume or the like.

Preferably, the fluid **2** is a liquid as already mentioned, in particular an aqueous or ethanolic medicament formulation. However, it may also be some other medicament formulation, a suspension or the like or particles or powder.

Some preferred ingredients and/or formulations of the preferably medicinal fluid **2** are listed below. As already mentioned, they may be aqueous or non-aqueous solutions, mixtures, ethanol-containing or solvent-free formulations. Particularly preferably, the fluid **2** contains:

The compounds listed below may be used in the device according to the invention on their own or in combination. In the compounds mentioned below, W is a pharmacologically active substance and is selected (for example) from among the betamimetics, anticholinergics, corticosteroids, PDE4-inhibitors, LTD4-antagonists, EGFR-inhibitors, dopamine agonists, H1-antihistamines, PAF-antagonists and PI3-kinase inhibitors. Moreover, double or triple combinations of W may be combined and used in the device according to the invention. Combinations of W might be, for example:

W denotes a betamimetic, combined with an anticholinergic, corticosteroid, PDE4-inhibitor, EGFR-inhibitor or LTD4-antagonist,

W denotes an anticholinergic, combined with a betamimetic, corticosteroid, PDE4-inhibitor, EGFR-inhibitor or LTD4-antagonist,

W denotes a corticosteroid, combined with a PDE4-inhibitor, EGFR-inhibitor or LTD4-antagonist

W denotes a PDE4-inhibitor, combined with an EGFR-inhibitor or LTD4-antagonist

W denotes an EGFR-inhibitor, combined with an LTD4-antagonist.

8

The compounds used as betamimetics are preferably compounds selected from among albuterol, arformoterol, bambuterol, bitolterol, broxaterol, carbuterol, clenbuterol, fenoterol, formoterol, hexoprenaline, ibuterol, isoetharine, isoprenaline, levosalbutamol, mabuterol, meluadrine, metaproterenol, orciprenaline, pirbuterol, procaterol, reproterol, rimiterol, ritodrine, salmefamol, salmeterol, soterenol, sulphonterol, terbutaline, tiaramide, tolubuterol, zinterol, CHF-1035, HOKU-81, KUL-1248 and

3-(4-{6-[2-hydroxy-2-(4-hydroxy-3-hydroxymethyl-phenyl)-ethylamino]-hexyloxy}-butyl)-benzyl-sulphonamide

5-[2-(5,6-diethyl-indan-2-ylamino)-1-hydroxy-ethyl]-8-hydroxy-1H-quinolin-2-one

4-hydroxy-7-[2-{[2-{[3-(2-phenylethoxy)propyl] sulphonyl}ethyl]-amino}ethyl]-2(3H)-benzothiazolone

1-(2-fluoro-4-hydroxyphenyl)-2-[4-(1-benzimidazolyl)-2-methyl-2-butylamino]ethanol

1-[3-(4-methoxybenzyl-amino)-4-hydroxyphenyl]-2-[4-(1-benzimidazolyl)-2-methyl-2-butylamino]ethanol

1-[2H-5-hydroxy-3-oxo-4H-1,4-benzoxazin-8-yl]-2-[3-(4-N,N-dimethylaminophenyl)-2-methyl-2-propylamino] ethanol

1-[2H-5-hydroxy-3-oxo-4H-1,4-benzoxazin-8-yl]-2-[3-(4-methoxyphenyl)-2-methyl-2-propylamino]ethanol

1-[2H-5-hydroxy-3-oxo-4H-1,4-benzoxazin-8-yl]-2-[3-(4-n-butyloxyphenyl)-2-methyl-2-propylamino]ethanol

1-[2H-5-hydroxy-3-oxo-4H-1,4-benzoxazin-8-yl]-2-{4-[3-(4-methoxyphenyl)-1,2,4-triazol-3-yl]-2-methyl-2-butylamino}ethanol

5-hydroxy-8-(1-hydroxy-2-isopropylaminobutyl)-2H-1,4-benzoxazin-3-(4H)-one

1-(4-amino-3-chloro-5-trifluoromethylphenyl)-2-tert.-butylamino)ethanol

6-hydroxy-8-{1-hydroxy-2-[2-(4-methoxy-phenyl)-1,1-dimethyl-ethylamino]-ethyl}-4H-benzo[1,4]oxazin-3-one

6-hydroxy-8-{1-hydroxy-2-[2-(ethyl 4-phenoxy-acetate)-1,1-dimethyl-ethylamino]-ethyl}-4H-benzo[1,4]oxazin-3-one

6-hydroxy-8-{1-hydroxy-2-[2-(4-phenoxy-acetic acid)-1,1-dimethyl-ethylamino]-ethyl}-4H-benzo[1,4]oxazin-3-one

8-{2-[1,1-dimethyl-2-(2,4,6-trimethylphenyl)-ethylamino]-1-hydroxy-ethyl}-6-hydroxy-4H-benzo[1,4]oxazin-3-one

6-hydroxy-8-{1-hydroxy-2-[2-(4-hydroxy-phenyl)-1,1-dimethyl-ethylamino]-ethyl}-4H-benzo[1,4]oxazin-3-one

6-hydroxy-8-{1-hydroxy-2-[2-(4-isopropyl-phenyl)-1.1 dimethyl-ethylamino]-ethyl}-4H-benzo[1,4]oxazin-3-one

8-{2-[2-(4-ethyl-phenyl)-1,1-dimethyl-ethylamino]-1-hydroxy-ethyl}-6-hydroxy-4H-benzo[1,4]oxazin-3-one

8-{2-[2-(4-ethoxy-phenyl)-1,1-dimethyl-ethylamino]-1-hydroxy-ethyl}-6-hydroxy-4H-benzo[1,4]oxazin-3-one

4-(4-{2-[2-hydroxy-2-(6-hydroxy-3-oxo-3,4-dihydro-2H-benzo[1,4]oxazin-8-yl)-ethylamino]-2-methyl-propyl}-phenoxy)-butyric acid

8-{2-[2-(3,4-difluoro-phenyl)-1,1-dimethyl-ethylamino]-1-hydroxy-ethyl}-6-hydroxy-4H-benzo[1,4]oxazin-3-one

1-(4-ethoxy-carbonylamino-3-cyano-5-fluorophenyl)-2-(tert-butylamino)ethanol

2-hydroxy-5-(1-hydroxy-2-{2-[4-(2-hydroxy-2-phenyl-ethylamino)-phenyl]-ethylamino}-ethyl)-benzaldehyde

N-[2-hydroxy-5-(1-hydroxy-2-{2-[4-(2-hydroxy-2-phenyl-ethylamino)-phenyl]-ethylamino}-ethyl)-phenyl]-formamide

8-hydroxy-5-(1-hydroxy-2-{2-[4-(6-methoxy-biphenyl-3-ylamino)-phenyl]-ethylamino}-ethyl)-1H-quinolin-2-one

8-hydroxy-5-[1-hydroxy-2-(6-phenethylamino-hexylamino)-ethyl]-1H-quinolin-2-one

US 8,733,341 B2

**9**

5-[2-(2-{4-[4-(2-amino-2-methyl-propoxy)-phenylamino]-phenyl}-ethylamino)-1-hydroxy-ethyl]-8-hydroxy-1H-quinolin-2-one

[3-(4-{6-[2-hydroxy-2-(4-hydroxy-3-hydroxymethyl-phenyl)-ethylamino]-hexyloxy}-butyl)-5-methyl-phenyl]-urea

4-(2-{6-[2-(2,6-dichloro-benzyloxy)-ethoxy]-hexylamino}-1-hydroxy-ethyl)-2-hydroxymethyl-phenol

3-(4-{6-[2-hydroxy-2-(4-hydroxy-3-hydroxymethyl-phenyl)-ethylamino]-hexyloxy}-butyl)-benzylsulphonamide

3-(3-{7-[2-hydroxy-2-(4-hydroxy-3-hydroxymethyl-phenyl)-ethylamino]-heptyloxy}-propyl)-benzylsulphona-mide

4-(2-{6-[4-(3-cyclopentanesulphonyl-phenyl)-butoxy]-hexylamino}-1-hydroxy-ethyl)-2-hydroxymethyl-phenol

N-adamantan-2-yl-2-(3-{2-[2-hydroxy-2-(4-hydroxy-3-hydroxymethyl-phenyl)-ethylamino]-propyl}-phenyl)-ac-etamide

optionally in the form of the racemates, enantiomers, diaste-reomers thereof and optionally in the form of the pharmaco-logically acceptable acid addition salts, solvates or hydrates thereof. According to the invention the acid addition salts of the betamimetics are preferably selected from among the hydrochloride, hydrobromide, hydriodide, hydrosulphate, hydrophosphate, hydromethanesulphonate, hydronitrate, hydromaleate, hydroacetate, hydrocitrate, hydrofumarate, hydrotartrate, hydroxalate, hydrosuccinate, hydrobenzoate and hydro-p-toluenesulphonate.

The anticholinergics used are preferably compounds selected from among the tiotropium salts, preferably the bro-mide salt, oxitropium salts, preferably the bromide salt, flutropium salts, preferably the bromide salt, ipratropium salts, preferably the bromide salt, glycopyrronium salts, pref-erably the bromide salt, trospium salts, preferably the chlo-ride salt, tolterodine. In the above-mentioned salts the cations are the pharmacologically active constituents. As anions the above-mentioned salts may preferably contain the chloride, bromide, iodide, sulphate, phosphate, methanesulphonate, nitrate, maleate, acetate, citrate, fumarate, tartrate, oxalate, succinate, benzoate or p-toluenesulphonate, while chloride, bromide, iodide, sulphate, methanesulphonate or p-toluene-sulphonate are preferred as counter-ions. Of all the salts the chlorides, bromides, iodides and methanesulphonates are particularly preferred.

Other preferred anticholinergics are selected from among the salts of formula AC-1

AC-1

wherein $X^-$ denotes an anion with a single negative charge, preferably an anion selected from among the fluoride, chlo-ride, bromide, iodide, sulphate, phosphate, methanesulpho-nate, nitrate, maleate, acetate, citrate, fumarate, tartrate, oxalate, succinate, benzoate and p-toluenesulphonate, pref-erably an anion with a single negative charge, particularly

**10**

preferably an anion selected from among the fluoride, chlo-ride, bromide, methanesulphonate and p-toluenesulphonate, particularly preferably bromide, optionally in the form of the racemates, enantiomers or hydrates thereof. Of particular importance are those pharmaceutical combinations which contain the enantiomers of formula AC-1-en

AC-1-en

wherein $X^-$ may have the above-mentioned meanings. Other preferred anticholinergics are selected from the salts of for-mula AC-2

AC-2

wherein R denotes either methyl or ethyl and wherein $X^-$ may have the above-mentioned meanings. In an alternative embodiment the compound of formula AC-2 may also be present in the form of the free base AC-2-base.

AC-2-base

Other specified compounds are:
tropenol 2,2-diphenylpropionate methobromide,
scopine 2,2-diphenylpropionate methobromide,
scopine 2-fluoro-2,2-diphenylacetate methobromide,
tropenol 2-fluoro-2,2-diphenylacetate methobromide;
tropenol 3,3',4,4'-tetrafluorobenzilate methobromide,
scopine 3,3',4,4'-tetrafluorobenzilate methobromide,
tropenol 4,4'-difluorobenzilate methobromide,
scopine 4,4'-difluorobenzilate methobromide,
tropenol 3,3'-difluorobenzilate methobromide,
scopine 3,3'-difluorobenzilate methobromide;

US 8,733,341 B2

11 | 12

tropenol 9-hydroxy-fluorene-9-carboxylate methobromide;

tropenol 9-fluoro-fluorene-9-carboxylate methobromide;

scopine 9-hydroxy-fluorene-9-carboxylate methobromide;

scopine 9-fluoro-fluorene-9-carboxylate methobromide;

tropenol 9-methyl-fluorene-9-carboxylate methobromide;

scopine 9-methyl-fluorene-9-carboxylate methobromide;

cyclopropyltropine benzilate methobromide;

cyclopropyltropine 2,2-diphenylpropionate methobromide;

cyclopropyltropine 9-hydroxy-xanthene-9-carboxylate methobromide;

cyclopropyltropine 9-methyl-fluorene-9-carboxylate methobromide;

cyclopropyltropine 9-methyl-xanthene-9-carboxylate methobromide;

cyclopropyltropine 9-hydroxy-fluorene-9-carboxylate methobromide;

cyclopropyltropine methyl 4,4'-difluorobenzilate methobromide.

tropenol 9-hydroxy-xanthene-9-carboxylate methobromide;

scopine 9-hydroxy-xanthene-9-carboxylate methobromide;

tropenol 9-methyl-xanthene-9-carboxylate methobromide;

scopine 9-methyl-xanthene-9-carboxylate methobromide;

tropenol 9-ethyl-xanthene-9-carboxylate methobromide;

tropenol 9-difluoromethyl-xanthene-9-carboxylate methobromide;

scopine 9-hydroxymethyl-xanthene-9-carboxylate methobromide,

The above-mentioned compounds may also be used as salts within the scope of the pre-sent invention, wherein instead of the methobromide the salts metho-X are used, wherein X may have the meanings given hereinbefore for X⁻.

As corticosteroids it is preferable to use compounds selected from among beclomethasone, betamethasone, budesonide, butixocort, ciclesonide, deflazacort, dexamethasone, etiprednol, flunisolide, fluticasone, loteprednol, mometasone, prednisolone, prednisone, rofleponide, triamcinolone, RPR-106541, NS-126, ST-26 and

(S)-fluoromethyl 6,9-difluoro-17-[(2-furanylcarbonyl)oxy]-11-hydroxy-16-methyl-3-oxo-androsta-1,4-diene-17-carbothionate

(S)-(2-oxo-tetrahydro-furan-3 S-yl)6,9-difluoro-1,1-hydroxy-16-methyl-3-oxo-17-propionyloxy-androsta-1,4-diene-17-carbothionate,

cyanomethyl 6α,9α-difluoro-11β-hydroxy-16α-methyl-3-oxo-17α-(2,2,3,3-tetramethylcyclopropylcarbonyl)oxy-androsta-1,4-diene-17β-carboxylate

optionally in the form of the racemates, enantiomers or diastereomers thereof and optionally in the form of the salts and derivatives thereof, the solvates and/or hydrates thereof. Any reference to steroids includes a reference to any salts or derivatives, hydrates or solvates thereof which may exist. Examples of possible salts and derivatives of the steroids may be: alkali metal salts, such as for example sodium or potassium salts, sulphobenzoates, phosphates, isonicotinates, acetates, dichloroacetates, propionates, dihydrogen phosphates, palmitates, pivalates or furoates.

PDE4-inhibitors which may be used are preferably compounds selected from among enprofyllin, theophyllin, roflumilast, ariflo (cilomilast), tofimilast, pumafentrin, lirimilast, arofyllin, atizoram, D-4418, Bay-198004, BY343, CP-325.366, D-4396 (Sch-351591), AWD-12-281 (GW-842470), NCS-613, CDP-840, D-4418, PD-168787, T-440, T-2585, V-11294A, Cl-1018, CDC-801, CDC-3052, D-22888, YM-58997, Z-15370 and

N-(3,5-dichloro-1-oxo-pyridin-4-yl)-4-difluoromethoxy-3-cyclopropylmethoxybenzamide

(−)p-[(4aR*,10bS*)-9-ethoxy-1,2,3,4,4a,10b-hexahydro-8-methoxy-2-methylbenzo[s][1,6]naphthyridin-6-yl]-N,N-diisopropylbenzamide

(R)-(+)-1-(4-bromobenzyl)-4-[(3-cyclopentyloxy)-4-methoxyphenyl]-2-pyrrolidone

3-(cyclopentyloxy-4-methoxyphenyl)-1-(4-N'-[N-2-cyano-S-methyl-isothioureido]benzyl)-2-pyrrolidone

cis[4-cyano-4-(3-cyclopentyloxy-4-methoxyphenyl)cyclohexane-1-carboxylic acid]

2-carbomethoxy-4-cyano-4-(3-cyclopropylmethoxy-4-difluoromethoxy-phenyl)cyclohexan-1-one

cis[4-cyano-4-(3-cyclopropylmethoxy-4-difluoromethoxyphenyl)cyclohexan-1-ol]

(R)-(+)-ethyl[4-(3-cyclopentyloxy-4-methoxyphenyl)pyrrolidin-2-ylidene]acetate

(S)-(−)-ethyl[4-(3-cyclopentyloxy-4-methoxyphenyl)pyrrolidin-2-ylidene]acetate

9-cyclopentyl-5,6-dihydro-7-ethyl-3-(2-thienyl)-9H-pyrazolo[3,4-c]-1,2,4-triazolo[4,3-a]pyridine

9-cyclopentyl-5,6-dihydro-7-ethyl-3-(tert-butyl)-9H-pyrazolo[3,4-c]-1,2,4-triazolo[4,3-a]pyridine

optionally in the form of the racemates, enantiomers or diastereomers thereof and optionally in the form of the pharmacologically acceptable acid addition salts thereof, the solvates and/or hydrates thereof. According to the invention the acid addition salts of the betamimetics are preferably selected from among the hydrochloride, hydrobromide, hydriodide, hydrosulphate, hydrophosphate, hydromethanesulphonate, hydronitrate, hydromaleate, hydroacetate, hydrocitrate, hydrofumarate, hydrotartrate, hydroxalate, hydrosuccinate, hydrobenzoate and hydro-p-toluenesulphonate.

The LTD4-antagonists used are preferably compounds selected from among montelukast, pranlukast, zafirlukast, MCC-847 (ZD-3523), MN-001, MEN-91507 (LM-1507), VUF-5078, VUF-K-8707, L-733321 and

1-(((R)-(3-(2-(6,7-difluoro-2-quinolinyl)ethenyl)phenyl)-3-(2-(2-hydroxy-2-propyl)phenyl)thio)methylcyclopropane-acetic acid,

1-(((1(R)-3 (3-(2-(2,3-dichlorothieno[3,2-b]pyridin-5-yl)-(E)-ethenyl)phenyl)-3-(2-(1-hydroxy-1-methylethyl)phenyl)propyl)thio)methyl)cyclopropaneacetic acid

[2-[[2-(4-tert-butyl-2-thiazolyl)-5-benzofuranyl]oxymethyl]phenyl]acetic acid

optionally in the form of the racemates, enantiomers or diastereomers thereof and optionally in the form of the pharmacologically acceptable acid addition salts, solvates and/or hydrates thereof. According to the invention the acid addition salts of the betamimetics are preferably selected from among the hydrochloride, hydrobromide, hydroiodide, hydrosulphate, hydrophosphate, hydromethanesulphonate, hydronitrate, hydromaleate, hydroacetate, hydrocitrate, hydrofumarate, hydrotartrate, hydroxalate, hydrosuccinate, hydrobenzoate and hydro-p-toluenesulphonate. By salts or derivatives which the LTD4-antagonists may optionally be capable of forming are meant, for example: alkali metal salts, such as for example sodium or potassium salts, alkaline earth metal salts, sulphobenzoates, phosphates, isonicotinates, acetates, propionates, dihydrogen phosphates, palmitates, pivalates or furoates.

EGFR-inhibitors which may be used are preferably compounds selected from among cetuximab, trastuzumab, ABX-EGF, Mab ICR-62 and

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(morpholin-4-yl)-1-oxo-2-buten-1-yl]-amino}-7-cyclopropylmethoxy-quinazoline

US 8,733,341 B2

**13**

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N,N-diethy-lamino)-1-oxo-2-buten-1-yl]amino}-7-cyclopropyl-methoxy-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N,N-dimethy-lamino)-1-oxo-2-buten-1-yl]amino}-7-cyclopropyl-methoxy-quinazoline

4-[(R)-(1-phenyl-ethyl)amino]-6-{[4-(morpholin-4-yl)-1-oxo-2-buten-1-yl]amino}-7-cyclopentyloxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{[4-((R)-6-methyl-2-oxo-morpholin-4-yl)-1-oxo-2-buten-1-yl]amino}-7-cyclopropylmethoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{[4-((R)-6-methyl-2-oxo-morpholin-4-yl)-1-oxo-2-buten-1-yl]amino}-7-[(S)-(tetrahydrofuran-3-yl)oxy]-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{[4-((R)-2-meth-oxymethyl-6-oxo-morpholin-4-yl)-1-oxo-2-buten-1-yl]amino}-7-cyclopropylmethoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[2-((S)-6-methyl-2-oxo-morpholin-4-yl)-ethoxy]-7-methoxy-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-({4-[N-(2-methoxy-ethyl)-N-methyl-amino]-1-oxo-2-buten-1-yl}amino)-7-cyclopropylmethoxy-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N,N-dimethy-lamino)-1-oxo-2-buten-1-yl]amino}-7-cyclopentyloxy-quinazoline

4-[(R)-(1-phenyl-ethyl)amino]-6-{[4-(N,N-to-(2-methoxy-ethyl)-amino)-1-oxo-2-buten-1-yl]amino}-7-cyclopropy-lmethoxy-quinazoline

4-[(R)-(1-phenyl-ethyl)amino]-6-({4-[N-(2-methoxy-ethyl)-N-ethyl-amino]-1-oxo-2-buten-1-yl}amino)-7-cyclopropylmethoxy-quinazoline

4-[(R)-(1-phenyl-ethyl)amino]-6-({4-[N-(2-methoxy-ethyl)-N-methyl-amino]-1-oxo-2-buten-1-yl}amino)-7-cyclopropylmethoxy-quinazoline

4-[(R)-(1-phenyl-ethyl)amino]-6-({4-[N-(tetrahydropyran-4-yl)-N-methyl-amino]-1-oxo-2-buten-1-yl}amino)-7-cyclopropylmethoxy-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N,N-dimethy-lamino)-1-oxo-2-buten-1-yl]amino}-7-((R)-tetrahydrofu-ran-3-yloxy)-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N,N-dimethy-lamino)-1-oxo-2-buten-1-yl]amino}-7-((S)-tetrahydro furan-3-yloxy)-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-({4-[N-(2-methoxy-ethyl)-N-methyl-amino]-1-oxo-2-buten-1-yl}amino)-7-cyclopentyloxy-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N-cyclopropyl-N-methyl-amino)-1-oxo-2-buten-1-yl]amino}-7-cyclo-pentyloxy-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N,N-dimethy-lamino)-1-oxo-2-buten-1-yl]amino}-7-[(R)-(tetrahydro-furan-2-yl)methoxy]-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N,N-dimethy-lamino)-1-oxo-2-buten-1-yl]amino}-7-[(S)-(tetrahydro-furan-2-yl)methoxy]-quinazoline

4-[(3-ethynyl-phenyl)amino]-6,7-to-(2-methoxy-ethoxy)-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-7-[3-(morpholin-4-yl)-propyloxy]-6-[(vinyl-carbonyl)amino]-quinazoline

4-[(R)-(1-phenyl-ethyl)amino]-6-(4-hydroxy-phenyl)-7H-pyrrolo[2,3-d]pyrimidine

3-cyano-4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(N,N-dimethylamino)-1-oxo-2-buten-1-yl]amino}-7-ethoxy-quinoline

4-{[3-chloro-4-(3-fluoro-benzyloxy)-phenyl]amino}-6-(5-{[(2-methanesulphonyl-ethyl)amino]methyl}-furan-2-yl)quinazoline

**14**

4-[(R)-(1-phenyl-ethyl)amino]-6-{[4-((R)-6-methyl-2-oxo-morpholin-4-yl)-1-oxo-2-buten-1-yl]amino}-7-methoxy-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-{[4-(morpholin-4-yl)-1-oxo-2-buten-1-yl]-amino}-7-[(tetrahydrofuran-2-yl)methoxy]-quinazoline

4-[(3-chloro-4-fluorophenyl)amino]-6-({4-[N,N-to-(2-methoxy-ethyl)-amino]-1-oxo-2-buten-1-yl}amino)-7-[(tetrahydrofuran-2-yl)methoxy]-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-{[4-(5,5-dimethyl-2-oxo-morpholin-4-yl)-1-oxo-2-buten-1-yl]amino}-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[2-(2,2-dimethyl-6-oxo-morpholin-4-yl)-ethoxy]-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[2-(2,2-dimethyl-6-oxo-morpholin-4-yl)-ethoxy]-7-[(R)-(tetrahydrofuran-2-yl)methoxy]-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-7-[2-(2,2-dimethyl-6-oxo-morpholin-4-yl)-ethoxy]-6-[(S)-(tetrahydro furan-2-yl)methoxy]-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{2-[4-(2-oxo-mor-pholin-4-yl)-piperidin-1-yl]-ethoxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[1-(tert.-butyloxy-carbonyl)-piperidin-4-yloxy]-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(trans-4-amino-cy-clohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(trans-4-methane-sulphonylamino-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(tetrahydropyran-3-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-methyl-piperi-din-4-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(morpholin-4-yl)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(methoxym-ethyl)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazo-line

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(piperidin-3-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[1-(2-acetylamino-ethyl)-piperidin-4-yloxy]-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(tetrahydropyran-4-yloxy)-7-ethoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-((S)-tetrahydrofu-ran-3-yloxy)-7-hydroxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(tetrahydropyran-4-yloxy)-7-(2-methoxy-ethoxy)-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{trans-4-[(dimethy-lamino)sulphonylamino]-cyclohexan-1-yloxy]-7-meth-oxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{trans-4-[(morpho-lin-4-yl)carbonylamino]-cyclohexan-1-yloxy}-7-meth-oxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{trans-4-[(morpho-lin-4-yl)sulphonylamino]-cyclohexan-1-yloxy}-7-meth-oxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(tetrahydropyran-4-yloxy)-7-(2-acetylamino-ethoxy)-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(tetrahydropyran-4-yloxy)-7-(2-methanesulphonylamino-ethoxy)-quinazo-line

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(piperidin-1-yl)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-aminocarbonyl-methyl-piperidin-4-yloxy)-7-methoxy-quinazoline

US 8,733,341 B2

15

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(cis-4-{N-[(tetrahydropyran-4-yl)carbonyl]-N-methyl-amino}-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(cis-4-{N-[(morpholin-4-yl)carbonyl]-N-methyl-amino}-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(cis-4-{N-[(morpholin-4-yl)sulphonyl]-N-methyl-amino}-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(trans-4-ethane-sulphonylamino-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-methanesulphonyl-piperidin-4-yloxy)-7-ethoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-methanesulphonyl-piperidin-4-yloxy)-7-(2-methoxy-ethoxy)-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[1-(2-methoxy-acetyl)-piperidin-4-yloxy]-7-(2-methoxy-ethoxy)-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(cis-4-acetylamino-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-[1-(tert.-butyloxycarbonyl)-piperidin-4-yloxy]-7-methoxy-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-(tetrahydropyran-4-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(cis-4-{N-[(piperidin-1-yl)carbonyl]-N-methyl-amino}-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(cis-4-{N-[(4-methyl-piperazin-1-yl)carbonyl]-N-methyl-amino}-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{cis-4-[(morpholin-4-yl)carbonylamino]-cyclohexan-1-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[2-(2-oxopyrrolidin-1-yl)ethyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(morpholin-4-yl)carbonyl]-piperidin-4-yloxy}-7-(2-methoxy-ethoxy)-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-(1-acetyl-piperidin-4-yloxy)-7-methoxy-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-(1-methyl-piperidin-4-yloxy)-7-methoxy-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-(1-methanesulphonyl-piperidin-4-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-methyl-piperidin-4-yloxy)-7(2-methoxy-ethoxy)-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-isopropyloxycarbonyl-piperidin-4-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(cis-4-methylamino-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{cis-4-[N-(2-methoxy-acetyl)-N-methyl-amino]-cyclohexan-1-yloxy}-7-methoxy-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-(piperidin-4-yloxy)-7-methoxy-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-[1-(2-methoxy-acetyl)-piperidin-4-yloxy]-7-methoxy-quinazoline

4-[(3-ethynyl-phenyl)amino]-6-{1-[(morpholin-4-yl)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(cis-2,6-dimethyl-morpholin-4-yl)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

16

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(2-methyl-morpholin-4-yl)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(S,S)-(2-oxa-5-aza-bicyclo[2,2,1]hept-5-yl)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(N-methyl-N-2-methoxyethyl-amino)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-ethyl-piperidin-4-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(2-methoxy-ethyl)carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-{1-[(3-methoxypropyl-amino)-carbonyl]-piperidin-4-yloxy}-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[cis-4-(N-methanesulphonyl-N-methyl-amino)-cyclohexan-1-yloxy]-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[cis-4-(N-acetyl-N-methyl-amino)-cyclohexan-1-yloxy]-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(trans-4-methylamino-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[trans-4-(N-methanesulphonyl-N-methyl-amino)-cyclohexan-1-yloxy]-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(trans-4-dimethylamino-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(trans-4-{N-[(morpholin-4-yl)carbonyl]-N-methyl-amino}-cyclohexan-1-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-[2-(2,2-dimethyl-6-oxo-morpholin-4-yl)-ethoxy]-7-[(S)-(tetrahydro furan-2-yl)methoxy]-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-methanesulphonyl-piperidin-4-yloxy)-7-methoxy-quinazoline

4-[(3-chloro-4-fluoro-phenyl)amino]-6-(1-cyano-piperidin-4-yloxy)-7-methoxy-quinazoline

optionally in the form of the racemates, enantiomers, diastereomers thereof and optionally in the form of the pharmacologically acceptable acid addition salts, solvates or hydrates thereof. According to the invention the acid addition salts of the betamimetics are preferably selected from among the hydrochloride, hydrobromide, hydriodide, hydrosulphate, hydrophosphate, hydromethanesulphonate, hydronitrate, hydromaleate, hydroacetate, hydrocitrate, hydrofumarate, hydrotartrate, hydroxalate, hydrosuccinate, hydrobenzoate and hydro-p-toluenesulphonate.

The dopamine agonists used are preferably compounds selected from among bromocriptin, cabergoline, alpha-dihydroergocryptine, lisuride, pergolide, pramipexol, roxindol, ropinirol, talipexol, tergurid and viozan, optionally in the form of the racemates, enantiomers, diastereomers thereof and optionally in the form of the pharmacologically acceptable acid addition salts, solvates or hydrates thereof. According to the invention the acid addition salts of the betamimetics are preferably selected from among the hydrochloride, hydrobromide, hydriodide, hydrosulphate, hydrophosphate, hydromethanesulphonate, hydronitrate, hydromaleate, hydroacetate, hydrocitrate, hydrofumarate, hydrotartrate, hydrooxalate, hydrosuccinate, hydrobenzoate and hydro-p-toluenesulphonate.

H1-Antihistamines which may be used are preferably compounds selected from among epinastine, cetirizine, azelastine, fexofenadine, levocabastine, loratadine, mizolastine,

US 8,733,341 B2

17

ketotifen, emedastine, dimetindene, clemastine, bamipine, cexchlorpheniramine, pheniramine, doxylamine, chlorophenoxamine, dimenhydrinate, diphenhydramine, promethazine, ebastine, desloratidine and meclozine, optionally in the form of the racemates, enantiomers, diastereomers thereof and optionally in the form of the pharmacologically acceptable acid addition salts, solvates or hydrates thereof. According to the invention the acid addition salts of the betamimetics are preferably selected from among the hydrochloride, hydrobromide, hydriodide, hydrosulphate, hydrophosphate, hydromethanesulphonate, hydronitrate, hydromaleate, hydroacetate, hydrocitrate, hydrofumarate, hydrotartrate, hydroxalate, hydrosuccinate, hydrobenzoate and hydro-p-toluenesulphonate.

It is also possible to use inhalable macromolecules as disclosed in EP 1 003 478 A1 or CA 2297174 A1.

In addition, the compound may come from the groups of ergot alkaloid derivatives, the triptans, the CGRP-inhibitors, the phosphodiesterase-V inhibitors, optionally in the form of the racemates, enantiomers or diastereomers thereof, optionally in the form of the pharmacologically acceptable acid addition salts, the solvates and/or hydrates thereof.

Examples of ergot alkaloid derivatives are dihydroergotamine and ergotamine.

### LIST OF REFERENCE NUMERALS

1 atomizer
2 fluid
3 container
4 fluid chamber
5 pressure generator
6 holder
7 drive spring
8 locking element
9 conveying tube
10 non-return valve
11 pressure chamber
12 nozzle
13 mouthpiece
14 aerosol
15 air inlet opening
16 upper housing part
17 inner part
17a upper part of the inner part
17b lower part of the inner part
18 housing part (lower part)
19 holding element
20 gear
21 sliding surface
22 sliding surface
23 button
H main movement
S tensioning movement
d stroke

The invention claimed is:

1. An atomizer (1) for a fluid (2), comprising:
a fluid reservoir in the form of a container (3);
a nozzle (12) for the delivery and atomization of the fluid (2), wherein the fluid (2) is delivered in metered individual full-doses; and
a conveying element in the form of a conveying tube (9), which is movable for conveying the fluid, which is movable: (i) in a preliminary movement to a tensioning position for delivering a preliminary amount of the fluid, and thereafter (ii) in a main movement for delivering a full-dose for actual delivery and atomization of the fluid (2),

18

wherein the conveying element is movable counter to a spring force by at least one of: (i) a gear (20), and (ii) manual actuation of the atomizer (1) into an over-tensioning position from which the conveying element is moved by spring force into the tensioning position,
wherein the preliminary amount of fluid (2), which is substantially less than a metered individual full-dose, rinses the nozzle (12) and is delivered before delivery of each metered individual full-dose or on each tensioning of the atomizer (1).

2. The atomizer according to claim 1, wherein the preliminary amount is between 0.5 to 3.0 microliters.

3. The atomizer according to claim 1, wherein the preliminary amount is one of: (i) between 1 to 10 percent of an amount of each full-dose and (ii) at least five times a volume of the nozzle (12).

4. The atomizer according to claim 1, wherein the preliminary movement and main movement are carried out exclusively by spring force.

5. The atomizer according to claim 1, wherein a stroke (d) of the preliminary movement is 0.2 to 1 millimeters.

6. The atomizer according to claim 1, wherein the atomizer (1) has a locking element (8) which in a locking position secures the conveying element directly or indirectly in the tensioning position and can be moved manually out of the locking position in order to release the conveying element.

7. The atomizer according to claim 1, wherein the atomizer (1) contains a fluid (2) that contains a solvent.

8. The atomizer according to claim 1, wherein the atomizer (1) contains an inhalable formulation or a medicament in the form of a fluid (2), selected from anticholinergics, betamimetics, steroids, phosphodiesterase IV-inhibitors, LTD4-antagonists and EGFR-kinase-inhibitors, antiallergics, ergot alkaloid derivatives, triptans, CGRP-antagonists, phosphodiesterase-V-inhibitors, and any combination of each of the foregoing.

9. The atomizer according to claim 1, wherein the atomizer (1) is constructed as a portable inhaler for medicinal aerosol therapy.

10. The atomizer according to claim 1, wherein the fluid includes a medicament selected from anticholinergics, betamimetics, steroids, phosphodiesterase IV-inhibitors, LTD4-antagonists and EGFR-kinase-inhibitors, antiallergics, ergot alkaloid derivatives, triptans, CGRP-antagonists, phosphodiesterase-V-inhibitors, and any combination of each of the foregoing.

11. A method for delivering and atomizing fluid (2), which is delivered in individual, metered full-doses through a nozzle (12), the method comprising:
moving a conveying element in the form of a conveying tube (9) for conveying the fluid in a preliminary movement to a tensioning position for delivering a preliminary amount of the fluid; and
thereafter moving the conveying element in a main movement for delivering an individual metered full-dose for actual delivery and atomization of the fluid (2), wherein the conveying element is movable counter to a spring force into an over-tensioning position, and from which the conveying element is moved by spring force into the tensioning position, and
wherein the preliminary amount of fluid (2) is substantially less than the individual metered full-dose, and rinses the nozzle (12) before delivery of each individual metered full-dose or on each tensioning of the atomizer (1).

12. The method according to claim 11, wherein the preliminary amount is between 0.5 and 3.0 microliters.

US 8,733,341 B2

19

20

**13**. The method according to claim **11**, wherein the preliminary amount is between 1 to 10 percent of the amount of the full-dose.

**14**. The method according to claim **11**, wherein the preliminary movement and main movement are carried out exclusively by spring force.

**15**. The method according to claim **11**, wherein a stroke (d) of the preliminary movement is 0.2 to 1 millimeters.

**16**. The method according to claim **11**, wherein the conveying element is released in the tensioning position by manual operation of a locking element (**8**).

\*   \*   \*   \*   \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.           : 8,733,341 B2                                    Page 1 of 1
APPLICATION NO.      : 12/299650
DATED                : May 27, 2014
INVENTOR(S)          : Boeck et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b)
by 1279 days.

Signed and Sealed this
Twenty-fifth Day of August, 2015

Michelle K. Lee
*Director of the United States Patent and Trademark Office*